BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
ANNE M. LORADITCH, ESQ.
Nevada Bar No. 8164
MICAELA RUSTIA, ESQ.
Nevada Bar No. 9676
**FOX ROTHSCHILD LLP**
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
　　　　aloraditch@foxrothschild.com
　　　　mrustia@foxrothschild.com

*[Proposed] Counsel for Whitton Corporation*

Electronically Filed December 16, 2010

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re

WHITTON CORPORATION,
a Nevada corporation,

　　　　　　　　　　Debtor.

Case No.: BK-S-10-32680-BAM

Chapter 11

**OMNIBUS DECLARATION OF TOM E. HALLETT FILED IN SUPPORT OF FIRST DAY MOTIONS**

Hearing Date:  OST PENDING
Hearing Time:  OST PENDING

TOM E. HALLETT, being duly sworn, hereby deposes and declares under penalty of perjury:

1.　I am over the age of 18, am mentally competent, and if called upon to testify as to the statements made herein, could and would do so.

2.　I am the president and sole director of Whitton Corporation (the "Debtor" or "Whitton"). Except as otherwise limited herein, I make the following statements based upon my personal knowledge, belief and where applicable, upon the business records of Debtor in support of the motions filed by Debtor in the above-captioned chapter 11 bankruptcy case. All statements below referencing or describing, individually or collectively, the Secured Lenders

VG1 61528v2 12/16/10　　　　　　　　　　1

(defined below) and are qualified in their entirety by the terms and conditions of the applicable loan documents. All statements below referencing valuations and financial projections of Debtor's properties are based on Debtor's books and records and upon the advice of Province Real Estate Advisors, LLC ("Province"), Debtor's proposed financial advisors. All statements containing legal conclusions herein are based on advice of Debtor's proposed counsel.

3. On December 5, 2010 (the "Petition Date"), Whitton filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Nevada (the "Court"); thereby initiating Whitton's chapter 11 proceeding (the "Chapter 11 Case").[1] The following is a summary of Debtor's capital structures, history, operations, events leading to the Chapter 11 Case, and the relief requested by Debtor's "first day" motions.

**A.    Debtor's History and Business Operations**

4. I founded Whitton (f/k/a South Tech, LLC) in 1995 as a full service commercial real estate enterprise encompassing sales and leasing, marketing, design, estimating, and general contracting. I have over forty years of broad experience and advancement in general management, real estate development, real estate investment and analysis. I am a lifelong business owner and entrepreneur in a variety of ventures.

5. Debtor's property portfolio consists of twelve high quality properties located in Las Vegas, Henderson, North Las Vegas, and Reno/Sparks, Nevada. Debtor's property portfolio offers a blended property type consisting of office, warehouse, and light industrial space. Seventy-five percent of the portfolio consists of concrete tilt-up structures, with the balance being block, metal, or wood construction. The average age of the portfolio properties is twelve years, with many buildings constructed in the mid-2000s.

6. Debtor's business strategy has been to differentiate itself from its competition by providing a vertically integrated ownership, management, leasing and maintenance business

---

[1] I was informed and believed that the property owned by South Tech Simmons 3040C, LLC ("Simmons") was foreclosed in November, 2010. After learning that the foreclosure sale had not been conducted, Simmons filed its chapter 11 bankruptcy case in this court on December 8, 2010, case number 10-32857-BAM.

VG1 61528v2 12/16/10                                            2

1  catering to primarily the light industrial tenant. Whitton's marketing efforts focus on eliminating a tenant's issues in dealing with third-party property managers, maintenance crews, leasing agents, and construction/maintenance contractors.

7. Debtor's current financial crisis is illustrated by its proposed financial advisors' most recent consolidated income projections for 2011. Based on current occupancy rates, Debtor expects to generate $3.9 million in annual revenue for 2011. Less bad rents and bad common area maintenance recoveries, Debtor's net annual revenue is projected to be reduced by $500,000 to $3.4 million. After accounting for Debtors' estimated common area maintenance and occupancy expenses of $2.0 million, Debtor's projected net operating income before administrative expenses is $1.3 million while its debt service as currently structured is approximately $3.2 million.

8. Debtor's financial crisis has been amplified by the fact that court ordered receivers have been appointed for nine of Debtor's properties thereby depriving Debtor of all cash flow generated by those properties and causing further deterioration in occupancy.

