Electronically filed on March 1, 2011

BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
ANNE M. LORADITCH, ESQ.
Nevada Bar No. 8164
MICAELA RUSTIA, ESQ.
Nevada Bar No. 9676
FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway,  Suite 500
Las Vegas, Nevada  89169
Telephone:  (702) 262-6899
Facsimile:  (702) 597-5503
Email: baxelrod@foxrothschild.com
        aloraditch@foxrothschild.com
        mrustia@foxrothschild.com
*Counsel for Debtors*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>WHITTON CORPORATION, a Nevada corporation<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects South Tech Simmons 3040C, LLC | Case Nos. BK-S-10-32857-BAM and BK-S-10-32680-BAM<br><br>Jointly Administered Under<br>Case No. BK-S-10-32680-BAM<br><br>Chapter 11<br><br>**MOTION FOR INTERIM AND FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 364, FED R. BANKR. P. RULE 4001(C) AND L.R. 4001(B) AND (C): (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) GRANTING RELATED RELIEF, AND (III) SCHEDULING FINAL HEARING**<br><br>Hearing Date:<br>Hearing Time: |

Whitton Corporation, a Nevada corporation ("Whitton"), and South Tech Simmons 3040C, LLC ("Simmons",  together with Whitton, the "Debtors"), as debtors and debtors in possession, hereby file this motion for entry of an interim order (the "Interim DIP Order") and final order (the "Final DIP Order") pursuant to sections 105(a) and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), Rule 4001(c) of the Federal Rules of Bankruptcy

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Procedure (the "<u>Bankruptcy Rules</u>") and Rules 4001(b) and (c) of the Local Rules for the U.S. Bankruptcy Court, District of Nevada ("<u>Local Rules</u>"): (i) authorizing and approving, among other things, Debtors' obtaining postpetition financing (the "<u>Postpetition Financing</u>") from Ruby Capital Investments, LLC ("<u>Ruby</u>") and Silver Phoenix, LLC ("<u>Silver</u>", together with Ruby, the "<u>Lenders</u>"), on a Section 364(c) secured and superpriority administrative claim basis, and (ii) scheduling interim and final hearings with respect to the relief requested herein.

Debtors' ability to obtain the Postpetition Financing is critical to Debtors' ability to continue as a going concern during the course of these Debtors' chapter 11 bankruptcy cases (the "<u>Chapter 11 Cases</u>"). The proceeds of the Postpetition Financing will be used to fund costs of administering Debtors' estates, including without limitation, fees assessed by the Office of the United States Trustee and the Clerk of Court and fees and expenses of professionals of the estates, as approved by the Bankruptcy Court, any expenses of operations not paid from cash collateral, reorganization costs and working capital needs.

Pursuant to Bankruptcy Rule 4001(c), the principal provisions of the Interim DIP Order, a proposed copy of which is attached as **Exhibit "A"** hereto, are as follows (capitalized terms used but not immediately defined herein shall have the meanings ascribed to them later in this Motion or in the Interim DIP Order, as the case may be):

    (a)  **<u>Nature and Amount of Financing</u>**. Pursuant to a credit agreement, substantially in the form of Exhibit B attached to this Motion (the "<u>DIP Credit Agreement</u>" and, collectively with any other loan agreement, notes, guaranties, security documents or other agreements or instruments executed by Borrowers in connection with the DIP Credit Agreement, the "<u>Loan Documents</u>"), Lenders will lend to Debtors up to $2,100,000 cash on a secured, administrative priority basis under § 364(b) of the Bankruptcy Code. (<u>Interim DIP Order</u> ¶ 2).

    (b) **<u>Borrowing Limits</u>**. Borrowings under the Postpetition Financing cannot exceed (i) on and after the Closing Date and prior to the date of entry of the 506(a) Order, the sum of $350,000, (ii) on and after the date of entry of the 506(a) Order and prior to the date of entry of the Plan Confirmation Order, the sum of $825,000 and (iii) on and after the date of entry of the Plan Confirmation Order, $2,100,000. (<u>DIP Credit Agreement</u> § 2.9).

    (c) **<u>Borrowing Conditions</u>**. The initial borrowing under the Postpetition Financing is conditioned upon (i) entry of the Interim DIP Order authorizing the financing on or before March 15, 2011, (ii) Lenders' receipt of Borrower's executed DIP Credit Agreement and related loan documents upon entry of the Interim DIP Order; (iii) no Material Adverse

Effect shall have occurred with respect to Borrowers, and (iv) no litigation shall have been commenced or be pending which has not been stayed by the commencement of the Chapter 11 Cases and which, if successful, would have a Material Adverse Effect on Borrowers taken as a whole, their business or ability to repay the Revolving Loans or which would challenge the DIP Credit Agreement, Postpetition Financing Orders or the transactions contemplated thereby. The second borrowing under the Postpetition Financing is conditioned upon the preceding conditions remaining in effect, entry of the Final DIP Order within 45 days of entry of the Interim DIP Order, no Material Adverse Effect on Borrowers, and entry of the 506(a) Order. The third and final borrowing under the Postpetition Financing is conditioned upon the preceding conditions remaining in effect and entry of the Plan Confirmation Order. (<u>DIP Credit Agreement</u> §§ 4.1 and 4.2).

(d) **<u>Interest Rate and Origination Fee</u>**. Interest accrues at a fixed rate per annum of 18% and a non refundable origination fee equal to three percent (3%) of the Maximum Cash Commitment Amount shall accrue upon the entry of the Interim DIP Order. The origination fee, and, on each payment date, the interest shall be capitalized and added to the outstanding principal balance of the Revolving Loans. In the event an Event of Default has occurred and is continuing, interest at a rate *per annum* equal to the rate set forth above plus 5.0% ("Default Interest") from the date of occurrence of such Event of Default until the date such Event of Default is cured or waived. (<u>DIP Credit Agreement</u> § 2.5).

(e) **<u>Maturity Date</u>**. Earlier of December 31, 2011, or the Plan's Effective Date. (<u>DIP Credit Agreement</u> § 1.1).

(f) **<u>Certain Events of Default</u>**. Among other Events of Default under the DIP Credit Agreement, an Event of Default occurs if (i) Borrowers fail to timely pay Postpetition Financing obligations, (ii) proceeds of any Revolving Loan are used to make a payment that is not in strict compliance with Section 2.8 of the DIP Credit Agreement, unless agreed to by Lenders, (iii) Borrowers materially violate or breach the Postpetition Financing Orders or file any pleadings seeking, joining in, or otherwise consenting to any material violation or breach of the Postpetition Financing Orders, (iv) a chapter 11 trustee or examiner with expanded powers is appointed in any of the Chapter 11 Cases, (v) any of the Chapter 11 Cases are converted to chapter 7, or (vi) the Interim DIP Order or the Final DIP Order is revoked, reversed, stayed, modified, supplemented or amended without the consent of Lenders, (vi) commencement of any suit against Lenders that would in any way reduce, set off, or subordinate the Obligations under this Agreement, (vii) the entry of an order in the Chapter 11 Cases confirming a plan or plans of reorganization that is not a Lender Approved Reorganization Plan, (viii) the entry of an order in the Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to Lenders (other then the Carve Out Expenses), (ix) orders granting relief from or modifying the automatic stay to permit one or more creditors to execute upon, enforce or perfect a lien on any material asset of the Borrowers. (<u>DIP Credit Agreement</u> § 8.1).

(g) **<u>Liens</u>**. Upon the date of entry of each Postpetition Financing Order, the Obligations of the Borrowers under the Loan Documents shall be secured by a first priority Lien on all unencumbered assets and property of the Borrowers and a junior Lien on all assets and property of the Borrowers that are encumbered by Liens as of the date of the Interim DIP Order. (<u>DIP Credit Agreement</u> §§ 2.10(b), (c))

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

(h) **Conversion of Loans to Equity**. All Obligations owing to Lenders under the DIP Credit Agreement shall be deemed fully paid and satisfied on the Plan's Effective Date by issuing to the New Parent Company, one-hundred percent (100%) of the equity interest in the Reorganized Debtors pursuant to the Lender Approved Reorganization Plan. (DIP Credit Agreement § 7.1(b))

In accordance with Fed. R. Bankr. P. 4001 and LR 4001, Debtors have identified below, by page and paragraph number, the location of each of the following provisions:

| Provision | Contained in Credit Agreement or Proposed Order | Location in Credit Agreement or Proposed Order | Location in Motion |
|---|---|---|---|
| (1) A grant of priority or a lien on property of the estate under § 364(c) or (d). | ☒ Yes ☐ No | DIP Credit Agreement §§ 2.10 (a), (b), (c); Proposed Order, ¶ H, Article VII | p. 7, ¶¶ 8-9; p. 8, line 22 to p. 10, line 14; page 16, lines 20-23 |
| (2) The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim. | ☐ Yes ☒ No | | |
| (3) A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim. | ☐ Yes ☒ No | | |
| (4) A waiver or modification of Code provisions or applicable rules relating to the automatic stay. | ☒ Yes ☐ No | DIP Credit Agreement § 8.2; Proposed Order, ¶ I, ¶ 15, Article XI | p. 17, lines 1-3 |
| (5) A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364. | ☐ Yes ☒ No | | |
| (6) The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order. | ☒ Yes ☐ No | DIP Credit Agreement § 6.3; | ¶¶ 8, 10 |

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

| | | | |
|---|---|---|---|
| (7) A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien. | ☐ **Yes**  ☒ **No** | | |
| (8) A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action. | ☐ **Yes**  ☒ **No** | | |
| (9) The indemnification of any entity. | ☐ **Yes**  ☒ **No** | | |
| (10) A release, waiver, or limitation of any right under § 506(c). | ☐ **Yes**  ☒ **No** | | |
| (11) The granting of a lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a). | ☐ **Yes**  ☒ **No** | | |

In addition to the foregoing relief, Debtors request that the Court:

(i) schedule, pursuant to Bankruptcy Rule 4001 and Local Rule 4001, an interim hearing on this Motion for this Court to consider entry of the Interim DIP Order and the relief set forth therein;

(ii) schedule, through the Interim DIP Order, pursuant to Bankruptcy Rule 4001(c)(2), the final hearing on this Motion (the "Final Hearing") on or before April 20, 2011 or forty-five days from entry of the Interim DIP Order to consider entry of the Final DIP Order authorizing borrowings under and approving the terms of the Postpetition Financing on a final basis as set forth herein; and

(iii) approve Debtors' notice procedures with respect to the Final Hearing.

In further support of this Motion, Debtors rely upon and incorporate by reference the Declaration of Tom Hallett in Support of the Motion (the "Hallett Declaration"), the Declaration of Paul Hamilton (the "Hamilton Declaration"), and the Declaration of David Crockett (the "Crockett Declaration") filed concurrently herewith. In further support of this Motion, Debtors submit the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## JURISDICTION AND VENUE

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1    1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and

2  1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core

3  proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief sought herein are

4  Bankruptcy Code §§ 105(a) and 364, Bankruptcy Rule 4001 and Local Rule 4001.

**II.**

**BACKGROUND**

2.    On December 5, 2010, Whitton commenced its bankruptcy case by filing a voluntary

petition for relief under Chapter 11 of the Bankruptcy Code.  On December 8, 2010, Simmons

commenced its bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the

Bankruptcy Code.

3.    Debtors are operating their businesses and managing their affairs as debtors-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or

statutory committee has been appointed in these cases.

4.    Whitton is a full service commercial real estate enterprise with dedicated departments for

sales and leasing, marketing, design, estimating, and general contracting.  Whitton owns fifteen (15)

commercial properties which are located in Las Vegas, Henderson, North Las Vegas, and Reno/Sparks,

Nevada.  In the aggregate, Whitton owns over 480,000 square feet of office, retail, light industrial,

warehouse, or flexible use real estate of which approximately 69% is occupied.  Simmons is a

subsidiary of Whitton which owns 51,690 square feet of light industrial and warehouse space in North

Las Vegas, Nevada, of which approximately 90% is occupied.  The Properties owned by Whitton and

Simmons are described in Exhibit A attached to the DIP Credit Agreement.

5.    Debtors lease a portion of the Properties to tenants and receives rents from the lease of

the Properties.

6.    Debtors seek postpetition financing to fund Debtors' chapter 11 administration expenses,

including the fees of Debtors' professionals whose services are required to move these cases towards

confirmation of a plan of reorganization, (ii) to fund a plan of reorganization, and (iii) to enable Debtors

to successfully emerge from chapter 11 as a financially viable reorganized debtor with sufficient

working capital and funding to perform its business operations, pursuant to a confirmed plan of

reorganization. These actions will maintain the value of Debtors' assets, and is in the best interests of Debtors and their creditors.

7.      If Debtors are unable to obtain Postpetition Financing, they will be unable to fund the chapter 11 administration expenses and reorganize, and thus the value of their estates and of their collateral will be adversely affected. By obtaining Postpetition Financing, Debtors will be able to funds the necessary costs and expenses to reorganize which will increase the value of their estates and of their collateral and maximize payments to creditors.

8.      Lenders are willing to provide such financing on a superpriority administrative claim basis and secured basis pursuant to Bankruptcy Code Section 364(c). Lenders are requesting a lien on all of Debtors' unencumbered collateral to secure the financing and a junior lien on all assets and properties of Debtors that are encumbered by liens as of the date of the Interim DIP Order, except for the BLV Mesquite Property. Lenders are willing to provide Postpetition Financing to Debtors pursuant to the terms of the DIP Credit Agreement, provided that the Court permits Lenders' claim to be treated as a superpriority administrative expense under section 364 (c) (1) and 503(b)(1) and allows the liens. As set forth in the DIP Credit Agreement, Debtors currently seek the immediate entry of the Interim DIP Order authorizing Debtors to enter the DIP Credit Agreement and obtain the Postpetition Financing. The willingness of Lenders to provide such financing is conditioned upon the entry of the Interim DIP Order approving this Motion on or before March 15, 2011.

