|   |   |   |
|---|---|---|
| 1 | Richard F. Holley, Esq. (NV Bar No. 3077)<br>Email: rholley@nevadafirm.com |   |
| 2 | Ogonna M. Atamoh, Esq. (NV Bar No. 7589)<br>Email: oatamoh@nevadafirm.com | E-filed on: March 14, 2011 |
| 3 | SANTORO, DRIGGS, WALCH,<br>KEARNEY, HOLLEY & THOMPSON |   |
| 4 | 400 South Fourth Street, Third Floor<br>Las Vegas, Nevada 89101 |   |
| 5 | Telephone:   702/791-0308<br>Facsimile:    702/791-1912 |   |
| 6 | *Attorneys for Bank of America, N.A., as successor-in-interest to First Republic Bank* |   |



**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| In re:<br><br>WHITTON CORPORATION, a Nevada corporation,<br><br>Debtor. | Case No. BK-S-10-32680-BAM (Lead Case)<br><br>Jointly Administered with Case No.<br>BK-S-10-32857-BAM<br><br>Chapter 11 |
|---|---|
| Affects:<br>☒ All Debtors<br>☐ Whitton Corporation (10-32680)<br>☐ South Tech Simmons 3040C, LLC (10-32857) | **OPPOSITION TO DEBTOR'S MOTION FOR INTERIM AND FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 364, FED. R. BANKR. P. RULE 4001(C) AND L.R. 4001(B) AND (C); (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) GRANTING RELATED RELIEF, AND (III) SCHEDULING FINAL HEARING**<br><br>Date of Hearing:   March 15, 2011<br>Time of Hearing:   3:00 p.m.<br>Place: Courtroom No. 3, Third Floor<br>         Foley Federal Building<br>         300 Las Vegas Blvd., S.<br>         Las Vegas, NV 89101<br><br>Judge: Hon. Bruce A. Markell<br>         300 Las Vegas Blvd., S.<br>         Las Vegas, NV 89101 |

BANK OF AMERICA, N.A. (the "Bank" or the "Lender"), by and through its counsel, the law firm of Santoro, Driggs, Walch, Kearney, Holley & Thompson, hereby files this Opposition to the Motion for Interim and Final Order Pursuant to 11 U.S.C. §§ 105, 364, Fed. R. Bankr. P. Rule 4001(c) and L.R. 4001(B) and (C); (I) authorizing Debtors to Obtain Postpetition

00759-47/709322_2.doc

Financing; (II) Granting Related Relief, and (III) Scheduling Final Hearing ("DIP Financing Motion") [Dkt. No. 229], filed by the Debtors Whitton Corporation ("Whitton") and South Tech Simmons 3040C, LLC ("Simmons") (collectively, the "Debtors"), set for hearing on shortened time.

This Opposition is based upon the following grounds and the following reasons: (1) There is no justification for bringing the Motion on an order shortening time; (2) the requested financing is not sought to preserve, protect or maintain assets or business operations; rather, the financing is designed to create a fund to pay postpetition administrative expenses for estate professionals and alleged postconfirmation operational expenses; and (3) the terms of Debtors' proposed DIP financing are unreasonable and impermissibly seek to leverage the Chapter 11 process by prematurely locking up the reorganization process.

All exhibits referred to in this Opposition are incorporated herein by this reference. This Opposition is based upon the Omnibus Declaration of Todd Baldi, Vice President of Secured Creditor Bank of America, N.A. [Dkt. No. 258], filed with the Court on March 14, 2011, all the papers and pleadings on file herein, the following Memorandum of Points and Authorities, together with such other and further evidence and argument as may be presented and considered by this Court at any hearing of the Motion.

Dated this 14th day of March, 2011.

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

_____
Richard F. Holley, Esq. (NV Bar No. 3077)
Ogonna M. Atamoh, Esq. (NV Bar No. 7589)
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone: 702/791-0308
Facsimile: 702/791-1912

*Attorneys for Bank of America, N.A., as successor-in-interest to First Republic Bank*

. . .

. . .

00759-47/709322_2.doc

# **MEMORANDUM OF POINTS AND AUTHORITIES**

## I. **INTRODUCTION**

On the eve of filing of the bankruptcy, Whitton caused a number of single-purpose real estate entities, including South Tech-Polaris, LLC ("South Tech-Polaris"), the Bank's borrower, to transfer their assets to Whitton. Each of the loans to the single-purpose entities were in various stages of default, including the loan to South Tech-Polaris. Many of the properties securing loans were subject to prepetition receivers. Since the bankruptcy filing, Whitton has entered into cash collateral or similar arrangements with all of the lenders. These arrangements provide for the use of cash collateral consisting primarily of rents, to be used to preserve, protect and maintain the various properties subject to a budget. Such is the case with the property securing the obligation to the Bank.

