HAL L. BAUME, ESQ.
*Admitted Pro Hac Vice*
BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
**FOX ROTHSCHILD LLP**
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899 / Facsimile: (702) 597-5503
Email: hbaume@foxrothschild.com; baxelrod@foxrothschild.com
*Counsel for Debtors*

Electronically Filed April 19, 2011

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEVADA

In re

WHITTON CORPORATION, a Nevada corporation,

            Debtor.

☐ Affects this Debtor
☒ Affects all Debtors
☐ Affects South Tech Simmons 3040C, LLC

Case Nos. BK-S-10-32857-BAM
and BK-S-10-32680-BAM

Jointly Administered Under
Case No. BK-S-10-32680-BAM

Chapter 11

**DEBTORS' REPLY IN SUPPORT OF MOTION FOR INTERIM AND FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 364, FED R. BANKR. P. RULE 4001(C) AND L.R. 4001(B) AND (C): (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) GRANTING RELATED RELIEF, AND (III) SCHEDULING FINAL HEARING**

Hearing Date:   April 20, 2011
Hearing Time:   9:30 a.m.

     Whitton Corporation, a Nevada corporation ("Whitton"), and South Tech Simmons 3040C, LLC, a Nevada limited liability company ("Simmons," and together with Whitton, "Debtors"), as debtors and debtors in possession in the above-captioned chapter 11 proceedings ("Chapter 11 Cases"), submit this Reply addressing the Supplemental Objection ("Wells Objection") filed by Wells Fargo Bank, N.A. ("Wells Fargo"), the Supplemental Objection ("BofA Objection") filed by Bank of America, N.A. ("BofA"), and the Response ("Secured Creditors Response") by Secured Creditors, German American Capital Corporation, GSMS 2004-GG2 Sparks Industrial, LLC, JPMCC 2006-CIBC14 Simmons Street, LLC ("Secured Creditors"), (BofA Objection, together with the Wells Objection and Secured Creditors

*VG1 82761v2 04/19/11*         1

Response, collectively referred to as the "Supplemental Objections") (BofA, together with Wells Fargo and Secured Creditors, collectively referred to as the "Objecting Creditors") to Debtors' Motion for Interim and Final Order Pursuant to 11 U.S.C. §§ 105, 364, Fed. R. Bankr. P. Rule 4001(c) and L.R. 4001(b) and (c):  (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Granting Related Relief, and (III) Scheduling Final Hearing [Docket No. 229] (the "Motion"), and, in support thereof, respectfully represent as follows:

## I. INTRODUCTION

The Supplemental Objections misstate and distort the facts underlying the Motion, just as these same facts were distorted in the initial objections to the Motion.  The following are the correct facts absent the spin and plain misstatements put forth by the Objecting Creditors.

- Prior to filing their petitions, Debtors sought both debtor in possession and exit financing and ultimately received limited prepetition financing from Umbra Partners, LLC ("Umbra") in the amount of a $300,000 loan secured by land not otherwise encumbered. Huygens Declaration in Support of Debtors' Opposition to Wells Motion for Stay Relief, filed at Docket No. 370 ("Huygens' Opposition Decl."), ¶ 7.

- The primary purpose of the prepetition merger among Whitton and certain of its affiliates was to facilitate obtaining financing and plan funding as well as to streamline costs and make the legal structure mirror the way Debtors actually operated.  See Huygens Opposition Decl., ¶ 7-9.

- The DIP Lenders are not Umbra and had **no** dealings or relationships with Debtors prepetition and had no involvement whatsoever with any prepetition actions taken by Debtors, including the decision to merge.  Huygens Opposition Decl., ¶ 14.

- The rents of the real estate collateral of BofA, GSMS and JPMCC are used solely to operate and maintain the respective properties, pursuant to budgets approved by each of these lenders, and excess funds for each property have been paid to each lender. Hamilton Declaration in Support of Debtors' Reply to Opposition of Objecting Creditors to Postpetition Financing ("Hamilton Decl."), ¶ 4, as filed concurrently herewith and incorporated for all purposes herein by this reference.

- The real properties and rents therefrom subject to liens held by Wells, LSREF2 and German American Capital Corporation are in the possession of prepetition state court appointed rent receivers, pursuant to consent orders entered by this Court.