**B.  Debtor's Capital Structure**

9. Whitton is a corporation formed under the laws of the state of Nevada on December 7, 1995. Effective December 3, 2010, the following former subsidiaries and affiliates of Whitton (each an "Affiliate" and collectively, the "Affiliates"), merged (the "Merger") with Whitton: (i) South Tech Construction Corp.; (ii) South Tech Real Estate Services, LLC; (iii) TEH Investments, LLC; (iv) Desert Pacific Properties, LLC; (v) South Tech – Russell, LLC; (vi) South Tech Polaris, LLC; (vii) South Tech – Annie Oakley, LLC; (viii) South Tech – Seven Hills, LLC; (ix) South Tech – Diablo, LLC; (x) South Tech Partners, LLC; (xi) South Tech – Cheyenne West 2455A, LLC; (xii) South Tech – Glendale 155; (xiii) South Tech – Greg; (xiv) South Tech – Brooks 2750K, LLC; (xv) South Tech – Cheyenne 2475, LLC; (xvi) South Tech – Rio, LLC; (xvii) South Tech – Dean Martin 7625, LLC; and (xviii) South Tech – Stephanie 1000. After the Merger, Whitton was the surviving entity and successor-in-interest, assuming the operations, assets, and liabilities of the Affiliates. An organizational chart including information about the properties and the secured lenders is attached hereto as **Exhibit 1**.

10. Prior to the Merger, each Affiliate was an operating entity under Whitton's corporate umbrella. The Merger was consummated to consolidate Whitton's operations as well as simplify the enterprise's balance sheet for purposes of its reorganization and deleveraging through the bankruptcy process.

11. As of the Petition Date, Debtor's balance sheet was highly leveraged with a total of twelve outstanding secured loans (each a "Loan" and collectively, the "Loans") from five separate secured creditors (collectively, the "Secured Lenders"). Each of the Loans is secured by one of Debtor's twelve commercial properties, which are located in Las Vegas, Henderson, North Las Vegas, and Reno/Sparks, Nevada. Prior to the Merger, each of the commercial properties was owned by an operating Affiliate under the Whitton corporate umbrella. Now, each is owned and operated by Whitton and reported on Whitton's balance sheet.

12. In the aggregate, as of today, Debtor owns over 485,000 square feet of office, retail, light industrial, warehouse, or flexible use real estate of which approximately 69% is occupied. The total purchase price paid for all properties was approximately $64.2 million with approximately $25 million of initial equity and $39.2 financed through secured debt. Finally, Debtor estimates approximately $37.2 of its secured debt principal is outstanding.

13. The recent downturn in Nevada's real estate market caused Debtor's debt-to-equity ratio to increase to approximately 2:1, creating an untenable debt load for the company. Further, failure to service any of its secured debt caused Debtor to default on all Loans, and nine properties have been forced into receiverships.

14. A description of each of Debtor's twelve operating properties, including their size, use, occupancy rate, purchase price, and a summary of their financing information is set forth below:

    a) "Annie Oakley" (f/k/a South Tech – Annie Oakley, LLC) - 26,941 square feet of office and flexible use space located at Sunset Road and Annie Oakley Drive in Las Vegas, Nevada. The current occupancy rate is approximately 66%. Annie Oakley was purchased in January 2008 for $7.275 million. Of the original purchase price, $4 million was financed through a loan secured by a deed of trust currently held by Bank of America, NA ("B of A"). Debtor's books and records indicate an outstanding loan balance of approximately

$3.6 million. While no receiver had been appointed, B of A filed a complaint seeking the appointment of a receiver on November 11, 2010.

b) "Brooks" (f/k/a South Tech – Brooks 2750K, LLC) - 28,710 square feet of light industrial space located at N. Simmons Street and W. Cheyenne Avenue in Las Vegas, Nevada. The current occupancy rate is approximately 52%. Brooks was purchased in August 2005 for $3 million. Of the original purchase price, $2.1 million was financed through a loan secured by a deed of trust currently held by German American Capital Corp. ("German American"). Debtor's books and records indicate an outstanding loan balance of approximately $2.02 million. There is a court appointed receiver in possession of this property.

c) "Cheyenne 2455" (f/k/a South Tech – Cheyenne West 2455A, LLC) - 27,363 square feet of office space located at N. Simmons Street and W. Cheyenne Avenue in Las Vegas, Nevada. The current occupancy rate is approximately 100%. Cheyenne 2455 was purchased in August 2005 for $4.756 million. Of the original purchase price, approximately $2.96 million financed through a secured loan secured by a deed of trust is currently held by LSREF2 NOVA Investments, LLC ("LSREF2").[2] Debtor's books and records indicate an outstanding loan balance of approximately $2.8 million. There is a court appointed receiver in possession of this property.