9.      Specifically, Lenders' claims under the DIP Credit Agreement and any order approving the Motion shall constitute a superpriority administrative expense pursuant to 11 U.S.C. § 364(c) (1) and 503(b)(1) which will have priority over administration expenses pursuant to Sections 503(b) and 507(b).

10.      In addition, the other key terms of the proposed Postpetition Financing are as follows:

(a)      Provided that the Interim DIP Order is entered on or before March 15, 2011, there is no Material Adverse Effect and Debtors execute the DIP Credit Agreement and related loan documents, then, Lenders will disburse $350,000 of the Postpetition Financing to Debtors.

(b)      Upon entry of the Final DIP Order, the 506(a) Order, and No Material Adverse Effect having occurred, Lenders will disburse an additional $475,000 of the Post Petition Financing to Debtors.

(c)     Upon entry of the Plan Confirmation Order, Lenders will disburse the balance of the Postpetition Financing of $1,275,000 which will be used to fund the Lender Approved Reorganization Plan and working capital for the Reorganized Debtor.

(d)     There will be no debt service payments by Debtors during the Chapter 11 Cases.  All interest and commitment fees will be capitalized and added to the principal of the Revolving Loans.  If a Lender Approved Reorganization Plan is confirmed, then the Postpetition Financing will be paid and satisfied by the issuance to Lenders of new equity in the reorganized debtor.  If such a plan is not confirmed, then the Revolving Loans will become due and payable.

(e)     No later than forty-five (45) days from the date of entry of the Final DIP Order, Debtors shall present Lenders with their proposed draft of Lender Approved Reorganization Plan and related disclosure statement ("Draft Plan and Disclosure Statement") for Lenders' review and approval.

(f)     No later than twenty (20) days from the date the Lenders notify Debtors' counsel that they have approved the Draft Plan and Disclosure Statement ("Lender Approval Date"), Debtors will finalize and file same with the Bankruptcy Court and seek a hearing to approve the disclosure statement and solicitation procedures.

(g)     No later than ninety (90) days from the Lender Approval Date, the Lender Approved Plan shall be confirmed by the Bankruptcy Court.

In light of the foregoing, it is essential that the Interim DIP Order be entered on or before March 15, 2011 or Debtors will not meet a condition for the financing.

### III.

### LEGAL ARGUMENT

**Debtors Have Satisfied the Legal Requirements for Approval of the DIP Credit Facility.**

**1.     Debtors Cannot Obtain Financing on Terms More Favorable than Those of the DIP Credit Facility.**

Bankruptcy Code section 364 states that a debtor in possession that is authorized to operate its business may obtain financing either in the ordinary course of business or outside the ordinary course of business. First, Bankruptcy Code section 364(a) allows the debtor to obtain unsecured credit and to incur unsecured debt in the ordinary course of business. 11 U.S.C. § 364(a).  Second, after notice and a hearing, the Court may authorize a debtor in possession to obtain unsecured credit or incur unsecured debt outside the ordinary course of business allowable as an administration expense under Bankruptcy

Code section 503(b)(1). 11 U.S.C. § 364(b).

If the debtor in possession is unable to obtain unsecured credit on this basis, Bankruptcy Code section 364(c) allows the Court, after notice and a hearing, to authorize the debtor in possession to obtain credit or to incur debt that has priority over administrative expenses under Bankruptcy Code section 503(b)(1), that is secured by a lien on unencumbered estate property, or that is secured by a junior lien on encumbered estate property. 11 U.S.C. §§ 364(c)(1),(2) and (3).

Other than the requirement of notice and a hearing, the only statutory prerequisite under Bankruptcy Code section 364(c) for obtaining credit on a secured basis and superpriority basis is that the debtor in possession must be unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1). 11 U.S.C. § 364(c)(2); see also, In re Garland Corp., 6 B.R. 456, 461 n. 11 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) is authorized, after notice and a hearing, upon showing that unsecured credit cannot be obtained); In re Ames Dept. Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).

The Bankruptcy Code offers a debtor-in-possession additional flexibility to the extent that it needs to borrow additional funds. Bankruptcy Code Section 364 provides a progression of various protections to induce a postpetition lender to extend credit to a debtor-in-possession. In re Sun Runner Marine, Inc., 945 F.2d 1089, 1092-93 (9th Cir. 1991). These include administrative priority, super-priority and secured status. 1l U.S.C. § 364.

In addition, parties who extend credit are protected under § 364(e) from the effects of a reversal on appeal of the authorization to incur debt as long as they have acted in good faith.

To demonstrate that the requisite credit is not obtainable on an unsecured basis, the debtor need only demonstrate "by good faith effort that credit was not available" without the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code. Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id. at 1088; see also In re Ames, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing when it selected the least onerous financing option from the two remaining lenders); In re Reading Tube

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1   Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Given the 'time is of the essence' nature of this type

2   of financing, we would not require this or any debtor to contact a seemingly infinite number of possible

3   lenders."). Where few lenders are likely to be able and willing to extend the necessary credit to a

4   debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive

5   search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub

6   nom., Anchor Savings Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989).

7        Most of Debtors' assets are encumbered by liens in excess of what Debtors estimate the value of

8   those assets are. Such liens also encumber the rents of the Properties which, pursuant to existing cash

9   collateral or custodian orders entered by this Court, may only be used for the operating expenses of the

10  Properties. Accordingly, there are no available funds from which chapter 11 administration expenses

11  and postpetition debt service payments can be made. Under such circumstances, stand alone

12  postpetition financing on an unsecured basis simply to fund chapter 11 operations during the case would

13  be virtually impossible to obtain. It is highly unlikely that a lender would make a loan for which no

14  debt service payments can be made during the case unless there is other consideration for the making of

15  such a loan.

16       Debtors therefore had to search for a lender willing to provide both DIP postpetition financing to

17  fund chapter 11 operations and expenses during the case, as well as "emergence" or "exit" financing to

18  support confirmation of a reorganization plan providing for a restructuring of existing debt.

19       Prior to the Petition Dates, Debtors' financial advisor embarked on the process of search for

20  such funding.

21       As set forth in the Hamilton Declaration, they started by underwriting the company and

22  collateral and found that Debtors had a product that was significantly over leveraged. In light thereof,

23  they needed to reach out to creative thinkers with an interest in the Properties and general interest in the

24  area. A detailed package on DIP and emergence financing for the Properties was prepared. They took

25  a three pronged approach to raising the desired capital. First, they reached out to groups that specialize

26  in this type of product. Second, they reached out to bankruptcy attorneys in this arena for successful

27  references of capital that they had worked with and emerged with in the past. Third, they marketed to

28  the people that actively invest in the Nevada market. The first two approaches resulted in a number of

1   potential partners with terms that were very unattractive. Right from the start the stronger indications of

2   interest and more attractive offers came from the local investors that understood the market.

3   Ultimately, within the local group, they narrowed the best two offers down to two local investors and

4   had them give their highest and best offer. Negotiations took place. The results were that the most

5   attractive package was offered by Ruby and Silver over Umbra Partners. The Postpetition Financing

6   provides funds for chapter 11 operational expenses and funds required to confirm a plan and provide

7   working capital for the reorganized debtor. Such financing is "repaid" or "satisfied" by issuance of

8   equity interests in the reorganized debtor and prior to confirmation of a plan Debtors are not required to

9   make any debt service payments. Debtors and their financial advisors firmly believe that, under the

10  circumstances of these cases, the proposed Postpetition Financing is the "best game in town."

11  **B.      Debtors' Decision to Enter into the DIP Credit Facility Is Supported by Sound Business
            Judgment.**

12          Courts generally give broad deference to the business decisions of a debtor. See, e.g., Stephens

13  Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986); In re Continental Air Lines, Inc., 780 F.2d

14  1223, 1226 (5th Cir. 1986); In re Lionel Corporation, 722 F.2d 1063, 1070 (2d Cir. 1983); Walter v.

15  Sunwest Bank (In re Walter), 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1987). In particular, a bankruptcy

16  court should defer to a debtor's reasonable business judgment regarding the need for funds, so long as

17  the proposed financing agreement does not contain terms that either leverage the bankruptcy process or

18  that benefit a third party rather than the bankruptcy estate. See, e.g., In re Trans World Airlines, Inc.,

19  163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-

20  based facility were approved because they "reflect[ed] sound and prudent business judgment ..., [were]

21  reasonable under the circumstances and in the best interest of [the debtor] and its creditors"). This was

22  explained by the bankruptcy court in In re Ames Department Stores, Inc., 115 B.R. 34 (Bankr. S.D.N.Y.

23  1990):

24              [A] court's discretion under section 364 is to be utilized on grounds that permit
                reasonable business judgment to be exercised so long as the financing agreement
25              does not contain terms that leverage the bankruptcy process and powers or its
                purpose is not so much to benefit the estate as it is to benefit a party-in-interest.
26

27  Id. at 40.

28

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Here, Debtors' decision to enter into the Postpetition Financing represents a reasonable exercise of business judgment. Debtors, have *de minimis* cash and an extensive amount of work to be performed by their professionals which must commence immediately in order pursue confirmation of a plan of reorganization. Thus, absent the financing to be provided under the DIP Credit Facility, Debtors will not be able to meet their chapter 11 operating and administrative obligations. Put another way, Debtors would be forced to cease operations and abandon the chance to reorganize and successfully emerge from Chapter 11 unless they have the funds to pay the costs which must be incurred immediately. The success of these Chapter 11 Cases therefore turns on Debtors' ability continue operations and implement their long-term strategy of restructuring. The Postpetition Financing will permit Debtors to accomplish these goals, and achieve their stated objective of maximizing value for all constituencies.

C.    **The Terms of the DIP Credit Facility are Reasonable Under The Circumstances And Should Be Approved.**

The terms of the DIP Credit Facility are similar to those often included in complex financing arrangements. Indeed, the DIP Credit Agreement and the Interim DIP Order reflect the give and take that result from complex financing negotiations. Courts have recognized that a debtor often must make significant concessions in exchange for financing. See, e.g., In re Ellingsen MacLean Oil Co., 65 B.R. 358, 365 (Bankr. W.D. Mich. 1986), aff'd, 834 F.2d 599 (6th Cir. 1987) (chapter 11 postpetition financing is "fraught with dangers for creditors . . ."). Accordingly, courts recognize that a debtor may need to "enter into a hard bargain with a creditor in order to acquire the needed funds to complete reorganization." Id. at 365.

Similarly, lenders often agree to subordinate or "carve-out" from their collateral funds to pay professionals. See Harvis Trien & Beck, P.C. v. Federal Home Mortgage Corp. (In re Blackwood Assocs., L.P.), 187 B.R. 856, 860 (Bankr. E.D.N.Y. 1995) (court advised that if professionals really want to be paid they had best insist upon a "real carve out"); In re Ames, 115 B.R. at 40 (noting practice of district to insist on carve-out for fees in order to preserve adversary system).

D.    **The Court Should Schedule Interim and Final Hearings On This Motion Pursuant To Bankruptcy Rule 4001(c)(2).**

Bankruptcy Rule 4001(c)(2) provides that a final hearing on a motion to obtain credit pursuant

to Bankruptcy Code Section 364 may be commenced not earlier than fourteen (14) days after service of the motion and Local Rule 4001(b)(2) requires that a final hearing may not take place on less than twenty one days notice. Upon request, however, the Bankruptcy Court is empowered to conduct an expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

Pursuant to Bankruptcy Rule 4001(c)(2), Debtors request the Court conduct an expedited interim hearing on the Motion (the "Interim Hearing") and, after the entry of the Interim DIP Order, allow Debtors to enter the DIP Credit Agreement by the required deadline, borrow funds in accordance therewith, and, at the Final Hearing, to allow Debtors to borrow under the Postpetition Financing on a final basis.

Debtors have an urgent and immediate need for cash to fund chapter 11 administration expenses and operations. Debtors have been unable to obtain financing on terms more favorable than presented herein, although they have attempted to do so. Absent entry of an Interim DIP Order on or before March 15, 2011 and ability to borrow the first $350,000 thereunder, Debtors' efforts to confirm a plan and restructure their businesses, will likely falter. Under the circumstances, the granting of the relief requested by the Motion is warranted.

Debtors respectfully submit that, given Debtors' immediate need to enter the Postpetition Financing, expedited notice as contemplated by Bankruptcy Rule 4001 is sufficient to permit this Court to approve, on an interim basis, Debtors' request for approval of Postpetition Financing. Debtors will provide notice by electronic mail, U.S. mail or the Court's ECF noticing of the Interim Hearing to: (a) Lenders: Silver Phoenix, LLC, 12111 La Carta Court, Las Vegas, Nevada 89138, Attn: David Crockett and Ruby Capital Investments, LLC, 12111 La Carta Court, Las Vegas, Nevada 89138, Attn: Ezra K. Nilson, (b) the Office of the United States Trustee for the District of Nevada, Attn: J. Michal Bloom; (c) Debtors' known twenty largest unsecured creditors; (d) all other secured creditors, and all other parties requesting notice pursuant to Bankruptcy Rule 2002.

In light of the foregoing, and pursuant to Bankruptcy Rule 4001(c)(2), Debtors request that the Court schedule the Final Hearing on this Motion on or before the Omnibus Hearing Date of April 20, 2011, and that the Court authorize Debtors to enter into the DIP Credit Facility on a final basis at such

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

hearing.

**V.**

**CONCLUSION**

Based upon all the foregoing, as set forth in this Memorandum, the Motion, the Hallett Declaration, the Hamilton Declaration, the Crockett Declaration, the OST Motion, and all other papers, documents, or other evidence submitted in support of the Motion, Debtors respectfully request that the Court grant the Motion in its entirety and: (1) approve the DIP Credit Facility on an interim basis; (2) enter the Interim DIP Order, in substantially the form attached hereto as Exhibit A; (3) authorize Debtors to borrow on an interim basis under the terms of the Loan Documents and the Interim DIP Order, pending a final hearing on this Motion; (4) grant Lenders the security, liens and superpriority claims provided for under the Interim DIP Order; (5) schedule a final hearing on this Motion; and (6) grant to Debtors such other relief as the Court deems necessary and appropriate.