Notwithstanding these arrangements, Whitton requests postpetition financing in the amount of $2.1 million on a superpriority secured basis under onerous terms that essentially lock exit financing for a yet-to-be filed plan of reorganization. The requested financing is not sought to preserve, protect or maintain assets or business operations; rather, the financing is designed to create a fund to pay postpetition administrative expenses for estate professionals and alleged postconfirmation operational expenses. The Motion is not supported by a budget but, rather, by buzzwords frequently used in the DIP financing context. There was certainly no need for filing the Motion on an order shortening time where estate professionals received generous prepetition retainers and no pending fee applications are on file. The Bank is not aware of a single reported decision that permits debtor-in-possession financing solely for the purposes outlined by Whitton. There is simply no need or justification for the requested funds under the guise of DIP financing. The appropriate context in which to address the proposed capital contribution is a plan of reorganization after approval of an acceptable disclosure statement.

. . .

. . .

. . .

. . .

00759-47/709322_2.doc

- 3 -

## II. STATEMENT OF FACTS

**$4 MILLION LOAN**

1. As set forth in the Baldi Declaration, the Bank is a Delaware corporation and successor-by-merger with First Republic Bank ("First Republic"), in connection with the loan made to Shoshone Cattle and Land Development Co. ("Shoshone"), the original borrower which entered into a series of agreements in February 2004 to procure a commercial loan. See Baldi Declaration [Dkt. No. 258].

2. On or about February 11, 2004, the Borrower entered into a Promissory Note Secured by Deed of Trust (as amended or supplemented, the "Note") with the First Republic Bank, a California financial institution which became a division of the Bank by merger (in its capacity as the successor-by-merger to First Republic Bank, the Bank is also alternatively referred to in this Opposition as "Bank" or "Lender"). A true and correct copy of the Note is attached to the Baldi Declaration as **Exhibit "1"** [Dkt. No. 258].

3. Pursuant to the Note, Lender agreed to make a loan (the "Loan") to Borrower in the stated principal amount of $4,000,000.00 accruing interest at a fixed rate 5.75% through March 1, 2001, subject to an adjusted interest accruing thereafter. See Baldi Declaration [Dkt. No. 258].

4. Borrower's payment and performance obligations under the Note are secured by, among other things, a Deed of Trust, Fixture Filing, Assignment of Rents and Security Agreement dated February 11, 2004, and recorded on February 23, 2004, at Document No. 20040223-03087, Clark County Recorder, Nevada (the "County") encumbering certain real property (the "Deed of Trust")[1], a true and correct copy of which is attached to the Baldi Declaration as **Exhibit "2"** [Dkt. No. 258].

5. The real property encumbered by the Deed of Trust is located at 3950 East Sunset Road, Las Vegas, Nevada and consists of 29,941 square feet of rentable office space and flexible use space situated on 2.52 acres located at Sunset Road and Annie Oakley Drive, in Clark

---

[1] The Note, Deed of Trust and all other documents related to the loan shall collectively be referred to as the "Loan Documents".

County, Las Vegas, Nevada 89120, identified as Assessors Parcel Number of 161-31-813-006 (the "Property"). The Property includes a single building with 22 individual units, several of which have been combined into larger leaseholds. See Baldi Declaration [Dkt. No. 258].

6. On or about January 15, 2008, South Tech-Polaris LLC ("Polaris") executed an Assumption Agreement (Release of Original Borrower), assuming the Note and the assumed balance of $3,696,909.30 under the Note. Tom E. Hallett ("Hallett") is a member and manger of Polaris. Hallett also guarantied the loan assumed and assigned to Polaris. Polaris agreed that the fixed monthly payments would be due through March 1, 2008, and variable payments would be due thereafter and continuing through the maturity date. A true and correct copy of the Assumption Agreement is attached to the Baldi Declaration as **Exhibit "3"** [Dkt. No. 258].

7. Tenants maintain leases with Polaris through its related entity South Tech Annie Oakley, LLC ("South Tech Annie Oakley"), an entity owned and managed by Hallett. True and correct copies of: (1) the legal description of the Property; and (2) the Hallett Guaranty are attached to the Deed of Trust as Exhibit A, attached to the Baldi Declaration as **Exhibit "2"**; see also legal description attached to the Baldi Declaration as **Exhibit "4"** [Dkt. No. 258].