- According to the Wells Fargo and LSREF2 Receiver Reports, their rent receiver is presently holding $1,000,000 in accumulated cash, which could be turned over to Wells and LSREF2.  Hamilton Decl., ¶ 9.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Moreover, the Postpetition Financing[1] *does not* lock Debtors into a plan approved by the lenders providing such financing (the "DIP Lenders"). To the contrary, the Postpetition Financing does not prevent, but actually facilitates, a full blown confirmation process. Notably, Debtors' exclusive period to file a plan has now terminated, thereby permitting competing plans to be pursued by any creditor or party. The Supplemental Objections also impermissibly seek to raise premature objections to Debtors' proposed plan of reorganization, the terms of which have never been secret,[2] which are appropriately raised only at the plan confirmation stage.

Additionally, Wells Fargo and its affiliate, LSREF2, who joined in the Wells Objection, posit that their offer of $300,000 of its Cash Collateral is a better postpetition financing option than that before the Court, as proposed by the Motion. Based upon the prior pleadings in these Chapter 11 Cases, $300,000 is not nearly sufficient to bring Debtors through the confirmation process and is inadequate consideration for the forfeiture of six of Whitton's Properties, all but one of which are necessary for an effective reorganization that is in prospect.

Some Objecting Creditors continue to argue harm to creditors by Debtors' actions in furtherance of their desire to reorganize complaining that creditors should not "bear the costs" of a failure by Debtors to confirm a plan. Yet, nowhere in the Supplemental Objections do they "connect the dots" and apply the law cited to the facts of these Chapter 11 Cases to show just what that harm might be.

Debtors concede there is no equity in Debtors' real properties. There are only *de minimis* unsecured assets, and the administrative expenses of these estates already far exceed the value of those assets. If Debtors fail to confirm a plan, there will be no recovery for unsecured claims whatsoever because the secured lenders, including the Objecting Creditors, will receive all of Debtors' real property and rents therefrom. There are simply no facts before the Court to support the assertion that the wholly unsecured Postpetition Financing in any way reduces or adversely affects the rights and claims of any creditors of these estates. Still, Objecting Creditors continue to vigorously oppose the Motion.

Such opposition and continuing allegations of bad faith asserted in the Supplemental Objections

---

[1] Unless otherwise defined herein, all capitalized terms shall have the same meaning ascribed in the Motion.

[2] Debtors' Joint Chapter 11 Plan of Reorganization (the "Plan") was filed with this Court on April 18, 2011, at Docket No. 414.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

VG1 82761v2 04/19/11                                           3

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

cause Debtors to muse upon whether Objecting Creditors are the parties acting in bad faith. If approved, the terms of the Postpetition Financing, as modified previously and herein, have absolutely no adverse impact on secured creditors' claims, liens and rights in these Chapter 11 Cases. If Debtors reorganize as contemplated, then Objecting Creditors will receive restructured secured loans, the principal amounts of which will be based on the Court determined value of their respective collateral, payable over time at Court determined market rate interest and terms, in which the borrower is an entity that the Court will have determined has the ability to make those payments. In light of these facts, Debtors can only conclude that the continued opposition to this Motion is solely for the purpose of "killing these cases" and depriving Debtors of the opportunity to pursue reorganization in accordance with applicable law.

## II.   ARGUMENT

Debtors filed these Chapter 11 Cases on the eve of foreclosure for the sole purpose of reorganizing their businesses in accordance with applicable bankruptcy law, and nothing more. "Chapter 11 of the Bankruptcy Code has one purpose; the rehabilitation or reorganization of entities entitled by statute to its relief." In re Thirtieth Place Inc., 30 B.R. 503, 505 (9th Cir BAP 1983). The Objecting Creditors' rights in their respective collateral are not prejudiced or adversely affected in any way by the granting of the Motion, which simply provides Debtors with funding to pay a portion of allowed administration expenses for professional fees, US Trustee fees and other business expenses, which are not being paid from the Objecting Creditors' cash collateral, in order to provide Debtors with an opportunity to confirm a reorganization plan. The Objecting Creditors' rights to oppose any or all provisions of such a plan are fully preserved under the Bankruptcy Code notwithstanding the approval of this Motion, as modified at the interim hearing and as further modified herein.