d) "Cheyenne 2475" (f/k/a South Tech – Cheyenne 2475, LLC) - 27,196 square feet of flexible use and light industrial space located at 2475 W. Cheyenne Avenue in Las Vegas, Nevada. The current occupancy rate is approximately 70%. Cheyenne 2475 was purchased in August 2005 for $3.3456 million. Of the original purchase price, $2.74 million was financed through a secured loan secured by a deed of trust currently held by The Bank of Las Vegas ("BLV").

e) "Dean Martin 7625" (f/k/a South Tech – Dean Martin 7625, LLC) - 14,524 square feet of office space located at S. Dean Martin Drive and W. Warm Springs Road in Las Vegas, Nevada. The current occupancy rate is approximately 7%. Dean Martin 7625 was purchased in April 2006 for $3.525 million. Of the original purchase price, $2.1 million was financed through a secured loan secured by a deed of trust currently held by LSREF2. Debtor's books and records indicate an outstanding loan balance of approximately $2 million. There is a court appointed receiver in possession of this property.

f) "Diablo" (f/k/a South Tech – Diablo, LLC) - 33,724 square feet of flexible use and light industrial space located at W. Russell Road and S. Valley View Boulevard in Las Vegas, Nevada. The current occupancy rate is approximately 83%. Diablo was purchased in March 2000 for $2.8 million. Of

---

[2] The previous beneficiaries on the deed of trust for the following properties were Citibank (West) FSB and Citibank, NA ("Citibank"), successor-by-merger to Citibank (West) FSB: Cheyenne 2455; Dean Martin 7625; Diablo; Russell; and, allegedly, Stephanie.

the original purchase price, $2.4 million was financed through a secured loan secured by a deed of trust currently held by LSREF2. Debtor's books and records indicate an outstanding loan balance of approximately $2.18 million. There is a court appointed receiver in possession of this property.

      g)      "Glendale" (f/k/a South Tech – Glendale 155) - 57,679 square feet of flexible use, light industrial, and warehouse space located at E. Glendale Avenue and S. Stanford Way in Sparks, Nevada. The current occupancy rate is approximately 59%. Glendale was purchased in December 2005 for $5.01 million. Of the original purchase price, $2.6 million was financed through a loan secured by a deed of trust currently held by German American. Debtor's books and records indicate an outstanding loan balance of approximately $2.48 million. There is a court appointed receiver in possession of this property.

      h)      "Greg" (f/k/a South Tech – Greg) - 69,236 square feet of flexible use, light industrial, and warehouse space located at Glendale Avenue and Industrial Way in Sparks, Nevada. The current occupancy rate is approximately 60%. Greg was purchased in December 2005 for $4.675 million. Of the original purchase price, $3.5 million was financed through a loan secured by a deed of trust currently held by German American. Debtor's books and records indicate an outstanding loan balance of approximately $3.3 million. There is a court appointed receiver in possession of this property.

      i)      "Kleppe" (f/k/a South Tech – Kleppe, LLC) - 80,515 square feet of office, light industrial, and warehouse space located at Kleppe Lane and Deming Way in Sparks, Nevada. The current occupancy rate is approximately 49%. Kleppe was purchased in January 2006 for $5.17 million. Of the original purchase price, $2.9 million was financed through a secured loan secured by a deed of trust currently held by US Bank, NA ("US Bank"). Debtor's books and records indicate an outstanding loan balance of approximately $2.67 million.

      j)      "Russell" (f/k/a South Tech – Russell, LLC) – 32,757 square feet of office, warehouse, and flexible use space located at W. Russell Road and S. Valley View Boulevard in Las Vegas, Nevada. The current occupancy rate is approximately 100%. Russell was purchased in May 1998 for $2.6 million. Of the original purchase price, $2 million financed through a secured loan secured by a deed of trust currently held by LSREF2. Debtor's books and records indicate an outstanding loan balance of approximately $1.8 million. There is a court appointed receiver in possession of this property.

      k)      "Seven Hills" (f/k/a South Tech – Seven Hills, LLC) - 26,399 square feet of retail space located at 7 Hills Drive and W. Horizon Ridge Parkway in Henderson, Nevada. The current occupancy rate is approximately 70%. Seven Hills was purchased in February 2008 for $16 million. Of the original purchase price, $8 million was financed through a secured loan secured by a deed of trust currently held by LSREF2. Debtor's books and records indicate an outstanding loan balance of approximately $8 million. There is a court appointed receiver in possession of this property.

l)    "Stephanie" (f/k/a South Tech – Stephanie) - 60,360 square feet of light industrial and warehouse space located at Stephanie Lane and Patrick Place in Henderson, Nevada.  The current occupancy rate is approximately 100%.  Stephanie was purchased in April 2006 for $6.1 million.  Of the original purchase price, $3.9 million was financed through a secured loan secured by a deed of trust currently held by LSREF2.  Debtor's books and records indicate an outstanding loan balance of approximately $3.67 million.  There is a court appointed receiver in possession of this property.