DATED:       March 1, 2011.

**FOX ROTHSCHILD LLP**

By    */s/Brett A. Axelrod*
     BRETT A. AXELROD, ESQ.
     Nevada Bar No. 5859
     ANNE M. LORADITCH, ESQ.
     Nevada Bar No. 8164
     MICAELA RUSTIA, ESQ.
     Nevada Bar No. 9676
     3800 Howard Hughes Parkway, Suite 500
     Las Vegas, Nevada  89169

     *Counsel for Debtors*

1

2

3

4

5

6 BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
7 ANNE M. LORADITCH, ESQ.
Nevada Bar No. 8164
8 MICAELA RUSTIA, ESQ.
Nevada Bar No. 9676
9 FOX ROTHSCHILD LLP
10 3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
11 Telephone: (702) 262-6899
Facsimile: (702) 597-5503
12 Email: baxelrod@foxrothschild.com
        aloraditch@foxrothschild.com
13        mrustia@foxrothschild.com
14 *Counsel for Debtors*

15 **UNITED STATES BANKRUPTCY COURT**

16 **DISTRICT OF NEVADA**

| | |
|---|---|
| In re | Case Nos. BK-S-10-32857-BAM and BK-S-10-32680-BAM |
| WHITTON CORPORATION, a Nevada corporation | Jointly Administered Under Case No. BK-S-10-32680-BAM |
| ☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects South Tech Simmons 3040C, LLC | Chapter 11 |
| | **INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 364, FED R. BANKR. P. RULE 4001(C) AND L.R. 4001(B) AND (C): (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) GRANTING RELATED RELIEF, AND (III) SCHEDULING FINAL HEARING** |
| | Hearing Date:<br>Hearing Time: |

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

The Court has reviewed and considered the motion of the debtors and debtors-in-possession (collectively, the "Debtors" or "Borrowers") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), for entry of an interim order (the "Interim DIP Order") and final order (the "Final DIP Order") (the "Motion") pursuant to sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 4001(b) and (c) of the Local Rules for the U.S. Bankruptcy Court, District of Nevada ("Local Rules"), which seeks, among other things[1]:

(a) authorization for Debtors to obtain secured postpetition financing in an aggregate principal amount of up to $2,100,000 (the "Postpetition Financing"), pursuant to section 364 of the Bankruptcy Code, from Ruby Capital Investments, LLC ("Ruby") and Silver Phoenix, LLC ("Silver", together with Ruby, the "Lenders"), pursuant to the terms of this Interim DIP Order and that certain Debtor in Possession Revolving Credit Agreement by and among the Borrowers, and the Lenders, in substantially the form attached to the Motion as Exhibit B (as the same may be amended, restated, supplemented or otherwise modified from time to time, collectively, the "DIP Credit Agreement"), and any related documents required to be delivered by or in connection with the DIP Credit Agreement (together with the DIP Credit Agreement, collectively, the "Loan Documents");

(b) authorization for Borrowers to execute and enter into the Loan Documents and to perform such other and further acts as may be required in connection with the Loan Documents;

(c) the grant of security interests, liens, and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code) to the Lenders to secure all obligations of the Borrowers under and with respect to the Postpetition Financing;

---

[1] Capitalized terms used, but not defined herein, shall have the meanings ascribed to such terms in the Credit Agreement and capitalized terms used but not immediately defined in Order shall have the meanings ascribed to them later in this Order

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

(d) the modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Borrowers and the Lenders to implement the terms of this Interim DIP Order.

A hearing on the Motion was held by this Court on March 15, 2011 ("Interim Hearing"). The Court has considered the Motion, all pleadings related thereto including all objections to the Motion, as well as the evidence submitted and the oral arguments of record made by Debtors and other parties at the Interim Hearing, and after due deliberation and consideration, and good and sufficient cause appearing,:

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:**

I.      **Background, Jurisdiction and Notice.**

A.      On December 5, 2010 (the "Whitton Petition Date"), Whitton commenced its bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On December 8, 2010 (the "Simmons Petition Date" and, together with the Whitton Petition Date, collectively, the "Petition Dates"), Simmons commenced its bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Debtors are continuing to operate their respective businesses and manage their respective properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in these cases.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      Debtors have complied with Bankruptcy Rule 4001(c) and (d), Local Rule 4001(b) and Local Rule 9006 to hold the Interim Hearing on less than twenty-one (21) days notice by serving the Motion and providing notice of the Interim Hearing by facsimile or overnight mail to: (i) the U.S. Trustee; (ii) Debtors' twenty (20) largest unsecured creditors; (iii) the Lenders; (iv) other parties with liens of record on assets and property of Debtors as of the respective Petition Dates; and (v) all other parties requesting notice pursuant to Bankruptcy Rule 2002. Given the nature of the relief sought in the

Motion, the Court concludes that the foregoing notice was sufficient and adequate under the circumstances and complies with Bankruptcy Rule 4001 in all respects.

**II.  Findings Regarding the Postpetition Financing Based on the Record at the Interim Hearing.**

D.      Debtors have an immediate and critical need to obtain the Postpetition Financing. Debtors' ability to obtain the Postpetition Financing is critical to Debtors' ability to continue as a going concern during the course of these Chapter 11 Cases.  The proceeds of the Postpetition Financing will be used to fund the costs of administering Debtors' estates, including, without limitation, fees assessed by the Office of the United States Trustee and the Clerk of Court, and fees and expenses ("Professional Fees") of (i) professionals employed pursuant to Bankruptcy court Order in accordance with Bankruptcy Code sections 327 or 1103 to be compensated for services rendered pursuant to Bankruptcy Code sections 327, 328, 329, 330 or 331, or (ii) persons awarded compensation and reimbursement by the Bankruptcy Court pursuant to Bankruptcy Code section 503(b)(4), as approved by the Bankruptcy Court, any expenses of operations not paid from cash collateral, reorganization costs and working capital needs.  Borrowers' access to sufficient liquidity through the incurrence of the Postpetition Financing under the terms of this Interim DIP Order are vital to the preservation and maintenance of the going concern value of Borrowers' estates and to Borrowers' successful reorganization.  Consequently, without access to the Postpetition Financing, to the extent authorized pursuant to this Interim DIP Order, Borrowers and their estates would suffer immediate and irreparable harm.

E.      The use of Cash Collateral alone would be insufficient to meet Borrowers' postpetition liquidity needs.  Borrowers are unable to obtain adequate unsecured credit allowable under sections 364(b) and 503(b)(1) of the Bankruptcy Code.  The only sufficient source of credit available to the Borrowers is the Postpetition Financing.   Borrowers require the Postpetiton Financing, in addition to the use of cash collateral under the terms of various Orders entered by this Court authorizing Debtors' use of the cash collateral of Prepetition Lenders holding Liens on Debtors' assets, to satisfy their postpetition liquidity needs.

F.      The Lenders have indicated a willingness to provide Borrowers with certain financing, but solely on the terms and conditions set forth in this Interim DIP Order and in the Loan Documents.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

After considering all of their alternatives, Borrowers have concluded, in an exercise of their sound business judgment, that the financing to be provided by the Lenders pursuant to the terms of this Interim DIP Order and the Loan Documents represents the best financing presently available to Borrowers.

G. The Lenders do not hold any prepetition claims against Debtors.

H. The security interests and liens granted pursuant to this Interim DIP Order to the Lenders, are appropriate under section 364(c)(2) and (c)(3) of the Bankruptcy Code because, among other things, such security interests and liens do not impair the interests of any holder of a valid, binding, continuing, enforceable and fully-perfected prepetition security interest or lien in the property of Borrowers' estates.

I. Good cause has been shown for immediate entry of this Interim DIP Order pursuant to Bankruptcy Rules 4001(c)(2), and, to the extent it applies, Bankruptcy Rule 6003, as the Court finds that entry of this Interim DIP Order is necessary to avoid immediate and irreparable harm to Borrowers and their estates. To the extent Borrowers have not complied with Bankruptcy Rule 4001(c)(2), the Court finds good cause to waive that requirement. In particular, the authorization granted herein for Borrowers to execute the Loan Documents and to obtain financing on an interim basis, is necessary to avoid immediate and irreparable harm to Borrowers and their estates. Entry of this Interim DIP Order is in the best interest of the Borrowers', their estates and creditors. The terms of the Loan Documents are fair and reasonable under the circumstances, reflect Borrowers' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

J. Borrowers' and the Lenders have negotiated the terms and conditions of the Loan Documents and this Interim DIP Order in good faith and at arm's-length, and any credit extended and loans made to Borrowers pursuant to this Interim DIP Order shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

K. Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**III. Disposition.**

VG1 70276v4 03/01/11

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1.     The Motion is approved on an interim basis on the terms and conditions set forth in this Interim DIP Order.  This Interim DIP Order shall become effective immediately upon its entry.  To the extent the terms of the Loan Documents differ in any material respect from the terms of this Interim DIP Order, this Interim DIP Order shall control.

**IV.     Authorization of the Postpetition Financing and Entry Into the Loan Documents.**

2.     The terms and conditions of the DIP Credit Agreement are hereby approved.  Borrowers are hereby authorized to enter into the Loan Documents, including the DIP Credit Agreement and such additional documents, instruments, and agreements as may be reasonably required by the Lenders to implement the terms or effectuate the purposes of this Interim DIP Order.  Immediately upon entry of this Interim DIP Order, Borrowers are hereby authorized to borrow an initial loan of up to $350,000, in accordance with this Interim DIP Order, the DIP Credit Agreement, and the other Loan Documents.

3.     Borrowers are hereby authorized to incur the Obligations solely in accordance with the terms and conditions set forth in the DIP Credit Agreement and this Interim DIP Order.

**V.     Loan Obligations.**

4.     Upon execution and delivery of the Loan Documents, the Loan Documents shall constitute valid, binding and continuing obligations of Borrowers, enforceable against each Borrower thereto in accordance with the terms thereof.  No obligation, payment, transfer or grant of security under the Loan Documents or this Interim DIP Order shall be stayed, restrained, voided, voidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

5.     All loans made to or for the benefit of Borrowers on or after the Petition Date under the Loan Documents (collectively, the "Loans"), all interest thereon, and all fees, costs, expenses, and other liabilities owing by the Borrowers to the Lenders under the Loan Documents and this Interim DIP Order shall hereinafter be referred to as the "Obligations."  The Loans: (i) shall bear interest payable at the rates set forth in the DIP Credit Agreement; (ii) shall be secured in the manner specified in Paragraph 7 below; (iii) shall be payable in accordance with the terms of the Loan Documents; and (iv) shall otherwise be governed by the terms set forth herein and in the Loan Documents.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

**VI.     Use of Loan Proceeds.**

6.      The Borrowers may use the Loans to fund payment of allowed Professional Fees and other administration expenses pursuant to the terms and conditions set forth in this Interim DIP Order and in the Loan Documents.

**VII.     Grant of Superpriority Claims and Liens.**

7.      As security for the full and timely payment of the Obligations, the Lenders are hereby granted, subject to the Carve-Out:

(a) pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed claim in the Chapter 11 Cases of Borrowers having priority over any and all administrative expenses and all other claims against Borrowers, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code (the "Superpriority Claims"); and, that the Superpriority Claims shall be payable out of all of the tangible and intangible property of Borrowers and their respective estates;

(b) pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully-perfected first priority security interest in and Lien on all assets and property of Borrowers that is not otherwise subject to a Lien, which shall include all tangible and intangible property of Borrowers other than claims, defenses, causes of action or rights of Debtors or their estates as arise under sections 542-553 of the Bankruptcy Code,

(c) pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully-perfected security interest in and lien upon all assets and property of Borrowers junior to all liens encumbering such assets and property as of the date of this Order, except for the BLV Mesquite Property  (the "Existing Liens") and except for the claims, defenses, causes of action or rights of Debtors or their estates as arise under sections 542-553 of the Bankruptcy Code .  No Lien shall be granted on the BLV Mesquite Property.

Hereinafter all assets and property of Borrowers upon which the Lenders were granted Liens pursuant to this Interim DIP Order shall be referred to as the "Collateral."

8.    The liens and security interests granted pursuant to this Interim DIP Order ("Liens") shall not be subject to challenge and shall attach and become valid, binding, continuing, enforceable, fully-perfected and non-avoidable by operation of law as of the respective Petition Dates without any further action by the Borrowers, the Lenders, or any other person, and without the necessity of execution by the Borrowers, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, deeds of trust, assignment of rents, filings with the U.S. Patent and Trademark Office, or other documents. All Collateral shall be free and clear of other liens, claims and encumbrances, except for liens and security interests in existence as of the date of this Interim DIP Order. The Borrowers, upon the request of the Lenders (i) shall enter into separate Deeds of Trust in recordable form on terms reasonably satisfactory to the Lenders with respect to any real property Collateral identified by Lenders, (ii) shall authorize the Lenders to file and record such financing statements and fixture filings with respect to any Collateral identified by Lenders, and (iii) shall take any such other action as required by Lenders with respect to Collateral identified by Lenders in order to perfect the Liens granted herein. The Lenders are authorized to file or record such documents in their discretion, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim DIP Order.

## VIII.    Carve-Out.

9.    Upon the occurrence and during the continuation of an Event of Default with respect to which the Lenders provide notice to Borrowers and their counsel of the cessation of funding under the Loan Documents (the "Carve-Out Trigger Notice"), to the extent unencumbered funds are not available to pay administrative expenses in full, the Liens and the Superpriority Claims shall be subject to the payment of the Carve-Out. For purposes of this Interim DIP Order, the "Carve-Out" shall mean an aggregate sum of not more than $1,250,000, less any Prepetition retainers paid by Debtors, which shall be used to pay (i) all Professional Fees incurred or accrued prior to the Commitment Termination Date and all Professional Fees accrued or incurred after the Commitment Termination Date to the extent allowed by the Bankruptcy Court for the payment of costs of winding up Borrowers' Chapter 11 Cases, (ii) statutory fees payable to the United States Trustee pursuant to 28 U.S.C. § 1903(a)(6) and (iii) fees

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

payable to the clerk of the Bankruptcy Court . All amounts payable as part of the Carve-Out for Professional Fees shall only be paid to the extent subsequently allowed by order of this Court.