**THE LOAN DEFAULTS**

8. Polaris defaulted under the Loan for the entirety of 2010. As of December 5, 2010, the principal, interest, late fees and other fees due under the Loan totaled $3,786,095. As of March 3, 2011, the total amount due under the Loan exceeds $3,878,231. Notwithstanding Polaris's multiple delayed payments and defaults, it continued to collect and hoard rent from the Property for several months. See Baldi Declaration [Dkt. No. 258].

9. On September 27, 2010, the Bank caused Nevada Title Company to record a Notice of Breach and Election to Sell under Deed of Trust (the "Notice of Breach") in the County. A true and accurate copy of the Notice of Breach is attached to the Baldi Declaration as **Exhibit "5"** [Dkt. No. 258].

10. On October 7, 2010, and pursuant to the requirements of Nevada's assignment of rents statute, NRS 107A.220 et seq., the Bank notified the tenants at the Property of the change in payee and payment address for the monthly rental payments. A true and accurate copy of one

00759-47/709322_2.doc

of the (identical) Tenant Notifications is attached to the Baldi Declaration as **Exhibit "6"** [Dkt. No. 258].

**BANKRUPTCY**

11. On December 5, 2010, Whitton filed for Chapter 11 Bankruptcy, Case No. BK-S-10-32680-BAM (the "Bankruptcy") [Dkt. No. 1].

12. On December 8, 2010, Simmons also filed for Chapter 11 Bankruptcy, Case No. BK-S-10-32857-BAM (the "Simmons Bankruptcy") [Dkt. No. 1].

13. Two (2) days before Whitton filed for bankruptcy and unbeknownst to the Bank, Hallett caused the Property to be transferred from Polaris to Whitton without the consent of the Bank and in direct violation of the Loan Documents. The Bank did not discover the property transfer until after Whitton filed its bankruptcy petition.

14. Two (2) days before Whitton filed for bankruptcy, Whitton also entered into a secured bridge loan with Umbra Partners, LLC for $300,000 in financing, of which $150,000 was paid to Fox Rothschild as a retainer for Chapter 11 restructuring services for the Debtors' benefit, and a $100,000 retainer was paid to Province as Debtor's financial advisor. See Hallett Omnibus Decl., p. 7, ¶ 15, p. 11, ¶¶ 31-32, p. 18, ¶ 57 [Dkt. No. 36].

15. In addition to the $150,000 from Umbra, Mr. Hallett, as the Debtor's president, paid Debtor's counsel, Fox Rothschild LLP, $75,000, for the benefit of the Debtor, as a retainer for the analysis of a potential bankruptcy, for a total of $225,000 to Fox Rothschild. See Hallett Omnibus Decl., p. 11, ¶ 32 [Dkt. No. 36].

16. In addition to the prepetition retainer paid to Debtor's counsel, Debtor's financial advisor also received a substantial retainer. The retainer consisted of two properties with a collective value of $166,085.00, as well as cash in the amount of $100,000. The cash portion of the prepetition retainer came from Umbra financing. See Hallett Omnibus Decl., p. 18, ¶¶ 56-57 [Dkt. No. 36].

**CASH COLLATERAL STIPULATION**

17. As of the Petition Date, the outstanding balance due and owing to the Bank under the Note was approximately $3.6 million, excluding interest, fees and costs.

18. On December 27, 2010, Whitton and the Bank entered into a Stipulation and Order (I) Authorizing the Debtor to Use Cash Collateral, and (II) Granting Adequate Protection to Bank of America (the "Stipulation") [Dkt No. 82].

19. Pursuant to the terms of the Stipulation, Whitton and the Bank stipulated that all of the Debtor's cash collected from rents on the Property constituted the Bank's cash collateral or proceeds thereof. [Dkt. No. 82].

20. Whitton and the Bank stipulated for the Debtor's use of the rents consisting of the Bank's cash collateral, absent which the Property would deteriorate substantially, to pay for expenses set forth in the budget attached to the Stipulation as Exhibit 1 (the "Budget"), subject to a 20% variance. See Dkt. No. 82, p. 18. Expenses set forth in the Budget include expenses such as a property management fees, insurance and bonds, government fees and taxes, security, utility expenses, site and building RMS, and commissions. Id. Additionally, Whitton and the Bank stipulated that the rents could be used to bring current any outstanding utilities, pay U.S. Trustee Fees, and the Bank's monitor fees and costs. Id.