A.   **The Modified Credit Agreement Benefits Debtors' Estates.**

   1.   **The Modified Credit Agreement Seeks only Debtor in Possession Financing.**

In light of the modifications made to the Credit Agreement following the interim hearing on the Motion, as circulated to counsel for the Objection Creditors on March 29, 2011, to render the Postpetition Financing a wholly unsecured loan under Bankruptcy Code section 364(b), Debtors subsequently obtained the DIP Lenders' agreement to modify the Motion and Credit Agreement further in response to

certain objections raised by Objecting Creditors. Such further modifications will render moot many of the objections raised. As indicated by Mr. Holley in his Declaration [Docket No. ___], Debtors' counsel provided him and other counsel to Objecting Creditors a draft of proposed revised Credit Agreement on or about March 29, 2011, prior to the supplemental briefing deadline.

The cumulative modifications to the Credit Agreement are as follows:[3]

a) Debtors only seek approval of Postpetition Financing in the amount of $825,000. The Debtors will not seek approval of the balance of $1,275,000 in this Motion. The Debtors' purpose in including the exit financing was for disclosure and cautionary purposes, but will address the exit financing as part of the plan confirmation process. The Origination Fee will be based on $825,000 and not $2,100,000.

b) Any advances under the DIP Loan will only be disbursed as and in the amount needed, rather than in minimum distributions of $50,000.

c) Section 2.12 of the revised Credit Agreement will be deleted. The sentence referring to "Superpriority Claim" was inadvertently left in. It should have been deleted.

d) The Credit Agreement also has been modified to provide that upon the occurrence of an event of default, the only "remedy" the DIP Lender will be entitled to is (i) being relieved of any obligation to make further loans and (ii) the right to be paid on account of its administrative claim for the loan obligations to the same extent that other similarly situated administrative creditors' claims are paid in accordance with applicable provisions of the Bankruptcy Code.

e) Each separate Debtor will be liable only for the funds advanced to it under the DIP Loan to pay its respective administrative expenses and not for the repayment of the other Debtor's advances necessary to pay its administrative expenses.

By virtue of the foregoing modifications, the concern of the Objecting Creditors, albeit unfounded, that this Court will be unable to "impartially decide substantive motions on the merits where granting of such motions would constitute an event of default under the revised Credit Agreement" have been resolved. BofA Supp. Obj. 7:4-8. Debtors have met all relevant disclosure requirements for the approval of postpetition financing under Bankruptcy Code section 364, Bankruptcy Rule 4001 and Local Rule 4001 and only seek approval of such financing. Moreover, the terms of the modified Credit

---

[3] A true and correct copy of the modified Credit Agreement is attached hereto as Exhibit A and incorporated by reference as if set forth in full herein. In addition, a blackline copy of the modified Credit Agreement is attached hereto as Exhibit B, which details all revisions made to the originally proposed Credit Agreement before the modifications made at the interim hearing and herein. Had Mr. Holley, or any other counsel, advised Debtors' counsel of the concerns regarding the proposed modified Credit Agreement they had received well before their supplemental briefing deadline, which concerns they have now voiced in the Supplemental Objections, Debtors would have addressed them with the DIP Lenders sooner and all parties could have avoided the expense of having to address them formally now.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Agreement are not onerous and are not only typical, but given the risk of nonpayment, are certainly warranted and do not lock the estates into a plan.

Under the modified Credit Agreement, it is almost certain that if no plan is confirmed the DIP Lenders will have only an administrative claim and will not be repaid the $825,000 advanced to Debtors pursuant to Bankruptcy Code section 364(b). Thus, the Postpetition Financing is an extremely risky loan. Moreover, if there is a default under the DIP Loan, other than ceasing to make further advances, the only remedy the DIP Lenders will have is to <u>wait and hope</u> for payment, if any, along with all other similarly situated administrative creditors with unpaid allowed administrative claims. On the other hand, Bank of America, GSMS and JPMCC have replacement liens and superpriority claims, and Wells Fargo, LSREF2 and German American Capital Corp., in effect, have total control over the real estate and rents therefrom, which serve as their collateral via their rent receivers who have remained in place during these Chapter 11 Cases, pursuant to orders entered by this Court which were consented to by Whitton.