15.    In addition to the secured loans used to finance each of Whitton's portfolio properties, on December 3, 2010, Whitton entered into a secured loan agreement (the "Bridge Loan") with Umbra Partners, LLC ("Umbra") in order to obtain necessary financing to cover certain of the expenses related to the Chapter 11 Case.  Umbra provided $300,000 in financing in exchange for (i) that certain convertible secured promissory note dated December 3, 2010 (the "Umbra Note"); (ii) a Short Form Deed of Trust and Assignment of Rents encumbering certain real property commonly known as Clark County, Nevada Assessor Parcel Number 139-17-510-032; (iii) Short Form Deed of Trust and Assignment of Rents encumbering certain real property commonly known as Clark County, Nevada Assessor Parcel Numbers 139-17-510-042 and 139-17-510-043 (collectively, the "Umbra Collateral"); and (iv) the right of first refusal to provide debtor-in-possession financing for the Chapter 11 Case.  Prior to the Bridge Loan, the Umbra Collateral was unencumbered and the proceeds of the loan are only being used to fund certain expenses related to the Chapter 11 Case.  Debtor's financial advisors value this property at $300,000 based on comparable sales transactions.

16.    On December 3, 2010, BLV and Whitton entered into a restructuring and lock-up agreement (the "Lock-Up Agreement") whereby BLV agree to support Whitton's plan of reorganization in the Chapter 11 Case, provided that Whitton adheres to the milestones set forth in the Lock-Up Agreement and successfully confirms a plan of reorganization that conforms to the restructuring plan term sheet attached as Exhibit A to the Lock-Up Agreement.  A copy of the Lock-Up Agreement is attached hereto as **Exhibit 2**.

///

///

VG1 61528v2 12/16/10                    7

**C.   Events Leading to Bankruptcy**

    **1.   Market Conditions**

17.   The current global financial crisis has had a particularly grave impact on the Nevada real estate market. As a result, Debtor's operations have been severely impacted by this challenging economic environment. Vacancy rates and uncollectable accounts have risen dramatically within the company's real estate portfolio, which has constricted cash flow. This cash flow restriction has negatively impacted Debtor's ability to service the Loans.

    **2.   Loan Defaults and The Appointment of Receivers**

18.   After the appointment of the receivers to the Brooks, Cheyenne 2455, Dean Martin 7625, Diablo, Glendale, Greg, Russell, Seven Hills, and Stephanie portfolio properties, Debtor suffered a severe blow to its operating cash flow. Further, foreclosure sales have been scheduled and noticed for seven of the properties currently in receivership.

19.   In addition to the deleveraging of Debtor's balance sheet, the impending sale of the majority of Debtor's portfolio properties precipitated the commencement of the Chapter 11 Case. Prepetition, Debtor's financial advisors and Debtor received expressions of interest from three potential "white knights" in investing in Debtor.

**D.   Emergency Motion for Order Directing Joint Administration of Related Cases Pursuant to Bankruptcy Rule 1015(b)**

20.   Through their own respective motions, Whitton and its affiliate, Simmons, each request joint administration of their cases with respect to purely administrative matters only, including a joint pleadings docket, a joint pleadings caption, and combined notices to creditors. Whitton does not request substantive consolidation of the Whitton and Simmons estates at this time.

21.   Joint administration clearly is warranted in the Whitton and Simmons bankruptcy cases because of the following facts:

    a.   Whitton and Simmons are affiliates, as that term is defined in Section 101(2)(B) of the Bankruptcy Code. Whitton is the sole member of

Simmons, and Tom Hallett is the sole manager of Simmons. Tom Hallett is also president of Whitton;

     b.     Whitton and Simmons share the same management;

     c.     There is overlap in the creditor bodies of Whitton and Simmons. Joint administration will avoid otherwise unnecessary and expensive duplication of effort and papers caused by preparing and serving the same creditors with sets of differently captioned but otherwise identical papers; and

     d.     It is likely that numerous motions filed in the Whitton and Simmons cases will concern both Whitton and Simmons. Again, joint administration will avoid unnecessary and expensive duplication of effort and papers caused by preparing the same motion with different captions.

22.     Whitton does not believe that an actual conflict will arise between the estates of Whitton and Simmons.

**F.     Motion Pursuant to 11 U.S.C. § 521, Fed. R. Bankr. P. 1007 and Local Rule 1007 for Order Extending Time to File Schedules and Statement for <u>Financial Affairs</u>**

23.     Debtor requests an extension of the 14-day period to file the schedules and statement of financial affairs ("<u>Statements and SOFA</u>") by, at least, an additional 30-day period without prejudice to Debtor's ability to request additional time should it become necessary.