**IX.     Restrictions on Additional Claims or Liens.**

10.     Except for the Carve-Out and the liens existing as of the date of this Interim DIP Order, no claim having a priority superior to or *pari passu* with those granted pursuant to this Interim DIP Order shall be allowed, and no lien having a priority superior to, *pari passu* with, or junior to those granted pursuant to this Interim DIP Order shall be granted in Borrowers' Chapter 11 Cases while any portion of the Postpetition Financing (or any refinancing thereof), or the Obligations remain outstanding. Except as expressly permitted by the DIP Credit Agreement and this Interim DIP Order, Borrowers shall not grant mortgages, deeds of trust, security interests, or liens in the Collateral to any parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

**X.     11 U.S.C. § 364(e) Protections.**

11.     If any or all of the provisions of this Interim DIP Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity of any Obligations incurred pursuant this Interim DIP Order or the Loan Documents, or (ii) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the Loan Documents with respect to any Obligations. Notwithstanding any such reversal, modification, vacation or stay, any incurrence of Obligations by Borrowers shall be governed in all respects by the provisions of this Interim DIP Order and the Loan Documents, and the Lenders shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Interim DIP Order, and the Loan Documents with respect to all incurrence of the Obligations by Borrowers.

**XI.     Vacation of the Automatic Stay.**

12.     Notwithstanding section 362 of the Bankruptcy Code, the automatic stay is hereby vacated and modified to the extent necessary to permit the Lenders to exercise, upon the occurrence and during the continuation of any Event of Default, upon three (3) business days written notice to Borrowers' counsel and the U.S. Trustee, all rights and remedies provided for in this Interim DIP Order,

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

the Loan Documents or applicable law, including, without limitation, taking one or more of the following actions, at the same or different times:

    (a) reduce the amount of any outstanding Revolving Loan Commitment or suspend or terminate any outstanding Revolving Loan Commitment;

    (b) charge the Default Interest on the Postpetition Financing;

    (c) declare all or any portion of the Obligations, including all or any portion of any Loan, to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrowers;

    (d) realize on any or all of the Collateral and exercise any and all remedies under the Loan Documents, and applicable law, and

    (e) exercise any rights and remedies under the Loan Documents and applicable law, including all remedies provided under the Bankruptcy Code, available to the Lenders. The rights and remedies of the Lenders specified in this Interim DIP Order are cumulative and not exclusive of any rights or remedies that the Lenders may have under the Loan Documents or otherwise.

**XII.    Miscellaneous Provisions.**

    13.    The provisions of this Interim DIP Order shall be binding upon and inure to the benefit of the Lenders, Borrowers, and their respective successors and assigns. The provisions of this Interim DIP Order and any actions taken pursuant thereto (a) shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Chapter 11 Cases that is not a Lender Approved Reorganization Plan; (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; or (iii) dismissing any of the Chapter 11 Cases; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Interim DIP Order shall maintain their priority as provided by this Interim DIP Order until all of the Obligations are indefeasibly paid in full and discharged in accordance with the terms of this Interim DIP Order and the DIP Credit Agreement.

    14.    Borrowers are hereby authorized, without further order of this Court to enter into agreements with the Lenders providing for (a) non-material modifications to the DIP Credit Agreement,

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

or (b) any other modifications to the DIP Credit Agreement necessary to conform the DIP Credit Agreement to this Interim DIP Order.

15. To the extent applicable, this Interim DIP Order is not subject to the 14-day stay provision of Rule 4001(a)(3) of the Bankruptcy Rules.

**XIII. Continuing Effect of the Emergency Cash Collateral Order and Certain Other Orders.**

16. This Order shall not alter or amend the terms of the existing orders approving and authorizing the use of cash collateral of various Prepetition Lenders, as entered by the Court.

**XIV. Notice and Final Hearing.**

17. <u>Service of Notice</u>. Debtor shall cause a copy of this Interim DIP Order to be served within three (3) business days of its entry, by electronic mail, U.S. mail or the Court's ECF noticing of the Interim Hearing to: (a) Lenders: Silver Phoenix, LLC, 12111 La Carta Court, Las Vegas, Nevada 89138, Attn: David Crockett and Ruby Capital Investments, LLC, 12111 La Carta Court, Las Vegas, Nevada 89138, Attn: Ezra K. Nilson, (b) the Office of the United States Trustee for the District of Nevada, Attn: J. Michal Bloom; (c) counsel for any statutory committee appointed in this case, and if no such committee was appointed, then to Debtors' known twenty largest unsecured creditors; (d) all other secured creditors, and all other parties requesting notice pursuant to Bankruptcy Rule 2002.

18. <u>Final Hearing</u>. A hearing to consider entry of an order granting the relief set forth in this Interim DIP Order on a final basis (the "<u>Final Order</u>") shall be held on _____, at ____ _.m. (the "<u>Final Hearing</u>") in Courtroom 3 in the Foley Federal Building, Third Floor, 300 Las Vegas Boulevard South, Las Vegas, Nevada 89101; with any objections (the "<u>Objections</u>") to entry of a Final Order due to be timely filed electronically with the Court and served on the Notice Parties and Debtors' counsel: Fox Rothschild, LLP, 3800 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169, Attn: Brett A. Axelrod, Esq. (collectively, the "<u>Objection Notice Parties</u>") (with a courtesy copy delivered directly to the Chambers of the Honorable Bruce A. Markell) so as to be actually received no later than _____, 2011. Replies to timely-filed Objections, if any, shall be filed with the Bankruptcy Court electronically and served so that they are received no later than _____, 2011 (with a courtesy copy delivered directly to the Chambers of the Honorable Bruce A. Markell) by the Objection Notice Parties and the objecting party, so as to be actually received by such filing deadline. If no timely

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1  Objections are filed, this Interim DIP Order may be deemed the Final Order upon the expiration of the

2  filing deadline for such Objections, as set forth above in this paragraph 18, at the Final Hearing.

3  DATED:        March ___, 2011.

4  Prepared and respectfully submitted by:

5  **FOX ROTHSCHILD LLP**

6  By_____

7      BRETT A. AXELROD, ESQ.
       Nevada Bar No. 5859

8      ANNE M. LORADITCH, ESQ.
       Nevada Bar No. 8164

9      MICAELA RUSTIA, ESQ.
       Nevada Bar No. 9676

10     3800 Howard Hughes Parkway, Suite 500

11     Las Vegas, Nevada 89169

12  *Counsel for Debtors*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION OF COUNSEL PURSUANT TO LOCAL RULE 9021

In accordance with Local Rule 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that:

☐ The Court has waived the requirement set forth in LR 9021(b)(1).

☐ No party appeared at the hearing or filed an objection to the motion.

☐ I have delivered a copy of this proposed order to all counsel who appeared at the hearing, any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below:

☐ I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objected to the form or content of the order.

# # #

# EXHIBIT B
# DIP CREDIT AGREEMENT

## DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT

AGREEMENT, dated as of March __, 2011, between WHITTON CORPORATION, a Nevada business corporation ("Whitton"), South Tech Simmons 3040C, LLC, a Nevada limited liability company ("Simmons" and together with Whitton, the "Borrowers", or "Debtors") debtors-in-possession in cases pending under Chapter 11 of Title 11 of the Bankruptcy Code (as defined in Section 1.1 (the "Chapter 11 Cases"); AND Ruby Capital Investments, LLC ("Ruby") and Silver Phoenix, LLC, a Nevada limited liability company ("Silver" and together with Ruby, the "Lenders" and the Lenders, together with the Borrowers, collectively referred to as the "Parties").

## RECITALS

WHEREAS, on December 5, 2010 ("Whitton Petition Date"), Whitton filed a voluntary petition with the Bankruptcy Court (as defined in Section 1.1) and, on December 8, 2010 ("Simmons Petition Date", and together with the Whitton Petition Date, collectively, the "Petition Dates"), Simmons filed a voluntary petition with the Bankruptcy Court, initiating the Chapter 11 Cases and have continued in the possession of their assets and in the management of their businesses pursuant to Bankruptcy Code Sections 1107 and 1108;

WHEREAS, an immediate and on-going need exists for the Borrowers to obtain additional funds in order to continue the operation of their businesses as debtors-in-possession under Chapter 11 of the Bankruptcy Code and, accordingly, the Borrowers have requested that the Lenders extend post-petition financing to the Borrowers;

WHEREAS, the Lenders are willing to make the Revolving Loans (as defined in Section 1.1) to the Borrowers upon the terms and conditions set forth herein;

1

WHEREAS, all exhibits hereto, or expressly identified in this Agreement, are incorporated herein by reference, and taken together, shall constitute a single agreement.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

**1.1     Defined Terms.**

Capitalized terms used in the Loan Documents (as defined herein) shall have (unless otherwise provided elsewhere in the Loan Documents) the following respective meanings and all section references in the following definitions shall refer to Sections of the Agreement:

"506(a) Order" shall mean the Final Order (unless the Lenders waive the Final Order requirement), or any stipulation entered between the Debtors and the Secured Lender holding a Lien on such Property, in reasonably satisfactory in form and substance to Lenders, together with all extensions, modifications and amendments thereto, entered upon an application of the Borrowers reasonably satisfactory in form and substance to the Lenders, which fixes and determines (i) the Property Value of some or all of the Properties as of the Plan's Effective Date in an amount acceptable to Debtors and within 10% variation (calculated as an aggregate across all Properties) of Debtors' opinion of value, and (ii) the amount of the secured portion of such Prepetition Lenders' Claims pursuant to Bankruptcy Code Section 506(a) as well as the amount of of such Prepetition Lenders' unsecured Claims.  For purposes of this Agreement, the satisfaction of any condition or time frame which is tied to the date of the entry of the 506(a) Order shall mean the date when the last of all such orders and stipulations shall have been entered.

2

"Affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person shall mean the power, directly or indirectly, either (a) to vote a majority of the outstanding equity securities having ordinary voting power for the election of directors of such Person or (b) to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agreement" shall mean this Debtor-in-Possession Revolving Credit Agreement, as the same may from time to time be amended, modified or supplemented.

"Administrative Claim" shall mean a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to Bankruptcy Code sections 503(b), 507(a)(2) or 507(b), including: (a) the actual and necessary costs and expenses incurred after the Whitton Petition Date and through the Plan's Effective Date of preserving the Borrowers' bankruptcy estates and operating the businesses of Borrowers (such as wages, salaries, or commissions for services, and payments for goods and services); (b) compensation and reimbursement of expenses for legal, financial advisory, accounting, and other services, including but not limited to, Professional Fees allowed pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Whitton Petition Date and ending on the Plan's Effective Date; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code and 28 U.S.C. §1930; and (d) all Bankruptcy Court approved requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

"Advance" shall mean the Lenders' disbursement of proceeds of a Revolving Loan to Borrowers in accordance with this Agreement.

VG1 74749v1 03/01/11

"Avoidance Actions" shall mean any actions commenced, or that may be commenced before or after the Effective Date, pursuant to section 542, 543 544, 545, 547, 548, 550, 551, 552 and/or 553 of the Bankruptcy Code.

"Bankruptcy Code" shall mean 11 U.S.C. §§ 101, et seq., as amended.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Nevada.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"BLV Dean Martin 7635 Property" shall mean that certain real estate as identified on Exhibit [A] attached hereto and as further described therein.

"BLV Mesquite Property" shall mean that certain real estate as identified on Exhibit [A] attached hereto and as further described therein.

"BLV Mountain Vista Property" shall mean that certain real estate as identified on Exhibit [A] attached hereto and as further described therein.

"Borrower" shall mean and refer to either of Whitton Corporation, a Nevada business corporation or South Tech Simmons 3040C, LLC, a Nevada limited liability company. Whitton and Simmons are collectively referred to herein as the "Borrowers."

"Borrowing Availability" means, at any time, (a) the aggregate amount of the Maximum Cash Commitment Amount at such time *less* (b) the Total Utilization of Revolving Loan Commitments.

"Business Day" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in Nevada are authorized or required by law to close.

4

"Carve Out Expenses" shall mean an aggregate sum of not more than $1,250,000, less any Prepetition retainers paid by Debtors, which shall be used to pay (i) all Professional Fees (x) incurred or accrued prior to the Commitment Termination Date and (y) all Professional Fees accrued or incurred after the Commitment Termination Date to the extent allowed by the Bankruptcy Court for the payment of costs of winding up the Borrowers' Chapter 11 Cases, (ii) statutory fees payable to the United States Trustee pursuant to 28 U.S.C. § 1903(a)(6) and (iii) fees payable to the clerk of the Bankruptcy Court.

"Carve Out Properties" shall mean the BLV Dean Martin 7635 Property and the BLV Mountain Vista Property.

"Chapter 11 Cases" shall have the meaning ascribed thereto in the Preamble.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing Date" shall mean the date of entry of the Interim DIP Order by the Bankruptcy Court.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Collateral" shall mean all assets and properties of any kind and nature of the Borrowers, including without limitation, real property, all deposit accounts and securities accounts, accounts receivable, chattel paper, inventory, equipment, rolling stock and general intangibles pursuant to Section 364(c) and (d) of the Bankruptcy Code but excluding avoidance actions under Section 544 through 550 of the Bankruptcy Code.

"Commitment Termination Date" shall mean the earliest of (a) the Maturity Date, (b) the date that is forty five (45) days after entry of the Interim DIP Order by the Bankruptcy Court unless the Final DIP Order has been entered by the Bankruptcy Court prior to the expiration of

5

such forty five (45) day period), (c) the date of substantial consummation (as defined in section 1101 of the Bankruptcy Code and which, for purposes of this Agreement, shall be no later than the Plan's Effective Date, and (d) the acceleration of the Revolving Loans and the termination of the Revolving Loan Commitments in accordance with the terms hereof, including Section 8.2.