21. The Budget shows the tenant occupancy rate of the Property at approximately 70%, projects an excess of nearly $10,000 after expenses are paid for the first two weeks of January 2011 and projects Ending Cash ranging from $25,000 to $80,000 between February 2011 and June 2011. Id.

22. The Stipulation further provides that the Debtor will provide the Bank with adequate protection by granting the Bank replacement liens in the rents and future rents and by allowing the Bank's Adequate Protection Claims an administrative expense priority under 11 U.S.C. 507(b). Section 4(d) of the Stipulation expressly provides that the Bank's 507(b) claims are senior to the Debtor's rights. Id.

**MOTION FOR DIP FINANCING**

23. On March 1, 2011, Debtors filed the Motion seeking approval to obtain for postpetition financing from Ruby Capital Investments, LLC ("Ruby") and Silver Phoenix, LLC ("Silver") (collectively, the "DIP Lenders") [Dkt. No. 229]. The requested DIP financing is nothing more than exit financing in relationship to plan confirmation.

00759-47/709322_2.doc

24. The Motion provides that the proposed use of the proceeds from the DIP Lenders are to pay for the following:

    a. fund the costs of administering Debtors' estates,

    b. fees assessed by the Office of United States Trustee and Clerk of Court;

    c. fees and expenses of professionals of the estates,

    d. any expenses of operations not paid from cash collateral,

    e. reorganization costs; and

    f. working capital needs

25. The basic terms of the proposed DIP financing are as follows:

    a. $2.1 million cash on a secured, administrative priority basis in exchange for a first priority security lien on all the Debtors' unencumbered assets and property and a junior lien on all of Debtors' encumbered assets;

    b. $350,000 paid initially upon entry of Interim DIP Order, $450,000 upon entry of Final DIP Order, and balance of $1,275,000 postconfirmation;

    c. Interest rate of 18%, compounding;

    d. Three percent (3%) non-refundable origination fee of the $2.1 million, up to $63,000;

    e. Default interest rate of twenty-three (23%); and

    f. All obligations owing to the DIP Lender shall be deemed fully paid and satisfied on Plan's effective date by issuing to the New Parent Company 100% of the equity interest in the Reorganized Debtors.

26. Default provisions of DIP Credit Agreement include:

    (i) appointment of a chapter 11 trustee or examiner;

    (ii) orders granting relief from or modifying the automatic stay to permit one or more creditors to execute upon, enforce or perfect a lien on any material assets of the Debtors;

    (iii) conversion of any of the chapter 11 cases to chapter 7;

    (iv) commencement of any suit against the DIP Lenders that would result in any reduction, set off, or subordination of DIP Lenders' position under the DIP Credit Agreement; and

    (v) failure to obtain DIP Lenders' pre-approval of draft Plan and Disclosure Statement.

. . .

00759-47/709322_2.doc

## III. LEGAL ARGUMENT

### A. There is No Justification for Bringing the Motion on an Order Shortening Time.

As a preliminary matter, the circumstances of the bankruptcy cases do not warrant filing the Motion on shortened time. First, the initial and second proposed distributions under the DIP Financing Motion are to provide a fund for payment of professional fees and costs; however, estate professionals already received significant prepetition retainers. On the eve of bankruptcy, Fox Rothschild received a $225,000 retainer for Chapter 11 restructuring services. Debtor also paid Province, Debtor's financial advisor, a $100,000 cash retainer days before the bankruptcies were filed, and earlier transferred two properties worth $166,085 as an additional retainer. See Hallett Omnibus Decl., p. 7, ¶ 15, p. 11, ¶¶ 31-32, p. 18, ¶ 57 [Dkt. No. 36].

Second, the Debtors' professionals have not filed fee applications and, therefore, there is no immediate need for the requested funds. Third, the Debtors do not intend to use the requested funds to preserve, protect, or maintain estate assets or business operations. Finally, the Debtors are effectively requesting exit financing, which is more appropriately provided in conjunction with a plan of reorganization and not pursuant to a DIP financing motion. Based upon these reasons, there is no pressing reason for the Motion to be heard on shortened time.