Since Debtors now seek only the approval of the first two tranches of Postpetition Financing, up to a total of $825,000, and not the plan funding financing tranche, the Motion as modified should be approved.

**2.    Confirmation Objections Are Not Appropriately Raised in an Objection to Postpetition Financing.**

The Objecting Creditors assert that the Postpetition Financing "short circuits the chapter 11 plan process." Wells Supp. Obj. 2:16-17. The Objecting Creditors are incorrect. As explained on the record at the interim hearing and in Debtors' last Reply, the Postpetition Financing (i) is not an "impermissible sale" of the Debtors' assets or a "*sub rosa* plan," and (ii) was not intended to, and with the above modifications does not, "impermissibly leverage the bankruptcy case by affecting the Court's ability to impartially decide substantive motions on the merits where the granting of such motions would constitute an event of default under the revised Credit Agreement." BofA Supp. Obj. 7:5-7.

a.    **The Postpetition Financing Is Not a *Sub Rosa* Plan.**

The Objecting Creditors seize upon Section 7.1(b) of the Credit Agreement as impermissible asserting that provision is in violation of the absolute priority rule, BofA Supp. Obj. 5:15-23, and consti-

tutes a *sub rosa* plan. BofA Supp Obj. 4:28-5:-4. This provision simply provides for repayment of the Postpetition Financing via equity in the reorganized debtor and discloses that a lender approved plan will provide certain considerations to Hallett. The Credit Agreement also provides a timetable for filing a plan and disclosure statement and confirming such plan, meaning, that the confirmation of the plan will be through the normal confirmation process. The Credit Agreement in no way obligates the estate or this Court to confirm a plan that the Court does not decide to confirm through the normal confirmation process. It also does not require the sale of Debtors' assets nor does it provide Hallett with any property.[4] The Credit Agreement, as modified, is neither a sale nor *sub rosa* plan and to argue otherwise is simply wrong, misleading and, quite frankly, disingenuous.

        **b.**      **The Postpetition Financing Does Not Create Impermissible Leverage of the Bankruptcy Proceedings.**

As exclusivity has expired, the Postpetition Financing and terms of the modified Credit Agreement in no way lock up a plan and do not in any way prohibit any creditor or party in interest from filing and pursuing confirmation of a plan. If a plan other than a "lender approved plan" is confirmed, the Postpetition Financing must simply be repaid as an administrative expense, just as any remaining administrative expenses of the estate not paid from the Postpetition Financing would have to be paid in accordance with applicable provisions of the Bankruptcy Code.

Such objections are related to whether the Plan is confirmable and are only properly raised as objections to confirmation. Though Debtors will seek the Court's approval of a disclosure statement and solicitation procedure to ultimately allow creditors entitled to vote to accept or reject the Plan, as well as object to confirmation, those issues are not before the Court at this time.

Debtors have filed their Plan to eliminate speculation concerning its provisions. Debtors have also sought, as part of the plan process, to determine the value of its various properties, either by agreement or a Court determination. In the event the various creditors, including the Objecting Creditors do not like the Plan, they have remedies under the Bankruptcy Code to object to the Plan, which include the opportunity to raise "good faith" issues in opposition to confirmation of a plan, or to file a plan more

---

[4] Furthermore, Hallett has now filed his individual bankruptcy petition, case no. 11-15770, which provides more court oversight regarding any future compensation provided to him by new equity.

1  to their liking. Debtors merely seek an opportunity to gain approval of their Plan with the Objecting

2  Creditors and all parties in interest being provided an opportunity to oppose confirmation of that Plan.

3        The Credit Agreement does not afford Hallett any leverage that the Bankruptcy Code does not

4  already provide him as the principal of a chapter 11 Debtor seeking reorganization. Similarly, the DIP

5  Lenders also have no special "veto power" and get no special benefits at the expense of other creditors..

6  Just like other unpaid administrative claimants, the only "leverage" or "veto power" the DIP Lenders

7  have is to receive payment of its administrative claim as a condition to a plan being confirmed.