24.     On the Petition Date, Debtor filed with this Court a list of creditors holding the twenty largest unsecured claims against Debtor's estate. Due to the large number of pressing matters present in the early stages of this Chapter 11 Case, Debtor anticipates that it will be unable to complete the Schedules and SOFA in the 14-day time period established under Bankruptcy Rule 1007(c).

25.     To prepare its Schedules and SOFA, Debtor must compile financial information from books, records, and documents relating to its assets, contracts and claims of creditors, much of which is in the possession of prepetition state court appointed receivers. This information is voluminous and assembling the necessary information requires a significant expenditure of time

and effort on the part of Debtor and its employees. While Debtor, with the help of professional advisors, is working diligently and expeditiously on the preparation of the Schedules and SOFA, resources are limited.

26. Debtor, with the aid of its professional advisors, has participated in extensive negotiations with certain of Debtor's secured lenders and with potential new capital providers, which successfully resulted in the out-of-court resolution of two commercial property loans and the consummation of a new prepetition loan that funded the preparation and filing of Debtor's chapter 11 bankruptcy proceeding. Additionally, such prepetition lender and other capital sources are in the process of completing their due diligence with Debtor and its professional advisors' assistance, with a goal to provide the emergence financing for Debtor.

27. In view of the extensive negotiations with certain of Debtor's secured lenders and potential new capital providers, the amount of work entailed in completing the Schedules and SOFA and the competing demands upon Debtor's employees and professionals during the initial postpetition period, Debtor will not be able to properly and accurately complete the Schedules and SOFA within the 14-day time period established under Bankruptcy Rule 1007(c). Debtor anticipates that its early efforts at negotiating with secured lenders and potential new capital providers will lead to favorable results for its creditors as the bankruptcy progresses, notwithstanding that these efforts will make it impossible to timely complete the Schedules and SOFA. In any event, creditors and other parties in interest will not be harmed by the proposed extension of the filing deadline because, even under the extended deadline, the Schedules and SOFA would be filed in advance of any bar date or other significant event in this Chapter 11 Case.

28. Accordingly, Debtor submits that, based upon the amount of information that must be assembled and compiled, the limited resources available and the other more pressing items that must be addressed at the inception of this Chapter 11 Case, good and sufficient cause exists for granting the requested extension of time. At present, Debtor anticipates that it will require at least an additional thirty days to complete the Schedules and SOFA. Debtor, therefore,

requests that the Court extend the filing period to and including January 20, 2011, without prejudice to Debtor's ability to request additional time should it become necessary.

   **G. Application for Order Authorizing Employment and Retention of Fox Rothschild LLP as Debtor's Reorganization Counsel Effective as of the Petition Date**

   29. Debtor wishes to employ Fox Rothschild LLP ("Fox Rothschild") as its attorneys. Debtor selected Fox Rothschild for the reason that such firm has considerable experience in reorganization matters and is qualified to represent Debtor in this Chapter 11 Case.

   30. Fox Rothschild was retained by Debtor prior to the Petition Date.

   31. In connection with Fox Rothschild's representation of Debtor, I, as president of Debtor, provided Fox Rothschild with $75,000, for the benefit of Debtor, as a retainer for an analysis of a potential bankruptcy filing and negotiation with Debtor's lenders. Fox Rothschild is under no obligation whatsoever to repay me for any of the retainer made for the benefit of Debtor. In connection with my funding of the retainers and the restructuring and Chapter 11 bankruptcy case of Debtor, I have acknowledged and confirmed that (a) Fox Rothschild is counsel for Debtor, (b) Fox Rothschild has not and is not acting as counsel for me, (c) I have been provided with the opportunity to seek the advice of my own counsel, (d) I have not relied on any statements or opinions made by Fox Rothschild, (e) there is no attorney-client relationship between me and Fox Rothschild, (f) Fox Rothschild's undivided loyalty is owed exclusively to Debtor, and (g) any actual or potential conflicts of interest between me and Fox Rothschild have consensually been waived.