 "Default" shall mean any of the events specified in Section 8.1, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Effective Date" shall mean the date of approval of the Final DIP Order by the Bankruptcy Court and in any event is not later then forty-five (45) days from the date of entry of the Interim DIP Order.

"Estate" shall mean the estates of Debtors that were created by the commencement of the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code, and shall be deemed to include any and all privileges and incorporeal hereditaments of Debtors and any and all interests in property, whether real, personal or mixed, rights, causes of action, avoidance powers or extensions of time that Debtors or the estates shall have had effective as of the Petition Dates or thereafter, whether by virtue of sections 544, 545, 546, 547, 548, 549 or 550 of the Bankruptcy Code or otherwise.

"Event of Default" shall have the meaning ascribed thereto in Section 8.1.

"Final DIP Order" means the Final Order of the Bankruptcy Court entered after a final hearing, upon an application of the Borrowers reasonably satisfactory in form and substance to the Lenders, under Bankruptcy Rule 4001(c)(2), or such other procedures as approved by the Bankruptcy Court, and assuming satisfaction of the standards prescribed in section 364 of the

Bankruptcy Code, together with all extensions, modifications and amendments thereto, which order shall be satisfactory in form and substance to Lenders, which, among other matters but not by way of limitation, (i) approves, on a final basis, the transactions contemplated in this Agreement, (ii) authorizes, on a final basis, the Borrowers to enter this Agreement and obtain credit, incur indebtedness, provide Lender with the Superpriority Claim and Liens to secure payment of the Obligations in accordance herewith, and (iii) includes a finding that the Lenders are extending credit to Borrowers in good faith within the meaning of Bankruptcy Code section 364(e).

"Final Order" means an order or judgment entered by the Bankruptcy Court: (a) that has not been reversed, stayed, modified, amended, revoked, varied or set aside, and as to which (i) any right to appeal or seek certiorari, review, reargument, stay or rehearing has been waived or (ii) the time to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending; or (b) as to which an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought and (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has been waived or expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending, provided, however, that no order or judgment shall fail to be a "Final Order" hereunder solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code, Rule 59 or 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be Filed with respect to such order or judgment.

7

"Fiscal Year" shall mean any of the annual accounting periods of the Borrowers ending on December 31 of each year.

"General Unsecured Claims" shall mean all the Claims against the Debtors, including any deficiency Claims of Prepetition Lenders and Claims resulting from rejection of executory contracts and unexpired leases, that are not secured Claims, Administrative Claims, or Priority Claims, and that are not subject to subordination by agreement or otherwise.

"General Unsecured Creditors Fund" shall mean a certain sum of Cash to be distributed, pro rata, on account of allowed General Unsecured Claims, pursuant to the terms of the Lender Approved Reorganization Plan.

"Interest Payment Date" means the last Business Day of each calendar quarter.

"Interim DIP Order" means the Order entered by the Bankruptcy Court after an interim hearing (assuming satisfaction of the standards prescribed in section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law) upon an application of the Borrowers reasonably satisfactory in form and substance to Lenders, together with all extensions, modifications and amendments thereto, which order shall be satisfactory in form and substance to Lenders, which, among other matters but not by way of limitation, (i) approves, on an interim basis, the transactions contemplated in this Agreement, (ii) authorizes, on an interim basis, the Borrowers to enter this Agreement and obtain credit, incur indebtedness, provide Lender with the Superpriority Claim and Liens to secure payment of the Obligations in accordance herewith, (iii) includes a finding that the Lenders are extending credit to Borrowers in good faith within the meaning of Bankruptcy Code section 364(e).

VG1 74749v1 03/01/11

"Lender" shall mean and refer to either of Ruby Capital Investments, LLC, a Nevada limited liability company or Silver Phoenix, LLC a Nevada limited liability. Ruby and Silver are collectively referred to herein as the "Lenders."

"Lender Approved Reorganization Plan" shall mean a Reorganization Plan that is consistent with that certain "Restructuring and Debtor-in-Possession Term Sheet" entered into between and among Borrowers and Lenders dated as of February 14, 2011, as the same may from time to time be amended, restated, modified of supplemented by mutual agreement of the Parties, or confirming a Reorganization Plan that is otherwise acceptable to Lenders in form and substance.

"Lien" shall mean (a) any mortgage, pledge, statutory deemed trust, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC (other than the filing of any such financing statement which states therein that such filing is a precautionary filing only and is filed in connection with "true leases" only) or comparable law of any jurisdiction), (b) any arrangement or agreement which prohibits Borrowers from creating any mortgage, pledge, hypothecation, deposit arrangement, encumbrance, lien, charge or other security interest, or from entering into any agreement or arrangement described in clause (a) of this definition or (c) the sale, assignment, pledge or transfer for security of any accounts, general intangibles or chattel paper of Borrowers with or without recourse.

"Litigation" shall have the meaning ascribed thereto in Section 3.4.

VG1 74749v1 03/01/11

"Loans" shall mean the Revolving Loans.

"Loan Documents" shall mean this Agreement, the Revolving Notes, deed of trust and assignment of rents and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, Lenders and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of Borrowers in connection with the Agreement or the transactions contemplated hereby. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all exhibits thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement as the same may be in effect at any and all times such reference becomes operative.

"Material Adverse Effect" shall mean a material adverse effect on (a) the business, operations, property or condition (financial or otherwise) of the Borrowers, (b) the ability of the Borrowers to fully and timely perform their Obligations, (c) the validity, priority or enforceability of this Agreement, any of the Revolving Notes or any of the other Loan Documents, or the rights or remedies of the Lenders hereunder or thereunder, or (d) the feasibility of any Lender Approved Reorganization Plan.

"Maturity Date" shall mean the earlier of (a) December 31, 2011, or (b) the Plan's Effective Date.

"Maximum Cash Commitment Amount" shall mean (a) on and after the Closing Date and prior to the date of entry of the 506(a) Order, the sum of up to $350,000, (b) on and after the date of entry of the 506(a) Order and prior to the date of entry of the Plan Confirmation Order, the sum of up to $825,000 and (c) on and after the date of entry of the Plan Confirmation Order, the sum of up to $2,100,000. Such Maximum Cash Commitment Amount (which shall be advanced

10

to Borrowers in cash) does not include the Interest and Origination Fee that will accrue in excess of the $2,100,000 Maximum Cash Commitment Amount.  Interest and Origination Fee will not reduce the Maximum Cash Commitment Amount.

"New Parent Company" shall mean a Nevada limited liability company that shall be formed and funded by the Lenders to own 100% of the equity interests of the Reorganized Debtors pursuant to a Lender Approved Reorganization Plan.

"Notes" shall mean the Revolving Notes.

"Notice of Revolving Loan" shall have the meaning ascribed thereto in Section 2.3.

"Obligations" shall mean the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Revolving Loans) the Revolving Notes and under this Agreement, or any other document made, delivered or given in connection therewith or herewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, or expenses.

"Plan Confirmation Order" shall mean the Final Order entered by the Bankruptcy Court (unless Lenders waive the requirement of a Final Order), satisfactory in form and substance to Lenders, together with all extensions, modifications and amendments thereto confirming a Lender Approved Reorganization Plan.

"Person" shall mean an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Petition Dates" shall have the meaning ascribed thereto in the Recitals.

"Plan's Effective Date" shall mean the date a Lender Approved Reorganization Plan, which has been confirmed pursuant to the Plan Confirmation Order, becomes effective in

11

accordance with its terms, or the occurrence of the "Effective Date" as defined in a Lender Approved Reorganization Plan which has been confirmed by the Plan Confirmation Order.

"Postpetition Financing Orders" shall mean the Interim DIP Order, any other interim orders approving the lending pursuant to this Agreement and the Final DIP Order.

"Prepetition" means anytime or date prior to December 5, 2010.

"Prepetition Lenders" shall mean the Prepetition Lenders set forth on **Exhibit A** who hold Liens to secure their claims on the Property indicated with respect to such lenders as set forth on **Exhibit A** .

"Priority Claim" shall mean a Claim entitled to priority under sections 507(a)(2) through (8) of the Bankruptcy Code.

"Professional" shall mean an Person or Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"Professional Fees" shall mean all reasonable fees and expenses incurred by Professionals and allowed by the Bankruptcy Court.

"Professional Fee Claims" shall mean any Claim for compensation or reimbursement of fees and expenses as may be requested by a Professional to the extent such Professional is required to apply to the Bankruptcy Court for payment of such Claim pursuant to sections 326, 328, 330 or 331 of the Bankruptcy Code or as otherwise provided in a Reorganization Plan.

"Properties" shall mean collectively, all real estate and Rents thereof owned by the Debtors and listed on the Debtors Schedules, as amended or modified, including, the BLV

Cheyenne Property, BLV Mountain Vista Property, BLV  Dean Martin Property, BLV Mesquite Property, BofA Property, German American Brooks Property, German American Glendale Property, German American Greg Property, GSMS Property, Hudson  Cheyenne Property, Hudson Dean Martin Property, Hudson Diablo Property, Hudson Russell Property, Hudson Seven Hills Property, Hudson Stephanie Property, JPMCC Property, and Umbra Property (each as described and defined on Exhibit A attached hereto) and each individually referred to as a "Property".

"Property Value" shall mean for any Property, its going concern value as determined by the Bankruptcy Court or through stipulation between the Debtors and the Prepetition Lender holding a Lien on such Property, for which the 506 Application seeks to fix a specific value for each such Property as set forth therein.

"Reorganized Debtors" shall mean on or after the Plan's Effective Date, the Borrowers, or the survivor of the Borrowers if the Borrowers have merged together, as reorganized debtor(s).

"Reorganization Plan" shall mean a plan of reorganization or plan of liquidation filed by the Borrowers in the Chapter 11 Cases.

"Requirement of Law" as to any Person shall mean the certificate of incorporation and bylaws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other governmental authority, in each case, applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

VG1 74749v1 03/01/11

"Revolving Loan" and "Revolving Loans" shall have the meaning ascribed to such terms in Section 2.1, as such Revolving Loans may be increased by interest and fees capitalized and added to the principal balance thereto pursuant to the terms of this Agreement.

"Revolving Loan Commitment" means Lenders' commitment to make Revolving Loans to the Borrowers in the aggregate amount of $2,100,000 in cash as follows: (a) on and after the Closing Date and prior to the date of entry of the 506(a) Order, the sum of $350,000, (b) on and after the date of entry of the 506(a) Order and prior to the date of entry of the Plan Confirmation Order, the sum of $825,000 (including the prior Advance totaling $350,000) and (c) on and after the date of entry of the Plan Confirmation Order, the sum of $2,100,000 (including the prior Advances totaling $825,000). Such Revolving Loan Commitment (which shall be advanced to Borrowers in cash) does not include the Interest and Origination Fee that will accrue in excess of the $2,100,000 Revolving Loan Commitment. Interest and Origination Fee will not reduce the Revolving Loan Commitment.

"Revolving Loan Tranche 1" shall mean the initial Revolving Loan and Advances thereunder totaling $350,000 made on and after the Closing Date and prior to the date of entry of the 506(a) Order.

"Revolving Loan Tranche 2" shall mean the second Revolving Loan and Advances thereunder totaling $475,000 (to bring the total outstanding amount of the Revolving Loans and Advances thereunder to $825,000) made on and after the date of entry of the 506(a) Order and prior to the date of entry of the Plan Confirmation Order.

"Revolving Loan Tranche 3" shall mean the third Revolving Loan and Advances thereunder totaling up to $1,275,000 (to bring the total outstanding amount of Revolving Loans

14

and Advances thereunder up to $2,100,000) made on and after the date of entry of the Plan Confirmation Order.

"Revolving Note" shall have the meaning ascribed thereto in Section 2.2.

"Subsidiary" or "Subsidiaries" of a Person shall mean a corporation, partnership or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the occurrence of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise indicated, all references to Subsidiaries are to the Subsidiaries of Borrowers.

"Superpriority Claim" shall mean an allowed Administrative Claim against the Borrowers having priority over any and all Administrative Claims of the kind specified in Bankruptcy Code sections 503(b) and 507(b), of any kind whatsoever, now existing or hereafter arising, including, without limitation, all Administrative Claims of the kinds or arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 (such superpriority status would be applicable to any proceeds from Avoidance Actions), subject only to the Carve Out Expenses.

"Total Utilization of Revolving Loan Commitments" means, as of any date of determination, the sum of the aggregate amount of all Advances of cash to Borrowers pursuant to Revolving Loans (and does not include interest and Origination Fee that are capitalized and added to principal balance of the Revolving Loans pursuant to the terms of this Agreement).

"US Trustee Fees" shall mean fees payable to the pursuant to 28 U.S.C. § 1930.

15

**1.2** **Other Definitional Provisions.**

(a)     Unless otherwise specified therein, all terms defined in this Agreement shall have their respective defined meanings when used in the Notes or other document made or delivered pursuant hereto.

(b)     As used herein, in the Notes or any other Loan Document made or delivered pursuant to this Agreement, accounting terms relating to Borrowers and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under normal and customary use.

(c)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole, including all Exhibits, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection or clause contained in this Agreement or any such Exhibit.  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(d)     Unless the context otherwise requires, each reference herein to any agreement, document or instrument (including the Loan Documents) shall be deemed a reference to such agreement, document or instrument as amended, restated, supplemented or otherwise modified from time to time.

(e)     The term "includes" and "including" shall not be construed to imply any limitation.

(f)     In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."  Periods of days referred to in this Agreement shall be counted in

calendar days unless Business Days are expressly prescribed. Any period determined hereunder by reference to a month or months or year or years shall end on the day in the relevant calendar month in the relevant year, if applicable, immediately preceding the date numerically corresponding to the first day of such period, provided that if such period commences on the last day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month during which such period is to end), such period shall, unless otherwise expressly required by the other provisions of this Agreement, end on the last day of the calendar month.