### B. Standard for DIP Financing Under 11 U.S.C. 364(c)

Debtors seek to obtain approval for postpetition superpriority financing under Section 364(c) of the Bankruptcy Code. Section 364(c) governs the requirements a debtor must meet before obtaining credit on a superpriority basis, and provides as follows:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503 (b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503 (b) or 507 (b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

00759-47/709322_2.doc

See 11 U.S.C. § 364(c).[2]

Bankruptcy courts undergo a three-pronged test that a debtor must demonstrate to succeed on a motion for debtor-in-possession financing under Section 364(c): (1) they are unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e., by allowing a lender only an administrative claim per 11 U.S.C. § 503(b)(1)(A); (2) the credit transaction is necessary to preserve the assets of the estate; and (3) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender. See In re Aqua Associates, 123 B.R. 195-96 (Bankr. E.D.Pa. 1991). The rationale for the three-pronged test is that the debtor should not be permitted to obtain credit only because it is not available elsewhere, which could suggest unsoundness of basis for use of funds by credit, but also because credit acquired is of significant benefit to debtor's estate and that terms of the proposed loan are within bound of reason, irrespective of ability of debtor to obtain comparable credit elsewhere. Id. at 196. The court in In re Aqua Associates emphasized that credit should not be approved when it is sought for the primary benefit of a party other than the debtor. Id.

In In re Aqua Associates, the benefit to the estate was evidenced by the use of the funds. The debtor spent $100,000 to renovate the debtor's only building, which was in poor condition, but the debtor needed an additional $162,000 to complete renovations to the building to enable the debtor to provide the tenant with a vanilla shell, after which time the tenant would spend an additional $200,000 to adapt the property for its own needs. Id. at 194. The court placed a great deal of emphasis upon the increase in the value of the property as a result of the loan, noting that with the loan, the renovation would allow the debtor to lease the property, resulting in an enhancement of value from $750,000 to $1 million. Id. at 198. The court further recognized that the debtor could not go forward with its plan to rent the property without the loan. Id. at 197.

---

[2] A debtor has the burden of proving that the requirements have been met under Bankruptcy Code provision enabling debtor to obtain financing secured by lien senior to all other interests if debtor is unable to obtain such credit otherwise. See In re 495 Cent. Park Ave. Corp., 136 B.R. 626 (Bankr. S.D.N.Y.1992). A debtor seeking interim financing through granting of priority over other administrative expenses pursuant to this section permitting court to authorize obtaining of credit or incurring of debt with such priority should carry at least same if not heavier burden of proof than that petitioner asking for temporary restraining order must bear. See In re Adamson Co., Inc., 29 B.R. 937 (Bankr. E.D.Va.1983).

00759-47/709322_2.doc

1. **Debtors Fail to Demonstrate DIP Financing is Necessary to Preserve, Protect or Maintain Assets of the Estates or Business Operations.**

Under the second prong for DIP financing under Section 364(c),[3] the Debtors must demonstrate that the credit transaction is necessary to preserve the assets of the estate. As a preliminary matter and from a practical perspective, the Debtors have failed to demonstrate a need for the proposed DIP financing, or the urgency of the hearing on shortened time for such a serious request. The proposed use of the $2.1 million identified in the Motion is to pay administrative costs, U.S. Trustee's fees, Clerk's fees, and for professionals to administer the estate, including postconfirmation administration. See Motion, p. 2, ll. 10-13 [Dkt. No. 229]. Bankruptcy courts look to the immediate needs of the debtors to determine the propriety of the postpetition financing requested. The recurring theme and fact pattern in the cases where the superpriority liens are requested are that the debtors cannot operate or function without the DIP financing. Bank was unable to find a single case where DIP financing was sought simply to pay professional fees and costs, or alleged postconfirmation operating expenses.

For instance, in *In re General Growth Properties, Inc.*, 423 B.R. 716 (S.D.N.Y.2010), the court granted a superpriority lien to debtor-in-possession financing where the loan was necessary to assure that the debtors could continue to provide integrated leasing, management

. . .

. . .

. . .

---

[3] Under the first prong of the analysis, Debtors failed to demonstrate they made reasonable efforts to obtain unsecured credit pursuant to 11 U.S.C. § 364(b). The debtor in *In re Plabell Rubber Products, Inc.*, 137 B.R. 897, 899 (Bankr. N.D.Ohio 1992), met with only one bank, because he believed it was futile to contact other financial institutions (holding that minimally, debtor should have contacted other financial institutions in an effort to obtain a better factor, and court could not find that it was patently clear that credit sought to be obtained was not otherwise available). Id. at 899; see also In re Reading Tube Industries, 72 B.R. 329, 332 (Bankr.E.D.Pa.1987). In *In re Reading Tube Industries*, the court held that courts have found 20 attempts and 2 attempts to be sufficient, but that one attempt to obtain financing under section 364(b) is not sufficient. Id. (citing In re Snowshoe Co., Inc., 789 F.2d 1085, 1088 (4th Cir. 1986). Debtor concedes that it would be "virtually impossible" to obtain an unsecured loan "simply to fund chapter 11 operations during the case, because it is "highly unlikely" for a lender to extend a loan with no loan servicing, and reached out to Ruby, Silver and Umbra Partners, see Motion, p. 11, [Dkt. No. 229], but the record does not reflect that Debtor did not approach a single lender to procure an unsecured administrative loan, as required.