8        **c.**      **Hallett only Receives Consideration if Plan Confirmed.**

9        Objecting Creditors argue that the Credit Agreement violates the absolute priority rule are con-

10  firmation issues and irrelevant to this Motion. The considerations to be provided to Hallett as set forth

11  in the Credit Agreement are for disclosure purposes and are not binding on Debtors. The Credit Agree-

12  ment does not require that Hallett be given certain considerations absent the confirmation of a lender

13  approved plan. If no such plan is confirmed, the DIP Lenders will not advance the additional

14  $1,275,000 for plan funding, and Hallett will not receive any of the consideration mentioned, thereby

15  leaving the DIP Lenders with only an administrative claim for their loan that may or may never be paid.

16  In any scenario, the Objecting Creditors and all other parties in interest will have ample opportunity to

17  raise any issues in opposition to confirmation (including alleged bad faith), and this Court will consider

18  such opposition in deciding whether or not to confirm the Plan.

19        After putting aside the Objecting Creditors' extreme and unsupported distortion of the terms of

20  the Credit Agreement, the proposed transaction is very simple: (i) DIP Lenders advance up to $825,000

21  to the estates to pay authorized or allowed administrative expenses incurred by the estate, and (ii) if a

22  lender approved plan (which for disclosure purposes set forth the DIP Lenders' desire for Hallett's

23  employment by the reorganized debtor and the considerations therefor) is approved, the DIP Lenders

24  advance exit funding of up to $1,275,000 to implement the Plan (including a fund for unsecured credi-

25  tors) with the Postpetition Financing to be satisfied by the DIP Lenders' receipt of equity in the reor-

26  ganized debtor; however, (iii) if there is an event of default (i.e., another plan is confirmed that lender

27  did not approve), then the Postpetition Financing must be repaid at confirmation as an administrative

28

expense just the same as any other allowed administrative expense; and (iv) if no plan is confirmed, then Postpetition Financing is likely not to be repaid with the DIP Lenders assuming that risk.

**B.    Debtors and DIP Lenders Have Acted in Good Faith.**

Throughout their pleadings, the Objecting Creditors continually allege that Debtors should be denied the opportunity to present and confirm a reorganization plan because they have acted in "bad faith." Bad faith means "an abuse of the bankruptcy process by a debtor and is offensive to the integrity of the bankruptcy system." Cal. Mortgage Serv. v. Yukon Enters., Inc. (In re Yukon Enters., Inc.), 39 B.R. 919, 922 (Bankr. C.D. Cal. 1984). However, the facts in the present case do not constitute bad faith. See In re Thirtieth Place, Inc. 30 B.R. 503, 505 (B.A.P. 9th 1983).

In Thirtieth Place, a shell corporation was created on the eve of bankruptcy to take title to the subject property solely for the purpose of filing a petition to prevent foreclosure upon its heavily encumbered property. In re Thirtieth Place, Inc., 30 B.R. 503 (B.A.P. 9th 1983). That debtor had no plan contemplated for the infusion of capital, no gain in managerial expertise, no history of past business conduct, no employees and indeed, no current business activity on the date of the commencement of the case nor were there any reasonable prospects for the conduct of future business. In a 2-1 decision, the Ninth Circuit Bankruptcy Appellate Panel ("BAP") reversed finding that the case was not filed in bad faith, not because of the proximity of debtor's formation to the date of the petition, which by itself does not indicate an intent to abuse the Bankruptcy Code's reorganization provisions, but because the BAP found there to be no reasonable prospects for the conduct of future business. Id., at 505-506. In determining bad faith the Bankruptcy Appellate Panel instructed:

> If it is obvious that a debtor is attempting unreasonably to deter and harass creditors in their bona fide efforts to realize upon their securities, good faith does not exist. But if it is apparent that the purpose is not to delay or defeat creditors but rather to put an end to long delays, administration expenses ... to mortgage foreclosures, and to invoke the operation of the [bankruptcy law] in the spirit indicated by Congress in the legislation, namely, to attempt to effect a speedy efficient reorganization, upon a feasible basis ... good faith cannot be denied.

Id. at 505, quoting Matter of Levinsky, 23 B.R. 210, 218 (N.Y. Bkrtcy. 1982)

In subsequent cases, courts have found that the bad faith concept is to be read restrictively. For example, in In re Victory Construction Company, Inc., the debtor was a "moribund corporation, revivi-

fied to take title to the asset in question, just shortly before filing;" however, unlike the debtor in Thirtieth Place whose motives were seen as pure self-dealing, the debtor in Victory was seen as having considered bankruptcy as a possibility prepetition but who was equally interested in continuing negotiations with its creditors to avoid bankruptcy if possible. Victory, 42 B.R. 145, 149 (Bankr. C.D. Cal. 1984). This difference was key to that court's ruling that the "general issue of 'good faith' must be resolved in favor of the debtor." Id. at 150.