   32. Fox Rothschild also received a disbursement, for the benefit of Debtor, in the amount of $150,000. The disbursement was part of proceeds of a loan from Umbra Partners, LLC ("Umbra Partners"), to Debtor. Debtor instructed Umbra Partners to disburse $150,000 to Fox Rothschild as a retainer for Chapter 11 bankruptcy restructuring services for Debtor's benefit. The $150,000 disbursement was made from the bank account of South Providence Holdings, LLC, an affiliate of Umbra Partners. Fox Rothschild is under no obligation whatsoever to repay Umbra Partners, or any of its affiliates, any of the amounts Fox Rothschild received as a disbursement from the loan proceeds, which was made for Debtor's benefit. In

1  connection with Debtor's loan from Umbra Partners and Debtor's Chapter 11 bankruptcy, both
2  Debtor and Umbra Partners have acknowledged and confirmed that (a) Fox Rothschild has not
3  and is not acting as counsel for Umbra Partners, (b) Umbra Partners is represented by its own
4  counsel, (c) Umbra Partners has not relied on any statements or opinions made by Fox
5  Rothschild, (d) Fox Rothschild's undivided loyalty is owed exclusively to Debtor, (e) there is no
6  attorney-client relationship between Umbra Partners and Fox Rothschild, and (f) any actual or
7  potential conflicts of interest between the parties have consensually been waived.

8       33.    Debtor believes that the appointment of Fox Rothschild as Debtor's general
9  bankruptcy and reorganization counsel is in the best interest of Debtor and its estate.

10       34.    Debtor seeks an order pursuant to Bankruptcy Code sections 327(a) and 329, and
11  Bankruptcy Rules 2014(a), 2016 and 5002, and Local Rule 2014 authorizing the employment
12  and retention of Fox Rothschild as general bankruptcy and reorganization counsel to Debtor for
13  the purpose of prosecution of this Chapter 11 Case, as described below, effective as of the
14  Petition Date, in accordance with Fox Rothschild's normal hourly rates and reimbursement
15  policies.

16       35.    Debtor has selected Fox Rothschild as its general bankruptcy and reorganization
17  counsel because of Fox Rothschild's extensive experience and knowledge in the field of debtors'
18  and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code and
19  familiarity with the facts and circumstances surrounding this case. As such, Fox Rothschild is
20  uniquely qualified to represent Debtor's interests with respect to Debtor's businesses and
21  financial affairs and the potential legal issues that may arise in this case.

22       36.    Debtor believes that Fox Rothschild is both well qualified and able to represent it
23  in this case in an efficient and timely manner and that such representation is in the best interests
24  of Debtor, its estate, and its constituents.

25       37.    Debtor seeks Court approval to retain Fox Rothschild, at the expense of Debtor's
26  estate, to provide the legal services described herein that will be required to represent Debtor as
27  in this case.
28

38. The professional services that Fox Rothschild will render to Debtor may include, but shall not be limited to, the following:

    a. Advising Debtor of its rights and obligations and performance of its duties during administration of this Bankruptcy Case.

    b. Attending meetings and negotiations with other parties-in-interest in this Chapter 11 Case.

    c. Taking all necessary action to protect and preserve Debtor's estate including: the prosecution of actions, the defense of any actions taken against Debtor, negotiations concerning all litigation in which Debtor is involved, and objecting to claims filed against the estate which are believed to be inaccurate.

    d. Negotiating and preparing a plan of reorganization, disclosure statement and papers and preparing for and attending court hearings related thereto.

    e. Representing Debtor in all proceedings before this Court or other courts of jurisdiction over this case; including, preparing and/or reviewing all motions, answers and orders necessary to protect the interests of Debtor.

    f. Assisting Debtor in developing legal positions and strategies with respect to all facets of these proceedings.

    g. Preparing on behalf of Debtor necessary applications, motions, answers, orders and other documents; and

    h. All other legal services for Debtor, as may be necessary.

39. Subject to the Court's approval under Bankruptcy Code sections 330(a) and 331, compensation to Fox Rothschild will be payable from Debtor's estate, which shall be liable for such compensation, on an hourly basis, plus reimbursement of actual, necessary expenses and other charges incurred by the Firm.

      **H.**      **Application for an Order Pursuant to Sections 327, 328, 1107 and 1108 of the Bankruptcy Code, Bankruptcy Rule 2014 and Local Rule 2014 Authorizing the Employment and Retention of Province Real Estate Advisors, LLC, as <u>Financial Advisor to Debtor, Effective as of the Petition Date</u>**

      40.      Debtor has determined that it requires financial advisory services. On October 15, 2010, Debtor duly selected and engaged Province to provide such financial and restructuring advisory services. On December 5, 2010, Debtor entered into a new engagement letter with Province that provided for expanded financial advisory services.

      41.      Debtor submits that it is necessary to employ Province as its financial advisors in order to ensure that the interests of Debtor are adequately represented in an efficient and effective manner. Debtor believes that, in light of Province's involvement in corporate restructuring in many similar matters and the provision of prepetition services to Debtor, Province is best suited to continue to provide financial and restructuring advisory services to Debtor, and Debtor will rely on Province in that regard.