**1.3    Payment Terms; References to Money.**

Except as expressly set forth herein to the contrary, (a) all payments made by the Borrowers shall be made in dollars in respect of principal and interest on the Revolving Loans, and (b) to the extent not otherwise indicated, all amounts of money referenced herein shall mean and be references to amounts of money denominated in dollars.

**ARTICLE II**

**AMOUNT AND TERMS OF REVOLVING LOANS**

**2.1    Revolving Loan Commitments.**

Subject to the terms and conditions in this Agreement (including without limitation the conditions precedent set forth in ARTICLE IV) from and after the Closing Date, Lenders agree to make Revolving Loans (each, a "<u>Revolving Loan</u>") to Borrowers from time to time until the Commitment Termination Date in an aggregate principal amount at any one time outstanding not to exceed the Borrowing Availability; provided that Lenders shall not be permitted or required to make any Revolving Loan if, after giving effect thereto, the aggregate outstanding principal amount of all Revolving Loans outstanding would exceed the Borrowing Availability.

17

Until the Commitment Termination Date, the Borrowers may from time to time borrow, prepay and re-borrow the Revolving Loans in whole or in part under this Section 2.1, all in accordance with the terms and conditions in this Agreement (subject in particular to any reductions in Revolving Loan Commitments pursuant to Sections 2.4). Each Revolving Loan shall be denominated in dollars.

**2.2 Revolving Notes.**

Each Revolving Loan made by Lenders shall be evidenced by a promissory note issued by the Borrowers made payable to the order of Lenders substantially in the form of Exhibit B (a "Revolving Note"), with appropriate insertions as to date and principal amount and in a principal amount equal to the lesser of (a) the amount of the Revolving Loan Commitment and (b) the aggregate unpaid principal amount of all Revolving Loans made by Lenders. Each Revolving Note shall (i) be dated as of its date of issuance, (ii) be stated to mature on the Maturity Date or such earlier date the Revolving Loans shall be due and payable in full, whether by acceleration or otherwise, pursuant to the terms of this Agreement and (iii) provide for the payment of all principal and accrued interest.

**2.3 Procedure for Revolving Loans and Payments.**

(a) Until the Commitment Termination Date, the Borrowers may borrow under the Revolving Loan Commitments on any Business Day; provided that (i) the Borrowers may not make more than one borrowing per calendar week. Each borrowing under the Revolving Loan Commitment shall be in an amount equal to not less than $50,000 or a whole multiple of $5,000 in excess thereof. Prior to 2:00 p.m. Nevada time on the Borrowing Date requested by the Borrowers, Lenders will make the amount of the Revolving Loan available to the account of the Borrowers.

18

(b)     The Revolving Loans (including all interest and fees capitalized and added to the principal balance of the Revolving Loans) shall be paid in full on or prior to the Commitment Termination Date, pursuant to the terms herein.  Lenders' obligation to make Revolving Loans shall terminate at the close of business on the Business Day immediately preceding the Maturity Date, unless sooner terminated in accordance with the terms hereof.

**2.4     Permanent Reduction of Revolving Loan Commitment**.

The Borrowers shall have the right, upon not less than five Business Days' notice, to terminate the Revolving Loan Commitment or, from time to time, to reduce permanently the amount of the Maximum Cash Commitment Amount in whole or in part.  Such reduction of the Maximum Cash Commitment Amount shall be accompanied by payment in full of all outstanding principal and accrued interest thereon, to and including the date of such prepayment, together with any additional amounts owing and any outstanding fees and expenses due and owing such that after such payment, the total amount outstanding on all Revolving Loans shall not exceed the Maximum Cash Commitment Amount as reduced hereby.

**2.5     Interest Rates, Origination Fee and Payment Dates.**

(a)     Each Revolving Loan (and all amounts capitalized and added to the principal balance of the Revolving Loans) shall bear interest at a rate *per annum* of eighteen per cent (18.0%).

(b)     A non refundable origination fee ("Origination Fee") equal to three percent (3%) of the Maximum Cash Commitment Amount shall accrue upon the entry of the Interim DIP Order.

(c)     Notwithstanding the foregoing, in the event an Event of Default has occurred and is continuing, the Revolving Loan shall bear interest at a rate *per annum* equal to the rate set

forth above plus 5.0% ("Default Interest") from the date of occurrence of such Event of Default until the date such Event of Default is cured or waived (after as well as before judgment). In addition, should any interest on any Revolving Loan or any other obligations payable hereunder not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest (to the extent permitted by law in the case of interest on interest) at a rate *per annum* equal to rate set forth above plus 5.0%, in each case, from the date of such non-payment until such amount is paid in full (after as well as before judgment).

(d)    Accrued interest on the Revolving Loans will be capitalized and added to the outstanding principal balance of the Revolving Loans as of each Interest Payment Date.

(e)    The Origination Fee shall be capitalized and added to the outstanding principal balance of the Revolving Loans.

Amounts representing interest and Origination Fee which are capitalized and added to the outstanding principal balance of Revolving Loan, shall thereafter bear interest in accordance with this Section and otherwise be treated as a Revolving Loan for all purposes of this Agreement (except for purposes of determining the Total Utilization of Revolving Loan Commitments). Interest accruing pursuant to Section 2.5(b) shall be payable in arrears on the Commitment Termination Date.

**2.6    Computation of Interest.**

(a)    Interest shall be calculated for the actual number of days elapsed on the basis of a hypothetical year of 365 days.

(b)    Each determination of an interest rate pursuant to any provision of this Agreement shall be conclusive and binding on the Borrowers and the Lenders in the absence of manifest error. Any payment of interest on any Revolving Loan shall be subject to any applicable

withholding taxes and any amount withheld shall be treated as having been paid by the Borrowers to the Lenders.

**2.7    Prepayments.**

(a)    Optional Prepayments.  Borrowers may, at any time and from time to time prepay the Revolving Loans, in whole or in part, without premium or penalty, upon irrevocable written notice to the Lenders by 11:00 a.m. (Nevada time) on such date of prepayment, in each case specifying the date and amount of prepayment.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with any amounts payable, accrued interest to such date on the amount prepaid and any outstanding fees and expenses then due and owing.   Any prepayment shall be applied in the following order of priority (a) first, to the payment of all costs and expenses that are due and payable to the Lenders on such date under and in respect of the Loans; and (b) second, to the payment of the outstanding principal amount of all of the Revolving Notes that are due and payable to the Lenders on such date, together with all accrued and unpaid interest thereon.

**2.8    Use of Proceeds.**

The Borrowers shall utilize the proceeds of the Revolving Loans solely (a) for ordinary course of business expenses incurred in operating the Borrowers' business, (b) to pay allowed Administration Claims, including payment of compensation to employees, payment of Professional Fees, and payment of any contractual obligations, all consistent with the Final DIP Order, (c) to provide all funds required to be disbursed, or deposited and held for later disbursement upon allowance or other Bankruptcy Court authorization, on or as of the Plan's Effective Date (1) to Holders of Professional Fee Claims, other allowed Administrative Claims, allowed Priority Claims to be paid in Cash on the Plan's Effective Date, (ii) to create the General

21

Unsecured Creditors Fund, (iv) to the U.S. Trustee for US Trustee Fees, and any other fees pursuant to chapter 123 of the Judicial Code, due as of the Plan's Effective Date, (v) for any other distributions and payment of Claims, costs and expenses in connection with consummating the Lender Approved Reorganization Plan, and (vi) to provide working capital for the Reorganized Debtors of not less than the amount of $500,000. Borrowers shall not be permitted to use the proceeds of the Loans: (i) to finance in any way, any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of Lenders or their rights and remedies under this Agreement, the other Loan Documents, or the Post Petition Financing Orders, (ii) to finance the payment of, or application for authority to pay, any Prepetition Claim, other than pursuant to the Lender Approved Reorganization Plan, without the Lenders' prior written consent, and (iii) to make any payment in settlement of any Claim, action or proceeding, before any court, arbitrator or other governmental body, other than pursuant to a Lender Approved Reorganization Plan, without the prior written consent of Lenders.

**2.9    Separate Loans Not To Exceed Commitment.**

All Loans to the Borrowers and all of the other Obligations of Borrowers arising under this Agreement and the other Loan Documents shall constitute separate loans to the Borrowers, evidenced by a separate promissory note executed by the Borrowers; provided, however, that the total outstanding balance of all loans by Borrowers, exclusive of accrued interest and Origination Fee which were capitalized and added to the principal, shall not exceed the Maximum Cash Commitment Amount as in effect from time to time under this Agreement.

**2.10    Superpriority Claims and Liens To Secure Obligations.**

(a)   Borrowers hereby covenant, represent and warrant that, upon the date of entry of each of the Postpetition Financing Orders, the Obligations of the Borrowers hereunder and under

the Loan Documents pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute a Superpriority Claim.

(b)  Subject to entry of each Postpetition Financing Order, to secure payment of the Obligations, Borrowers do hereby grant Lenders a first priority Lien on all unencumbered assets and property of the Borrowers other than Avoidance Actions.  Borrowers hereby covenant, represent and warrant that, upon the date of  entry of each Postpetition Financing Order, the Obligations of the Borrowers hereunder and under the Loan Documents, pursuant to section 364(c)(2) of the Bankruptcy Code, shall be secured by a first priority Lien on all unencumbered assets and property of the Borrowers other than on Avoidance Actions.

(c)  Subject to entry of each Postpetition Financing Order, to secure payment of the Obligations, Borrowers do hereby grant Lenders a junior Lien on all assets and property of the Borrowers that are encumbered by Liens as of the date of the Interim DIP Order, except for the BLV Mesquite Property and Avoidance Actions.  Borrowers hereby covenant, represent and warrant that, upon the date of entry of each Postpetition Financing Order, the Obligations of the Borrowers hereunder and under the Loan Documents, pursuant to section 364(c)(3) of the Bankruptcy Code, shall be secured by a junior Lien on all assets and property of the Borrowers that are encumbered by Liens as of the date of the Interim DIP Order, except for the BLV Mesquite Property.  No Lien shall be granted or provided to Lenders on the BLV Mesquite Property.

**2.11  Payment of Obligations.**

Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

**2.12    No Discharge; Survival of Claims.**

Borrowers agree that to the extent the Obligations hereunder are not satisfied in full, (i) their Obligations arising hereunder shall not be discharged by the entry of a order confirming a Reorganization Plan (and the Borrowers, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (ii) the Superpriority Claim granted to Lenders pursuant to the Interim DIP Order and Final DIP Order shall not be affected in any manner by the entry of an order confirming a Reorganization Plan in any Chapter 11 Case.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce Lenders to make the Loans, the Borrowers, make the following representations and warranties to Lenders with respect to Borrowers, as of the date of the entry of each of the Post Petition Financing Orders, each and all of which shall survive the execution and delivery of this Agreement.

**3.1    Corporate Existence; Compliance with Law.**

Borrowers (a) are duly organized, validly existing and in good standing under the laws of Nevada; (b) are duly qualified as a foreign corporation or limited liability company, as the case maybe, and are in good standing under the laws of each jurisdiction where their ownership or lease of property or the conduct of their business requires such qualification, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect; (c) subject to the entry of the Postpetition Financing Orders by the Bankruptcy Court, have the requisite corporate power and authority and the legal right to effect the transactions contemplated hereby and by the other Loan Documents to which they are a party; (d) subject to the entry of the Postpetition Financing Orders by the Bankruptcy Court, have the requisite corporate power and

VG1 74749v1 03/01/11

authority and the legal right to including, without limitation, to own, pledge, mortgage or otherwise encumber and operate their properties, to lease the property they operates under lease and to conduct their business as now, heretofore and proposed to be conducted; and (e) are in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**3.2     Corporate Power, Authorization, Enforceable Obligations.**

Upon, and subject to, entry by the Bankruptcy Court of the Postpetition Financing Orders, (a) Borrowers have the corporate power and authority, and the legal right, to make, deliver and perform the Loan Documents to which they are a party and to authorize the execution, delivery and performance of the Loan Documents to which they are a party, (b) Borrowers have the appropriate power and authority to borrow hereunder and have taken all necessary corporate action to authorize the borrowings on the terms and conditions set forth in this Agreement and in the Notes, (c)  the Agreement, and each other Loan Document to which they are a party will be, duly executed and delivered on behalf of Borrowers, and (d) this Agreement, and each other Loan Document to which Borrowers are a party when executed and delivered, will constitute, a legal, valid and binding obligation of the Borrowers, enforceable against each Borrowers in accordance with its terms, (whether enforcement is sought by proceedings in equity or at law).

**3.3     No Legal Bar.**

Except for the effect of the filing of the Chapter 11 Cases, and subject to the entry of the Postpetition Financing Orders, the execution, delivery and performance of the Loan Documents to which Borrowers are a party, the borrowings by the Borrowers hereunder and the use of the proceeds of the Loans (a) will not violate any Requirement of Law or material contractual

obligation of Borrowers, (b) will not accelerate or result in the acceleration of any payment obligations of Borrowers, and (c) will not result in, or require, the creation or imposition of any Lien on any of the respective properties or revenues of any Borrowers pursuant to any such Requirement of Law or material contractual obligation.

**3.4    No Material Litigation.**

Other than for any litigation, investigation or proceeding before the Bankruptcy Court in the Chapter 11 Cases, no litigation, investigation or proceeding of or before any arbitrator or governmental authority (collectively, "Litigation") is pending or, to the knowledge of Borrowers, threatened by or against Borrowers (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) which could reasonably be expected to have a Material Adverse Effect, except for litigation commenced prior to the Petition Dates by various Prepetition Lenders against the Debtors, or their predecessors in interest).

**3.5    No Default.**

Other then as set forth on Schedule 3.5 attached hereto, Borrowers are not in default under, or with respect to, any of their material contractual obligations arising after the Petition Dates in any respect which could reasonably be expected to have a Material Adverse Effect. Immediately after giving effect to this Agreement, no post petition Default or Event of Default has occurred and is continuing.