00759-47/709322_2.doc

and operating services to the various properties, pay employees, satisfy postpetition obligations[4] and pay the administrative cost of the various chapter 11 cases. Id. at 719. The court found that the debtors established that DIP financing was required to maintain centralized business operations, continue their business uninterrupted and preserve value at each property. Id. at 725. The court held that the objecting creditor did not have a security interest in the properties at issue, and that the objecting creditor's interests were not being adversely affected by granting a lien in the properties to the DIP lender. The court held that the DIP loan was necessary to preserve the value of the debtors' estates, and that the DIP loan was necessary to avoid "immediate harm to the Debtors' estates" and to prevent "substantial harm to the debtors' assets". Id. at 720, 724-25.

Another instance where postpetition lending was vital to the preservation and operation of the debtor's business was found in *In re Devlin*, 185 B.R. 376, 377 (Bankr. M.D.Fla. 1995), where the Chapter 11 debtor operator of a motel requested $123,920 in postpetition financing to preserve the property and continue to operate the property. Specifically, the debtor argued that its centralized air conditioning system units used to cool the interior of the buildings were inadequate and needed immediate replacement, along with the resort's antiquated boiler and hot water heaters, which were subject to frequent breakdowns. Id. at 377. The court gave the debtor authority to incur the secured debt with superpriority status to replace air conditioning, boiler and hot water heaters with a loan from the debtor's mother, where the debtor was unable to obtain unsecured credit or other secured financing to make necessary repairs and replacement of air conditioning unit, boiler and hot water heaters was necessary to preserve value of motel and maintain ongoing operations. Id. at 378. The court looked to the necessity of the repairs and the preservation of the property, finding:

---

[4] The Debtors operated their businesses on an integrated basis with centralized administration, leasing, and management functions to promote operating efficiencies. Accounting, business development, construction, contracting, design, finance, forecasting, human resources and employee benefits, insurance and risk management, property services, marketing, leasing, legal, tax, treasury, and other services are provided or administered centrally for all properties under debtor's ownership and management. See In re General Growth Properties, Inc., 423 B.R. at 719.

- 12 -

00759-47/709322_2.doc

> ...the replacement of the air conditioning unit, the boiler, and the hot water heaters is necessary to preserve the value of the Resort and maintain ongoing operations. The replacement of these items will inure to the benefit of all persons claiming an interest in the Resort--including Nat Max & Associates--regardless of whether Debtor successfully reorganizes. The replacement of the air conditioning system, boiler, and hot water heaters is in the best interest of the Debtor and its estate.

Id. at 378.

The court in *In re Payless Cashways, Inc.*, 268 B.R. 543 (Bankr. W.D.Mo. 2001), likewise found the postpetition lending was critical to the survival of the business. The *Payless Cashways* court contemplated payment of prepetition debts prior to plan confirmation as postpetition financing under Section 364(b), which was essentially a preferential treatment of suppliers.[5] According to the analysis adopted by the *Payless Cashways* court, in applying these principles to a request to prefer certain creditors as part of a borrowing agreement, the Court must be guided by practicality and common sense. If the court is satisfied that the debtor will not be able to obtain inventory or labor of the same quality on a timely basis, and that that is critical to survival of the business, the Court must decide whether the granting of preferential treatment to some creditors is a better result than closing the business, or allowing it to die slowly for lack of necessary supplies. In making its determination, the court took testimony from the unsecured creditor body, which the court views as critical and the most relevant, because they were the ones most directly affected, and after hearing testimony, held that the proposed arrangement found support of the unsecured creditors' committee. Id. at 547. The court allowed the debtor to obtain postpetition credit from suppliers whose continued shipments were critical to the continued operation of the Chapter 11 debtor's business, and to grant suppliers postpetition administrative expense claim for any new purchases. Id. at 547-48.