The facts in these Chapter 11 Cases do not even remotely approach the egregious actions of the Thirtieth Place debtor, which are instructive to debtors as to what not to do – although even those facts were found by 1 of the 3 BAP judge not to rise to the level of bad faith. These Chapter 11 Cases are not new debtor syndrome cases. Unlike the debtor in Thirtieth Place, Debtors have a plan for the infusion of working capital and exit financing, they have formulated a Plan, which has been filed, they have managerial experience, and current businesses to run. Like Victory, Debtors explored bankruptcy as a possibility but equally wanted to continue negotiations with their creditors to avoid bankruptcy, if at all possible. As held by the court in Victory, this is not indicative of bankruptcy abuse.

The Objecting Creditors refuse to recognize that utilizing the chapter 11 reorganization process to cure a contract default is an acceptable, good faith use of the Bankruptcy Code's reorganization provisions. See, e.g., Platinum Capital, Inc. v. Sylmar Plaza, LP (In re Sylmar Plaza LP), 314 F.3d 1070, 1075 (9th Cir. 2002) (finding that a debtor may avail itself the protections of the Bankruptcy Code in order to use the reorganization process to cure the consequences of contractual defaults). The Objecting Creditors have shown no facts or evidence that the DIP Lenders have not acted in good faith.

Debtors have been above board and have disclosed facts regarding their circumstances as well as disclosed their intentions in the case **even when not required to do so.** Such open and broad disclosures evidence the Debtors' good faith. In the Motion, rather than limiting it to $825,000 to be advanced during the Chapter 11 Cases, Debtors took the extra, albeit unnecessary, step to disclose both the intended structure of its Plan, the exit financing in support thereof, and its intended management structure as a reorganized debtor, including compensation to be paid to Hallett for his employment with the reorganized debtor. Debtors are proceeding in the utmost good faith and have not been and are not now "hiding the ball."

The allegations of bad faith in connection with the prepetition merger among Whitton and certain of its affiliates by Objecting Creditors, while incorrect, are also irrelevant to this Motion. Such expenses can only be authorized under applicable law or allowed if the Court approves them and, if found appropriate and proper, then there is no reason why they should not be paid from the Postpetition Financing. There is no evidence before the Court that the DIP Lenders or Debtors are not acting in good faith to put financing in place to pay for legitimate, court approved expenses of these estates, with all risk of not being repaid being borne by the DIP Lenders.

When considering all of the facts of this case, including the facts and legal argument contained in the Debtors Amended Opposition to Wells Fargo Bank's Motion for a Determination that Debtor Is Subject to the Bankruptcy Code Requirements for a Single Asset Real Estate Case and for Relief from Stay, and in the Alternative for Adequate Protection ("Debtors' Opposition to Wells Stay Relief Motion") which Debtors hereby incorporate in full by reference herein, there can only be one conclusion -- Debtors are not acting in bad faith.

Although Debtors had intended to wait until completion of the valuation process, rather than respond to the meritless and twisted accusations made by Objecting Creditors regarding the Plan, Debtors chose to simply file the Plan now to eliminate further speculation. As all parties are aware, Debtors will not be in the position to move to the confirmation process until the valuation process of the Properties (now underway) is completed. However, on its face, the Plan is legitimately confirmable, and Debtors by this Motion have demonstrated that they have the funding to implement the Plan.

In light of the foregoing, it is clear that the Debtors are not "attempting to deter and harass creditors" but are clearly and as expeditiously as possible "attempting a speedy, efficient reorganization on a feasible basis." In re Marsch, 36 F.2d 825, 828 (9th Cir. 1994).