      42.      Debtor respectfully requests entry of an order authorizing and approving Debtor's employment and retention of Province to perform the financial advisory services set forth in the engagement letter dated December 5, 2010 (the "<u>Province Engagement Agreement</u>"), effective as of the Petition Date. A true and correct copy of the Province Engagement Agreement is attached hereto as **Exhibit 3**.

      43.      Debtor selected Province because of its excellent qualifications and its reasonable fee structure.

      44.      In providing prepetition services to Debtor in connection with this matter, Province's professionals have worked closely with Debtor's management and other professionals and have become well-acquainted with Debtor's operations, debt structure, creditors, businesses and operations, and other related matters. Province has developed significant relevant experience and expertise regarding Debtor that will assist it in providing effective and efficient services in this Chapter 11 case.

      45.      Province has acted as a liaison between Debtor and its secured and unsecured creditors, participating in numerous discussions with parties in interest to drive consensus and

effectuate a reorganization plan. Specifically, Province's professionals participated in extensive negotiations with Debtor, certain of Debtor's secured lenders and with potential new capital providers, which successfully resulted in the out of court resolution of two commercial property loans, and the consummation of a new prepetition loan that funded the preparation and filing of Debtor's chapter 11 bankruptcy proceeding. Additionally, such prepetition lender and other capital sources are in the process of completing their due diligence with Province's assistance with a goal to provide the emergence financing for Debtor.

46. Province, in its capacity as financial advisor, advised Debtor with respect to all of the documentation necessary for an early Chapter 11 filing and a seamless transition into bankruptcy. Province's prepetition involvement has provided Debtor with continuity throughout the Chapter 11 process.

47. Since October 15, 2010, Province has assisted Debtor in connection with its restructuring efforts through, among other things, the following:

 a. Evaluating its liquidity and in the preparation of a rolling thirteen week cash flow forecast;
 b. Preparation of evaluating their entire rent roll and in the preparation of a 5 year cash flow forecast;
 c. Evaluating the tax implications of various options for restructuring;
 d. Formulation, evaluation and implementation of various options for restructuring; and
 e. Negotiations with creditors and other appropriate parties.

48. An experienced financial advisor such as Province fills a critical need that complements the services offered by Debtor's other restructuring professionals. Debtor believes it requires the services of a capable and experienced advisory firm such as Province because, *inter alia*, Province's resources and capabilities together with its experience advising Debtor prepetition, are crucial to Debtor's success in this Chapter 11 Case.

49. Accordingly, Province is well qualified and positioned to provide the services being sought by Debtor and has developed significant relevant experience and knowledge that will assist in dealing with potential issues that may arise in context of Debtor's Chapter 11 Case. Debtor respectfully submits that the employment and retention of Province is in the best interests of Debtor and the estate.

50. As more fully set forth in the Province Engagement Agreement, Debtor proposes to employ and retain Province to render all necessary financial and restructuring advisory services to Debtor that may be required, including, but not limited to:

(a) assist Debtor in evaluating its liquidity and in the preparation of a rolling 13-week cash flow forecast;

(b) assist in the formulation, evaluation and implementation of various options for restructuring;

(c) assist Debtor in negotiations with creditors and other appropriate parties;

(d) assist in the preparation of any statements and schedules or other first day motion supporting documentation

(e) if necessary, participate in hearings before the bankruptcy court with respect to matters that are within Province's area of expertise or on information that Province has prepared or upon which Province has provided advice;

(f) assist in the preparation of any financial projections or budgets;

(g) develop a liquidation analysis to be used for the best interest of creditors test;

(h) provide financial advisory services to Debtor in connection with developing, and seeking approval for, a restructuring plan (a "Plan");

(i) testify at the Plan confirmation hearing, if necessary;

(j) provide contingency planning and ongoing advice and assistance to management through the restructuring process;

(k) if necessary, assist in preparing an offering memorandum, with any amendments and supplements thereto, for distribution and presentation to prospective purchasers or creditors;

VG1 61528v2 12/16/10                                    16

(l) assist in soliciting interest in a transaction among prospective purchasers or creditors;

(m) assist, as necessary, in any claims analyses or reconciliation;

(n) assist in evaluating proposals received from prospective purchasers or creditors;

(o) assist in the preparation of periodic reporting required by the Bankruptcy Court and/or the US Trustee; and

(p) other activities as are approved by Debtor and as agreed to by Province.

51. In light of Province's expertise in all of these areas, Province is well-qualified to perform these services and assist Debtor in this Chapter 11 Case.