**3.6    Taxes.**

Borrowers have filed or caused to be filed all tax returns which, to the knowledge of the Borrowers are required to be filed. Borrowers have paid all taxes shown to be due and payable on said returns or on any assessments made against them or any of their property and all other taxes, fees or other charges imposed on them or any of their property by any governmental

26

authority (other than any tax, fee or other charge the amount or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with customary usage has been provided on the books of such Loan Party or which accrued or became payable prior to the Petition Dates); and, no tax Lien has been filed, and, to the knowledge of Borrowers, no claim is being asserted, with respect to any such tax, fee or other charge.

**3.7    Purpose of Loans.**

The Borrowers shall not use the proceeds of any Revolving Loan hereunder other than in accordance with this Agreement.

**3.8    Accuracy and Completeness of Information.**

All information, reports and other papers and data with respect to the Borrowers (other than projections) furnished to the Lenders by or on behalf of Borrowers, were, at the time furnished, complete and correct in all material respects, or have been subsequently supplemented by other information, reports or other papers or data, to the extent necessary to give the Lenders a true and accurate knowledge of the subject matter in all material respects other then as set forth in this Agreement [or on Schedule 3.8 hereto], there is no fact known to Borrowers which has, or could reasonably be expected to have, a Material Adverse Effect.

**3.9    The Required Orders.**

On or prior to the date of the making of Revolving Loan Tranche 1 hereunder and Advances with respect thereto, the Interim DIP Order shall have been entered and shall not have been stayed, amended (without the Lenders' prior written consent, which consent shall be in their sole discretion), vacated, reversed, rescinded or otherwise modified in any respect.  On or prior to the date of the making Revolving Loan Tranche 2 hereunder and Advances with respect

27

thereto, the Interim DIP Order, the Final DIP Order and the 506(a) Order, shall have been entered and shall not have been amended, stayed, vacated or rescinded without the Lenders' consent which shall not be unreasonably withheld, conditioned or delayed. On or prior to the making of Revolving Loan Tranche 3 hereunder and Advances with respect thereto, the Plan Confirmation Order shall have been entered. Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations of the Borrowers hereunder and under the other Loan Documents, the Lender shall be entitled to immediate payment of such obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

**3.10    Priority of Claims.**

Upon the entry of the Interim DIP Order, the Superpriority Claim status of Lenders shall be as set forth herein and the relative priorities of all the claims and interests shall be as set forth on <u>Exhibit A</u> attached hereto.

**3.11    Reorganization Matters.**

(a)     The Chapter 11 Cases were commenced on their respective Petition Dates in accordance with applicable law and proper notice thereof and the proper notice for the hearing for the approval of the Interim DIP Order has been given and proper notice for the hearing for the approval of the Final DIP Order will be given.

(b)     After the entry of the Interim DIP Order, and pursuant to and to the extent permitted in the Interim DIP Order, and the Final DIP Order, the Obligations will constitute Superpriority Claims, subject only to the Carve Out Expenses.

(c)     The Interim DIP Order (with respect to the period prior to entry of the Final DIP Order) or the Final DIP Order (with respect to the period on and after entry of the Final DIP

Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended.

(d)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

**ARTICLE IV**

**CONDITIONS PRECEDENT**

**4.1     Initial Loan Conditioned Upon Entry of the Interim DIP Order.**

The obligations of the Lenders to make the Revolving Loan Tranche 1 on the Closing Date, or to take, fulfill, or perform any other action hereunder is subject to the satisfaction of the following conditions precedent:

(a)     Loan Documents.     The Lenders shall have received this Agreement, the Revolving Note and all other Loan Documents, each other agreement, documents and instruments relating to the loan and other credit transactions contemplated by this Agreement, each duly executed where appropriate and in form and substance satisfactory to the Lenders.

(b)     No Material Adverse Effect.     No Material Adverse Effect shall have occurred with respect to Borrowers between February 14, 2011 and the date of making the initial Revolving Loan, other than those which customarily occur as a result of the pendency of the Chapter 11 Cases.

(c)     Interim DIP Order.     On or before March 15, 2011, the Interim DIP Order shall have been entered by the Bankruptcy Court. Such Interim DIP Order (i) shall be in full force and effect and (ii) shall not have been stayed, reversed, vacated or rescinded or, without the consent

29

of the Lenders, modified or amended in any respect and, if the Interim DIP Order is the subject of a pending appeal in any respect, neither the making of such Loan nor the performance by the Borrowers of any of their Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(d)     Litigation.  No litigation shall have been commenced or be pending which has not been stayed by the commencement of the Chapter 11 Case and which, if successful, would have a Material Adverse Effect on Borrowers taken as a whole, their business or ability to repay the Revolving Loans or which would challenge this Agreement, Postpetition Financing Orders or the transactions contemplated thereby.

**4.2     Conditions to Additional Loans upon Entry of the 506(a) Order and Plan Confirmation Order.**

The obligations of the Lenders to make Revolving Loan Tranche 2 on the date of Bankruptcy Court entry of the 506(a) Order and Revolving Loan Tranche 3 on the date of Bankruptcy Court entry of the Plan Confirmation Order, or to take, fulfill, or perform any other action hereunder is subject to the satisfaction of the following conditions precedent:

(a)     Conditions Set Forth In Section 4.1.  Each of the conditions precedent set forth in Section 4.1 shall be in full force and continuing effect.

(b)     Final DIP Order.  Not later than forty-five (45) days after the date of entry of the Interim DIP Order, the Final DIP Order shall have been entered by the Bankruptcy Court.  Such Final DIP Order (i) shall be in full force and effect and (ii) shall not have been stayed, reversed, vacated or rescinded or, without the consent of the Lenders which shall not be unreasonably withheld, conditional or delayed, modified or amended in any respect and, if the Final DIP Order

30

is the subject of a pending appeal in any respect, neither the making of such Loans nor the performance by the Borrowers of any of their Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(c)     No Material Adverse Effect.  As a condition precedent to Lenders' obligations to make Revolving Loan Tranche 2, no Material Adverse Effect shall have occurred with respect to Borrowers between the date of entry of the Interim DIP Order and the date of entry of the 506(a) Order, other than those which customarily occur as a result of the pendency of the Chapter 11 Cases

(d)     506(a) Order.  As a condition precedent to Lenders' obligations to make Revolving Loan Tranche 2, the 506(a) Order shall have been entered by the Bankruptcy Court. Such 506(a) Order (i) shall be in full force and effect and (ii) unless waived by Lenders, shall be a Final Order, or, without the consent of the Lenders which shall not be unreasonably withheld, conditional or delayed, modified or amended in any respect and, if the 506(a) Order is the subject of a pending appeal in any respect, neither the making of such Loans nor the performance by the Borrowers of any of their Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(c)     Plan Confirmation Order.  As a condition precedent to Lenders' obligations to make Revolving Loan Tranche 3, the Plan Confirmation Order shall have been entered by the Bankruptcy Court.  Such Plan Confirmation Order shall be in full force and effect and unless waived by Lenders, shall be a Final Order, or, without the consent of the Lenders which shall not be unreasonably withheld, conditional or delayed, modified or amended in any respect and, if the

31

Plan Confirmation Order is the subject of a pending appeal in any respect, neither the making of such Loans nor the performance by the Borrowers of any of their Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

**ARTICLE V**

**NEGATIVE COVENANTS**

From the date hereof and for so long as the Revolving Loan Commitments remain in effect, any Revolving Note remains outstanding and unpaid or any Obligation is owing to the Lenders hereunder, Borrowers hereby agree that they will not, (and will not seek, unless in connection with an amendment to the Agreement that is reasonably likely to be approved by the Lenders to the Bankruptcy Court authority to):

**5.1     Limitation on Indebtedness.**

Create, incur, assume or permit to exist any indebtedness, or enter into any agreement or binding commitment to create, incur, assume or suffer to exist any indebtedness, except the Revolving Loans and the other Obligations created under this Agreement;

**5.2     Limitation on Liens.**

Create, incur, assume or permit to exist any Lien any of their properties, assets or revenues, (whether now owned or hereafter acquired), except for inchoate Liens for taxes, assessments or governmental charges or levies or Liens for taxes, assessments, governmental charges or levies not yet due or which are being contested in good faith by appropriate proceedings; *provided* that adequate reserves with respect thereto are maintained on the books of the Borrowers;

**5.3     Limitation on Sale of Assets.**

Convey, sell, lease, assign, transfer or otherwise dispose of any of their property, business or assets (including, without limitation, any capital stock of Borrowers, receivables and fee or leasehold interests), whether now owned or hereafter acquired, in each case, in one transaction or a series of transactions to any Person, except:

(a)    as otherwise approved in writing prior to the consummation thereof by Lenders; and

(b)    the sale or other disposition of obsolete or worn out property in the ordinary course of business and having a book value not exceeding $10,000 in the aggregate in any Fiscal Year, provided that the net proceeds of each transaction (if any) are applied in prepayment of the Revolving Loans;

(c)    Incur, create, assume, suffer to exist or permit any other Superpriority Claim or Lien which is *pari passu* with or senior to the claims of the Lenders granted pursuant to this Agreement and the Postpetition Financing Orders subject only to the Carve Out Expenses;

**5.4    Plan of Reorganization.**

Propose, file, solicit votes for, support or prosecute a plan or disclosure statement for the Borrowers that is not acceptable to Lenders in form and substance;

**ARTICLE VI**

**AFFIRMATIVE COVENANTS**

From the date hereof and for so long as the Revolving Loan Commitments remain in effect, any Revolving Note remains outstanding and unpaid or any Obligation is owing to the Lenders hereunder, Borrowers shall perform or be subject to the following:

**6.1    Monthly Operating Reports.**

Each month Borrowers shall provide Lenders with a copy of the Monthly Operating Reports prepared by Borrowers and filed with the Bankruptcy Court in accordance with U.S. Trustee guidelines, contemporaneously with such reports filing with the Bankruptcy Court.

**6.2      Other US Trustee Reports.**

Borrowers shall provide Lenders with a copy of the any other reports or information mandated or requested by the U.S. Trustee in accordance with U.S. Trustee guidelines, contemporaneously with the Borrowers providing such reports to the U.S. Trustee.

**6.3      Deadlines re Lender Approved Reorganization Plan.**

(a)      No later than forty-five (45) days from the Effective Date, Borrowers shall present Lenders with their proposed draft of Lender Approved Reorganization Plan and related disclosure statement ("Daft Plan and Disclosure Statement") for Lenders' review and approval.

(b)      No later than twenty (20) days from the date the Lenders notify Borrowers' counsel that they have approved the Draft Plan and Disclosure Statement ("Lender Approval Date"), the Borrowers will finalize and file same with the Bankruptcy Court and seek a hearing to approve the disclosure statement and solicitation procedures.

(c)      No later than ninety (90) days from the Lender Approval Date, the Lender Approved Plan shall be confirmed by the Bankruptcy Court.

**6.4      Other Requirements.**

Borrowers will:

(a) deliver to the Lenders all financial statements and other reporting reasonably requested by the Lenders;

(b) promptly provide written notice to the Lenders of the receipt of any notice of

(i) the commencement of any material litigation against or involving any of the Borrowers (including any insolvency, administration, liquidation, or similar proceeding relating to any of the Borrowers) other than with respect to proceedings brought in the Chapter 11 Cases or in any adversary proceeding related to the Chapter 11 Cases,

(ii) termination of or default under any material contract, and (c) noncompliance with any rule, statute, law, permit or license that could reasonably be expected to have a material adverse impact on the business, property or financial condition of any of the Borrowers;

(iii) maintain adequate insurance; and

(iv) provide the Lenders, and their advisors, with reasonable access to all of the Borrowers' facilities and offices for the purposes of reviewing the business operations and assets of the Borrowers.

**ARTICLE VII**

**TERMINATION**

7.1     **Termination.**

(a)     The financing arrangements contemplated hereby shall be in effect until the Commitment Termination Date, and the Loans and all other Obligations shall be automatically due and payable in full on such date.

(b)     Borrowers shall pay the entire obligation owing to the Lenders under this Agreement and all Obligations hereunder shall be deemed fully paid and satisfied on the Plan's Effective Date by issuing to the New Parent Company, one-hundred percent (100%) of the equity interest in the Reorganized Debtors pursuant to the Lender Approved Reorganization Plan.  It is a condition to Lenders support of the Lender Approved Reorganization Plan and their agreement to the satisfaction of the Obligations by the issuance of the equity interests in the

Reorganized Debtors as set forth herein, that Tom Hallet continue his employment with and management of the Reorganized Debtors and the Properties. Accordingly, Tom Hallett, as part of the consideration for his employment and property management on behalf, or for the benefit, of the New Parent Company, will receive the following: (i) an employment agreement providing Tom Hallet with an annual salary of $200,000 and thirty percent (30%) of the equity interests in the New Parent Company, and (ii) a property management agreement with Tom Hallett pursuant to which he will receive compensation in the form of ownership of 100% of the equity interest in, and title to, the Carve Out Properties, subject to the restructured secured loans encumbering same as provided under the Lender Approved Reorganization Plan.

**7.2    Survival of Obligations Upon Termination of Financing Arrangements.**

Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of the Borrowers or the rights of Lenders relating to any unpaid portion of the Loans or any other Obligations, due or not due, liquidated, contingent or unliquidated or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Commitment Termination Date. Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon the Borrowers, and all rights of Lenders, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Commitment Termination Date.