---

[5] Under its section 364(b) analysis, the court considered a number of factors, including (1) whether the transaction is an arms-length transaction; (2) whether approval of the borrowing is critical to the future of the business, given the condition of the business at the time the motion is heard, and given the status of its postpetition financing; (3) whether the transaction confers a benefit on the estate and its creditors, not just the payees; (4) whether interested parties are represented and, if not, the level of sophistication of unrepresented parties; and (5) the extent to which there is unanimous support or strong disagreement from the creditor body. Id. at 547 (citation omitted).

00759-47/709322_2.doc

Those cases all share one common element: without immediate DIP financing the debtors could not continue to operate. Practical considerations, such as meeting payroll needs, purchasing inventory, maintaining the properties, and paying expenses to sustain the operation of the business, are at the heart of the DIP financing requests. However, none of the concerns are present in the instant case.

The requested funds are not being used to preserve, protect or maintain estate property or operate the Debtors' business. Since the bankruptcy filing, Whitton has entered into cash collateral or similar arrangements with all of the lenders. These arrangements provide for the use of cash collateral consisting primarily of rents to be used to preserve, protect and maintain the various properties subject to a budget. Such is the case with the property securing the obligation to the Bank.

Notwithstanding these arrangements, the proposed financing is designed primarily to create a fund from which Debtors' professionals can eventually be paid allowed administrative expenses. In other words, the Debtors are asking this Court to burden and encumber the estate with superpriority secured debt to pay a lesser-priority administrative expense. An odd request, to say the least, particularly where the Debtors' professionals received significant prepetition retainers. The balance of the funds is designed for anticipated postconfirmation costs, rather than postpetition operations. This is also an unusual, if not unprecedented request. It should also be noted that this portion of the Motion is not supported by a budget, but rather by buzzwords frequently used in the DIP financing context. It is clear that the requested funds are not critical to the survival of the Debtors' business, or preservation, protection or maintenance of estate assets.

2. **Terms of DIP Financing Impermissibly Leverage Bankruptcy Process and Violate Debtors' Fiduciary Duties to Estate and Creditors.**

The third prong for DIP financing under Section 364(c) relates to whether the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender. The bankruptcy court in *In re Ames Dep't Stores, Inc.*, 115 B.R. 34

(Bankr. S.D.N.Y. 1990), analyzed whether a lender seeking a superpriority for postpetition DIP financing resulted in the impermissible leveraging[6] of the bankruptcy case:

> Acknowledging that Congress, in Chapter 11, delicately balanced the hope of debtors to reorganize and the expectations of creditors for payment, the courts have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits.

See In re Ames Dep't Stores, Inc., 115 B.R. at 37. The underpinnings of the abuses attendant with leveraging a bankruptcy case through postpetition financing are the debtor-in-possession's exercise of the business judgment decision consistent with their fiduciary duties to the estate and its creditors. Id. at 38. Bankruptcy courts have held that the debtor violated its fiduciary duties when it sought approval of financing arrangements that would pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the Bank and the debtor's principals who guaranteed its debt. Id.

The *Ames* court emphasized that it was the court's practice not to approve financing arrangements:

> ... containing clauses triggering default on the appointment of a trustee or examiner under section 1104. Such entrenchment of management may not be in the best interests of the estate and only precludes parties-in-interest from seeking to redress fraud or gross

---

[6] The creditor in *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 118 (N.D.Ga.1989), argued that the debtor was attempting to use the § 364(d) first lien as its plan of reorganization while avoiding the strict requirements of § 1129, relying upon *In re Chevy Devco*, 78 B.R. 585 (Bankr.C.D.Cal.1987). Id. at 123. In *Chevy Devco*, the proceeds of the superpriority lien were to be used completely to renovate the shopping center that was the debtor's sole asset, and, therefore, the court viewed it substantially the same as a cramdown situation. Id. The *Chevy Devco* court denied the request because it did not meet the requirements of § 1129(b). Id. The *Anchor* court found the *Chevy Devco* decision unpersuasive, because the debtor had numerous assets ranging from the resort golf course and ski facility to the time share units and condominiums to the raw land designated for development as single and multiple family homes and commercial development. Id. The *Anchor* court also distinguished the *Chevy Devco* by noting that the proceeds from the § 364(d) lien were to be used to prepare and advertise the condominiums for sale, to improve and maintain the golf course and for administrative expenses. Id. The *Anchor* court also considered that the superpriority lien did not affect all of the debtor's assets or all of its creditors'. Id. The *Anchor* court found that the request for a lien was not a camouflaged plan of reorganization, holding that it is not necessary to test the lien proposal against the confirmation requirements of § 1129. Id.