**1.     The Merger Was Proper and Legal.**

The merger of the entities was an appropriate exercise by Whitton and certain of its prepetition affiliates of their business judgment in governing their corporate affairs under Nevada law. N.R.S. 92A.120. A creditor typically has no right to object to a consolidation, merger, or dissolution. Corporate Form and Substantive Consolidation, William H. Wilden, 75 Geo. Wash. L. Rev. 237, 326-27 (2007). Moreover, deference is given to a company's exercise of its business judgment. Under Nevada

corporate law, a company's directors have full control over the affairs of the company. See N.R.S. 78.120(1); see also Berman v. Riverside Casino Corporation, 247 F.Supp. 243, 245 (D. Nev. 1964). Directors are generally afforded protections in conducting the company's affairs as governed by the business judgment rule. The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Shoen v SAC Holding Corporation, 122 Nev. 621, 632, 137 P.3d 1171, 1179-1180 (Nev. 2006) (citing Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984), overruled in part on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del.2000); N.R.S. 78.138(3) ("Directors and officers, in deciding upon matters of business, are presumed to act in good faith, on an informed basis and with a view to the interests of the corporation.")[5]

Objecting Creditors assert that a shareholder-approved prepetition merger is tainted with "bad faith" because the merger occurred immediately prior to the bankruptcy filing. In doing so, Objecting Creditors are overreaching by essentially seeking veto power over the prepetition merger and thereby blurring the dividing line between a company's rights and creditors' rights, as granted by the Nevada statute. N.R.S. 92A.120. Under Nevada law, creditors are not afforded rights regarding a company's corporate governance, including the decision of the equity holders to merge with another company. Id. That right has been specifically reserved to the equity holders of a company. N.R.S. 92A.120. Creditors' rights are protected by having the liability for their claims adhere to the newly merged entity. N.R.S. 92A.250; see also United States of America v. Oil Resources, Inc., 817 F.2d 1429, 1434 (9th Cir. 1987). If the Nevada state legislature had wanted to give creditors power over a company's internal affairs, including the ability to effect a merger, it would have done so–much the same way it did for minority equity interests. N.R.S. 92A.380. They chose not to do so.

Indeed, the Objecting Creditors' assertions that the prepetition merger rises to the level of "bad faith" smacks of the behaviour of equity holders, not of creditors.

Affording Objecting Creditors "veto" power and permitting them to exert control over the deci-

---

[5] Even a bad decision is generally protected by the business judgment rule's presumption that the directors acted in good faith, with knowledge of the pertinent information, and with an honest belief that the action would serve the company's interests. Schoen, at 636, 1181; N.R.S. 78.138(3).

sion by Whitton and certain of its affiliates in exercising their business judgment to effect a prepetition merger runs afoul of the dividing line between the rights of equity holders versus the rights of creditors.

### 2. Merger Is Distinct from Substantive Consolidation.

The Bankruptcy Code's plain language recognizes that there is a difference between a merger and consolidation. See 11 U.S.C. §1123(a)(5)(C); see also In re Standard Brands Paint Co., 154 B.R. 563, 570 (Bankr. C.D. Cal. 1993) (citing In re Parkway Calabasas, Ltd., 89 B.R. 832, 836 (Bankr. C.D. Cal. 1988) (disagreeing with Judge Bufford's observation from Parkway Calabasas and noting "Section 1123(a)(5)(C) of the Code ... refers to 'merger or consolidation.' This suggests that substantive consolidation is not the same as merger, or it would be redundant to refer to 'consolidation or merger.'") (emphasis original). Where merger is a corporate transaction having serious ramifications not to be undertaken lightly, including tax implications and that the merging entities will cease to exist, substantive consolidation generally comes about in the context of court proceedings, requires Court approval and often leaves the various debtor legal entities in place and merely pools the assets and liabilities of those entities.

Indeed, there is nothing in the Bankruptcy Code that prohibits a prepetition merger of related entities, and there is nothing in the Bankruptcy Code specifically providing for the unwinding of a merger. Similarly, there is nothing that requires entities to seek substantive consolidation in a bankruptcy proceeding rather than effectuating a merger prior to that bankruptcy. Thus, Whitton and certain of its affiliates were completely within the provinces of Nevada law and the Bankruptcy Code when they elected to effect a merger prepetition in a permissible exercise of their business judgment.