52. To the best of Debtor's knowledge, Province is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code, as modified by Section 1107(b) of the Bankruptcy Code, and does not hold or represent an interest materially adverse to Debtor's estate.

53. I believe that Province:

(a) is not a creditor or insider of Debtor;

(b) does not hold or represent an interest adverse to Debtor;

(c) is a "disinterested person," as defined by section 101(14) and modified by section 1107(b) and used in section 328(c) of the Bankruptcy Code;

(d) does not represent any other creditor, party in interest, or entity in this Chapter 11 Case; and

(e) has no connection with Debtor, its creditors, or other parties in interest in this Chapter 11 Case, except as set forth in the Huygens Verified Statement.

54. Province's willingness to continue with this engagement to advise and assist Debtor is contingent upon its ability to be retained in accordance with its customary terms and conditions of employment, including without limitation the indemnity provisions stated in the Province Engagement Agreement, and compensation for its services and reimbursement for the expenses it incurs in accordance with its customary billing practices.

VG1 61528v2 12/16/10    17

55. Debtor seeks to employ and retain Province on an hourly basis at rates consistent with those Province routinely charges in comparable matters. Additionally, upon confirmation of a bankruptcy plan, Debtor agrees to pay a fee to Province in the amount of $200,000, which Debtor believes is reasonable.

56. Prior to the Petition Date, Debtor's subsidiary, South Tech Lake Mead W9420, LLC, provided Province with two properties, valued at $166,085, as payment for Debtor's prepetition services. $151,068.11 was deemed earned and applied to prepetition fees and expenses incurred by Province. The balance of the unearned retainer under the October 15, 2010 engagement letter is $115,016.89.

57. On December 4, 2010, Debtor also paid Province a retainer in the amount of $100,000. The retainer was funded from the proceeds of a promissory note made by Debtor to Umbra Partners. Pursuant to Debtor's instructions, Umbra Partners disbursed $100,000 to Province for the benefit of Debtor, as a retainer to be applied towards postpetition services to Debtor. The $100,000 disbursement was made out of the account of South Providence Holdings, LLC, an affiliate of Umbra Partners. Province is under no obligation to pay Umbra Partners or any of its affiliates, any of the amounts Province received from Umbra Partners, which were made for the benefit of Debtor. Currently, the total retainer available for services to be rendered to Debtor postpetition is $115,016.89. Province has not received any other compensation from Debtor or any other party in interest in connection with this Chapter 11 Case.

58. Debtor respectfully submits that the proposed fee arrangement with Province, as set forth above, is (i) similar to fee arrangements that have been authorized in other Chapter 11 cases in which Province has rendered services, (ii) reasonable in light of industry practice and similar to market rates both in and out of Chapter 11 proceedings, (iii) reasonable in light of Province's experience in reorganizations, and (iv) reasonable in light of the scope of work to be performed pursuant to its retention. Debtor believes that, given the nature of the financial and restructuring advisory services to be provided by Province, the proposed compensation arrangement is both fair and reasonable.

59. As set forth in the Province Engagement Agreement and subject to terms and conditions therein, Debtor has agreed to indemnify Province in accordance with the indemnity provisions set forth therein (the "<u>Indemnity Provisions</u>"). Debtor believes the Indemnity Provisions are customary and reasonable terms for Province's engagement. Unlike the market for other professionals that Debtor may retain, indemnification is a standard term of the market for financial advisors. Province and Debtor believe that the Indemnity Provisions are comparable to those generally obtained by financial advisory firms and for comparable engagements, both in and out of court. Accordingly, Debtor requests that the Court approve the Indemnity Provisions.

60. Debtor believes the compensation contained in the Province Engagement Agreement and the Indemnification Provisions are reasonable terms and conditions of employment and should be approved under section 328(a) of the Bankruptcy Code. The compensation in the Province Engagement Agreement and the Indemnity Provisions adequately reflect: (a) the nature of the services to be provided by Province; and (b) compensation structures and indemnification provisions typically utilized by Province and other financial advisory and investment banking firms, which are generally compensated on a transactional basis. In particular, Debtor believes the proposed compensation creates a proper balance between the hourly rates and a deferred fee based on the consummation of plan of reorganization. Moreover, Province's substantial experience with respect to financial advisory services, coupled with the nature and scope of work already performed by Province before the Petition Date, further suggest the reasonableness of the Province Engagement Agreement and Indemnity Provisions.

Executed this 16th day of December 2010, in Henderson, Nevada.

                                         */s/Tom E. Hallett*
                                       TOM E. HALLETT, PRESIDENT
                                       WHITTON CORPORATION