VG1 74749v1 03/01/11

## ARTICLE VIII

## EVENTS OF DEFAULT; RIGHTS AND REMEDIES

**8.1    Events of Default.**

Notwithstanding the provisions of section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court or any notice to Borrowers, and subject to Section 8.2, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)    (i)  Borrowers shall fail to pay any principal of any Revolving Note when due in accordance with the terms thereof or hereof or

(ii) Borrowers shall fail to pay any interest on any Revolving Note, any other Obligation or any other amount payable hereunder, within three days after any such interest or other amount becomes due in accordance with the terms thereof or hereof; or

(b)    One or more judgments or decrees shall be entered after the Petition Dates against the Borrowers involving in the aggregate a liability (to the extent not covered by third party insurance as to which the insurer has acknowledged coverage) of $10,000 or more, net of insurance proceeds, and all such judgments or decrees shall not has been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

(c)    Proceeds of any Revolving Loan made hereunder are used to make a payment that is not in strict compliance with Section 2.8, unless agreed to by the Lenders or

(d)    The occurrence of any additional "Event of Default" identified in the Interim DIP Order or the Final DIP Order not identified herein; or

(e)    The occurrence of any of the following in the Chapter 11 Cases:

(i) the dismissal of the Chapter 11 Cases, or the conversion of the Chapter 11 Cases from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or Borrowers shall file a motion or other pleading seeking the dismissal of the any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

(ii) the appointment of a trustee in the Chapter 11 Cases or the appointment of an examiner with expanded powers (powers beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of any of the Borrowers under Bankruptcy Code section 1106(b);

(iii) the entry of an order of competent jurisdiction (1) reversing, staying, vacating or rescinding any Postpetition Financing Order or any of them otherwise ceases to be in full force and effect (except in the case of the replacement of the Interim DIP Order with the entry of the Final DIP Order) or (2) amending, supplementing or otherwise modifying the Interim DIP Order or the Final DIP Order without the written consent of the Lenders or the filing of a motion for reconsideration (x) in respect of the total Revolving Loan Commitments, without Lenders' consent;

(iv) Borrowers materially violate or breach the Postpetition Financing Orders or file any pleadings seeking, joining in, or otherwise consenting to any material violation or breach of the Postpetition Financing Orders;

(v) this Agreement is not negotiated and finalized (along with all other Loan Documents) by the date that is fifteen (15) days after the date on which the Interim DIP Order is entered;

38

(vi) the bringing of a motion, taking of any action by Borrowers: (1) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (2) to grant any Lien other than as set forth at Section 5.2 of this Agreement upon or affecting any Collateral; (3) to file or seek confirmation of a Reorganization Plan or disclosure statement attendant thereto which is not a Lender Approved Reorganization Plan; or (4) any other action or actions adverse to Lenders' rights and remedies hereunder;

(vii) the entry of an order in the Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to the Lender (other then the Carve Out Expenses);

(viii) the Final DIP Order is not entered within forty-five (45) days following the entry of the Interim DIP Order;

(viii) the entry of an order in the Chapter 11 Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement;

(ix) the entry of an order in the Chapter 11 Cases confirming a plan or plans of reorganization that is not a Lender Approved Reorganization Plan;

(x) the Bankruptcy Court shall enter an order or orders granting relief from or modifying the automatic stay applicable under Section 362 of the Bankruptcy Code to permit one or more creditors to execute upon, enforce or perfect a lien on any material asset of the Borrowers or that otherwise could reasonably be expected to have an adverse impact on the Borrowers' businesses;

VG1 74749v1 03/01/11

(xi) commencement of any suit against the Lenders that would in any way reduce, set off, or subordinate the Obligations under this Agreement; or any such suit that is commenced by any party other than the Borrowers, and in the reasonable judgment of the Lenders, such suit has a reasonable possibility of success, and if successful, would be reasonably likely to has a Material Adverse Effect;

(xii) the payment of, or application for authority to pay, any prepetition Claim other than pursuant to a Lender Approved Reorganization Plan, without the Lenders' prior written consent, or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under this Agreement.

**8.2    Remedies.**

Upon the occurrence and during the continuance of an Event of Default, and without further order of or application to the Bankruptcy Court, the Lenders shall, by 3 business days prior written notice to the Borrowers (with a copy to the United States Trustee for the District of Nevada), take one or more of the following actions, at the same or different times:

(i)        terminate forthwith the Revolving Loan Commitments;

(ii)        declare the Loans or any portion thereof then outstanding to be forthwith due and payable, whereupon the principal of such Loans together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Borrowers accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrowers, anything contained herein or in any other Loan Document to the contrary notwithstanding; and

VG1 74749v1 03/01/11

(iii)    take any other action or exercise any and all other rights or remedies under the Loan Documents, and under applicable law available to the Lenders.  For purposes of the Lenders' exercise of any and all of its remedial rights upon the occurrence and during the continuation of an Event of Default, the automatic stay imposed by Section 362(a) of the Bankruptcy Code shall be automatically vacated and modified following three (3) business days' prior written notice to Borrowers.

## ARTICLE IX

## MISCELLANEOUS

**9.1    Amendments and Waivers.**

Neither this Agreement, nor any Revolving Note or any other Loan Document, nor any terms hereof or thereof may be amended, restated, supplemented or modified except in writing signed by each of the parties hereto

**9.2    No Waiver; Cumulative Remedies.**

No failure to exercise and no delay in exercising, on the part of Lenders, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

**9.3    Survival of Representations and Warranties.**

All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall

VG1 74749v1 03/01/11

survive the execution and delivery of this Agreement and the Revolving Notes and the making of the Loans hereunder.

**9.4    Successors and Assigns; Participations and Assignments.**

(a)    This Agreement shall be binding upon and inure to the benefit of the Borrowers and the Lenders and their respective successors and assigns, including any trustee appointed in this case.

(b)    Lenders may not sell any participation interest in or otherwise assign their rights under this Agreement or any Obligations of Borrowers hereunder without prior written consent of Borrowers.

(c) The Borrowers authorize Lenders to disclose to any permitted Assignee (each, a "Transferee") any and all financial information in Lenders' possession concerning the Borrowers which has been delivered to Lenders.

**9.5    Counterparts.**

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by telecopy), and all said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrowers and the Lenders.

**9.6    Severability.**

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

VG1 74749v1 03/01/11

**9.7    Governing Law.**

THIS AGREEMENT AND THE REVOLVING NOTES AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND THE REVOLVING NOTES SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEVADA WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEVADA.

Submission To Jurisdiction; Waivers. Borrowers and Lenders hereby irrevocably and unconditionally: (a) submit for themselves and their property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the jurisdiction of the Bankruptcy Court; (b) consent that any such action or proceeding may be brought in the Bankruptcy Court and waive any objection that they may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agree not to plead or claim the same; (c) agree that nothing contained herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and (d) waive, to the maximum extent not prohibited by law, any right they may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

**9.8    No Waiver.**

No failure on the part of Lenders to exercise, and no delay in exercising, any right, power or remedy hereunder or any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or

further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

**9.9**     **Waiver of Claims.**

Upon the effectiveness of this Agreement, the Borrowers shall be deemed to have (a) released and forever discharged Lenders and their respective Subsidiaries, agents, employees, officers, directors, managers, attorneys, Affiliates, successors and assigns (collectively, the "Released Parties") of and from any and all liabilities, claims, obligations, indebtedness, liens, causes of action and rights of any kind, character or nature whatsoever, whether known or unknown, whether fixed or contingent, and whether liquidated or unliquidated, that the Borrowers may have or claim to have against any such Released Party and which arises out of or is connected in any way with any action of commission or omission of the Borrowers existing or occurring on or prior to the date of this Agreement, including without limitation any claims, liabilities or obligations relating to or arising out of or in connection with any of the transactions contemplated by any of the Loan Documents, from the beginning of time until the execution and delivery of this Agreement (collectively, the "Released Claims") and (b) agreed forever to refrain from commencing, instituting or prosecuting any law suit, action or other proceeding against any of the Released Parties with respect to any of such Released Claims.

VG1 74749v1 03/01/11

IN WITNESS WHEREOF, the parties hereto has caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

WHITTON CORPORATION
SOUTH TECH SIMMONS 3040C LLC

By: _____
Name: Tom E. Hallett
Title:

RUBY CAPITAL INVESTMENTS, LLC

By: _____
Name:
Title:

SILVER PHOENIX, LLC

By: _____
Name:
Title:

VG1 74749v1 03/01/11

# EXHIBIT A

## THE PROPERTIES

| DEFINED TERM FOR PROPERTY | PROPERTY DESCRIPTION | PREPETITION LENDER |
|---|---|---|
| BLV Cheyenne 2475 Property | 27,363 square feet of flexible use and light industrial space located at West Cheyenne Avenue in North Las Vegas, Nevada 89032 | Bank of Las Vegas |
| BLV Mountain Vista Property | 27,436 square feet of light industrial space located at 6100 Mountain Vista in Henderson, Nevada | Bank of Las Vegas |
| BLV Dean Martin 7635 Property | 14,251 square feet of office space located at 7635 Dean Martin in Las Vegas, Nevada | Bank of Las Vegas |
| BLV Mequite Property | 15.45 Acres located at: 1300 W. Pioneer Blvd, Mesquite, NV 89027, APN: 002-13-701-012 | Bank of Las Vegas |
| BofA Property | 26,941 square feet of office and flexible use space located at Sunset Road and Annie Oakley Drive in Las Vegas, Nevada (3950 E. Sunset Road, Las Vegas, Nevada) | Bank of America |
| German American Brooks Property | 28,710 square feet of light industrial space located at N. Simmons Street and W. Cheyenne Avenue in Las Vegas, Nevada | German American Capital Corporation |
| German American Glendale Property | 57,679 square feet of flexible use, light industrial, and warehouse space located at E. Glendale Avenue and S. Stanford Way in Sparks, Nevada | German American Capital Corporation |
| German American Greg Property | 69,236 square feet of flexible use, light industrial, and warehouse space located at 1220 and 1250 Greg Street in Sparks, Nevada | German American Capital Corporation |
| GSMS Property | 1215 and 1275 Kleppe Lane and 1455 Deming Way, Sparks, Nevada, consisting of approximately 80,518 square feet of office, light industrial and warehouse space | GSMS 2004, GG2 Sparks Industrial, LLC |
| Hudson Cheyenne Property | 2455 Cheyenne Avenue, Las Vegas, Nevada 89032, APN 139-17-510-039 | Hudson Americas, LLC as attorney in fact for Wells Fargo Bank, NA |

VG1 74749v1 03/01/11

| | | |
|---|---|---|
| Hudson Dean Martin Property | 7625 Dean Martin Drive, Las Vegas, Nevada 89139, APN 177-08-211-001 | Hudson Americas, LLC as attorney in fact for Wells Fargo Bank, NA |
| Hudson Russell Property | 5720 and 5770 South Valley View Boulevard, Las Vegas, Nevada 89119, APN 162-32-101-001 | Hudson Americas, LLC as attorney in fact for Wells Fargo Bank, NA |
| Hudson Seven Hills Property | 835 and 855 Seven Hills Road, Henderson, Nevada 89053, APN 177-35-512-002 and 4 | Hudson Americas, LLC as attorney in fact for Wells Fargo Bank, NA |
| Hudson Stephanie Property | 1000 and 1030 Stephanie Place, Henderson, Nevada 89104, APN 161-34-201-001 | Hudson Americas, LLC as attorney in fact for Wells Fargo Bank, NA |
| JPMCC Property | approximately 51,690 square feet of light industrial and warehouse space located at 3040 Simmons Street, North Las Vegas, Nevada 89032 | JPMCC 2006-CIB 14 Simmons Street, LLC |
| Umbra Property | certain real property known as Clark County, Nevada Assessor Parcel Numbers 139-17-510-042 and 137-17-510-043 | Umbra Partners, LLC |

VG1 74749v1 03/01/11

[FORM OF]

<u>REVOLVING CREDIT NOTE</u>

$_____                                                    _____ \_\_, 2011

      FOR VALUE RECEIVED, the undersigned, **WHITTON CORPORATION**, a Nevada business corporation and **SOUTH TECH SIMMONS 3040C, LLC**, a Nevada limited liability company, (collectively, the "Borrowers"), jointly and severally, promise to pay to the order of **Ruby Capital Investments, LLC**, a Nevada limited liability company and **Silver Phoenix, LLC**, a Nevada limited liability company (collectively, the "Lenders"), on the Maturity Date, if not sooner paid, the principal sum of [_____]pursuant to that certain Debtor-in-Possession Revolving Credit Agreement between the Borrowers and the Lenders dated as of _____, 2011, as such agreement may be amended, modified or supplemented from time to time (the "**Loan Agreement**"). The Borrowers further promise to pay to the order of the Lenders interest on the unpaid principal amount of this Revolving Note from time to time outstanding at the rate or rates per annum determined pursuant to Section 2.5 of, or as otherwise provided in, the Loan Agreement, and with such amounts being payable on the dates set forth in Section 2.5 of, or as otherwise provided in, the Loan Agreement.

      All payments and prepayments to be made in respect of principal, interest or other amounts due from the Borrowers under this Revolving Note shall be payable at 12:00 noon Las Vegas time, on the day when due. The Borrowers expressly waive presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Revolving Note, and an action for any amounts due and unpaid shall therefore accrue immediately.

      This Revolving Note is the "Revolving Note" referred to in, and is entitled to the benefits of, the Loan Agreement. This Revolving Note is secured by, and is entitled to the benefits of, certain other Loan Documents, as each of them may be amended, modified or supplemented from time to time. Capitalized terms used in this Revolving Note that are defined in the Loan Agreement have the meanings assigned to them in the Loan Agreement unless otherwise expressly defined in this Revolving Note.

      This Revolving Note is governed by, and will be construed and enforced in accordance with, the laws of the State of Nevada. The Borrowers consent to the exclusive jurisdiction and venue of the United States Bankruptcy Court for the District of Nevada located in [Clark County], Nevada with respect to any suit arising out of, relating to, or mentioning this Revolving Note.

      IN WITNESS WHEREOF, and intending to be legally bound, the Borrowers have executed, issued and delivered this Revolving Note as of March \_\_, 2011.

ATTEST:                                    **WHITTON CORPORATION**

_____                    By_____
Secretary                                      Name:
                                               Title:


ATTEST:                                    **SOUTH TECH SIMMONS 3040C, LLC**

_____                    By_____
Secretary                                      Name:
                                               Title:


49

**SCHEDULE 3.5**

**SCHEDULE 3.8**

VG1 74749v1 03/01/11