00759-47/709322_2.doc

>mismanagement through such an appointment. Nor are clauses requiring debtor retention of exclusivity approved. Clauses providing for absolute control over fees and entrenchment of management clauses skew the carefully designed balance of debtor and creditor protections that Congress drew in crafting Chapter 11.

See In re Ames Dep't Stores, Inc., 115 B.R. at 38. The *Ames* court reasoned that a provision providing for default or relief from the automatic stay, unless it is limited to the Debtor's principal asset, overreaches and can only be designed to skew the Court's disinterested decision of a motion for such relief with the knowledge that to grant the relief may affect hundreds of other creditors and thousands of employees. Id. at 40-41.[7]

There is no doubt in the present case that the proposed terms of the DIP financing submitted by the Debtors will result in leveraging the bankruptcy process to the detriment of the creditors and the Bankruptcy estate. The proposed financing is nothing more than exit financing for a yet-to-be-filed plan of reorganization.

The unreasonable, onerous and unfair terms proposed by the Debtors effectively lock up the bankruptcy process and eliminate creditor protections inherent in the Chapter 11 process. The most offensive terms proposed by the Debtors are the default-triggering provisions, which raise serious concerns in light of the excessively high non-refundable $63,000 origination fee, and the high interest rate of 18% on the $2.1 million, which interest is compounding, and the excessive and unreasonable default rate of 23%. According to the proposed terms, an event of default occurs if a chapter 11 trustee is appointed, if a motion to terminate stay is granted, or if plan is proposed that is not approved by the DIP Lenders. Moreover, Debtors have not demonstrated the ability to repay the requested financing in the event of a default. The Debtors do not identify the alleged unencumbered assets to be provided as security for the financing, or the source of payments to cover advances.

---

[7] One concern raised by the *Ames* court that is not at issue here is the failure of the finance agreement to provide a carve-out for the unsecured creditors' committee and trustee's counsel, leaving the committee and trustee without the assistance of counsel and the court without the adversary system. There is no trustee or committee involved in the present case, and debtor's counsel received a retainer of $300,000 prepetition. Thus, the same concerns raised in *Ames* on this point are not at issue in the present case.

- 16 -

00759-47/709322_2.doc

The proposed financing terms also create an ironic situation for the Bank. Aside from the fact that Bank may seek stay relief, which, if granted, will constitute an event of default, the terms also provide for the subordination of all pre-existing 507 claims. Pursuant to the cash collateral stipulation between Whitton and the Bank, Whitton granted Bank a 507 claim as additional adequate protection for the use of the Bank's cash collateral; however, the DIP financing is to be accorded superpriority status. As a result, the additional alleged adequate protection granted by the Debtor to the Bank in December 2010, as an inducement to use the Bank's cash collateral, will be completely eliminated under the terms of the proposed DIP financing requested by the Debtor in March, 2011.

## IV. CONCLUSION

Based on the foregoing, the Bank requests that the Court deny the Debtors' Motion in its entirety.

Dated this 14th day of March, 2011.

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

Richard F. Holley, Esq. (NV Bar No. 3077)
Ogonna M. Atamoh, Esq. (NV Bar No. 7589)
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone: 702/791-0308
Facsimile: 702/791-1912

*Attorneys for Bank of America, N.A., as successor-in-interest to First Republic Bank*

00759-47/709322_2.doc

**CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of Santoro, Driggs, Walch, Kearney, Holley & Thompson, and that on the 14th day of March, 2011, I caused to be served a true and correct copy of OPPOSITION TO DEBTOR'S MOTION FOR INTERIM AND FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 364, FED. R. BANKR. P. RULE 4001(C) AND L.R. 4001(B) AND (C); (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) GRANTING RELATED RELIEF, AND (III) SCHEDULING FINAL HEARING in the following manner:

☒ (ELECTRONIC SERVICE) Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

☐ (UNITED STATES MAIL) By depositing a copy of the above-referenced document for mailing in the United States Mail, first class postage prepaid, at Las Vegas, Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on the date above written.

☐ (OVERNIGHT COURIER) By depositing a true and correct copy of the above-referenced document for overnight delivery via Federal Express, at a collection facility maintained for such purpose, addressed to the parties on the attached service list, at their last known delivery address, on the date above written.

☐ (FACSIMILE) That I served a true and correct copy of the above-referenced document via facsimile, to the facsimile numbers indicated, to those persons listed on the attached service list, on the date above written.

*/s/ Maureen Lilesio*
An employee of Santoro, Driggs, Walch, Kearney, Holley & Thompson

00759-47/709322_2.doc