### 3. Objecting Creditors Are Adequately Protected and Will Suffer No Prejudice.

There can be no argument of prejudice to the secured creditors or any unsecured creditors because there are no significant unencumbered assets and, though now held by Whitton, all property, claims and liens of the pre-merger affiliates remain otherwise unaffected. Nevertheless, Wells argues that the DIP financing should be disallowed for lack of good faith and incorporates its arguments in its Motion for Determination that Debtors Are Subject to Single Asset Real Estate Requirement and for Relief from Stay, and in the Alternative, Adequate Protection ("Wells Motion For Relief"). Debtors question Wells Fargo's lack of good faith.

*VG1 82761v2 04/19/11*

13

Wells Fargo repeatedly cites to Bankruptcy Code section 362(d)(3) and argues that Whitton should have commenced payments or filed a plan within 90 days of filing its petition…but fails more than once to mention that a debtor's deadline to commence such payments or file a plan is *the later of* 90 days from the petition date or 30 days after there is a determination that the debtor is subject to the SARE provisions. 11 U.S.C. § 362(d)(3). Debtors are not in violation of section 362(d)(3), and Wells Fargo knows it.

Of greater concern is the fact that, by its own admission, Wells states that its Receiver has approximately $300,000 in cash accrued from the rents generated by its collateral Properties, which has not been paid over to Wells Fargo. Wells Supp. Obj. to Financing Motion 4:5-7. In fact, the Wells Receiver's reports indicate accrued cash in excess of $1,000,000, as of March 31, 2011. Hamilton Decl., ¶ 9. What possible reason exists for the receiver to continue to hold such a large amount of net rents? If this Court determines that Whitton is a SARE and section 362(d)(3) applies, the Bankruptcy Code permits required 362(d)(3) payments to be paid out of rents and the $1,000,000 in accumulated cash held by the Wells Receiver, constitute rents.

Similarly, the rents generated from the BofA collateral property are being used only to operate and maintain that collateral, pursuant to a budget approved by BofA, with all excess cash being paid to BofA. Other than being deprived of the immediate ability to effect a forfeiture of the Properties for their own use and benefit, Objecting Creditors' claims and liens are suffering no prejudice while Debtors pursue their reorganization goals, which are already in progress.

C. **Proposed Funding by Wells Fargo and LSREF2 Is Wholly Inadequate.**

Although Debtors believe that settlement offers are inappropriate in formal pleadings before the Court, they will nevertheless briefly respond to the "offer" by Wells Fargo and LSREF2 to give the Whitton estate $300,000 in exchange for the forfeiture of six properties (the "Offer"). After due consideration, Whitton finds the Offer is unacceptable and must be declined. Debtors seek to reorganize and need most of their Properties to do so. Wells Fargo and LSREF2 are far too sophisticated to be ignorant of the fact that $300,000 is woefully insufficient to support Debtors' funding needs through confirmation. Even if Whitton did not need five of the six Properties in question to reorganize, which it does, the sum of $300,000 does not replace the need for the Postpetition Financing. The fees and expenses in

1  these Chapter 11 Cases are anticipated to be well in excess of that sum. The Postpetition Financing is
2  for $825,000, not $300,000. Thus, the Offer by Wells Fargo and LSREF2 is less than half of Debtors'
3  anticipated requirements to fund their costs and expenses through confirmation. The Offer, if accepted,
4  would effectively kill Debtors' chances to successfully reorganize by eviscerating Debtors' assets and
5  would drive away the DIP Lenders and render the estates administratively insolvent. Debtors, sadly,
6  believe this is just what Wells Fargo and LSREF2 desire and intend to do.[6]

### III. CONCLUSION

WHEREFORE, for all of the foregoing reasons, Debtors respectfully request that the Court enter an order overruling the Supplemental Objections, approving the Motion and Credit Agreement, modified as described herein and attached hereto, on a final basis, and grant such other and further relief as is just and proper.

DATED this 19th day of April, 2011.

**FOX ROTHSCHILD LLP**

By  */s/ Brett A. Axelrod*
　　BRETT A. AXELROD, ESQ.
　　Nevada Bar No. 5859
　　3800 Howard Hughes Parkway, Suite 500
　　Las Vegas, Nevada 89169
　　*Counsel for Whitton Corporation*

---

[6] Despite Debtors' rejection of the Offer, Debtors welcome the opportunity to meet with the business decision makers at Wells/LSREF2, and all other secured lenders in these Chapter 11 Cases, to attempt to negotiate a consensual reorganization plan.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)