# EXHIBIT A

# EXHIBIT A

## DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT

AGREEMENT, dated as of March __, 2011, between WHITTON CORPORATION, a Nevada business corporation ("Whitton"), South Tech Simmons 3040C, LLC, a Nevada limited liability company ("Simmons" and together with Whitton, the "Borrowers", or "Debtors") debtors-in-possession in cases pending under Chapter 11 of Title 11 of the Bankruptcy Code (as defined in Section 1.1 (the "Chapter 11 Cases"); AND Ruby Capital Investments, LLC ("Ruby") and Silver Phoenix, LLC, a Nevada limited liability company ("Silver" and together with Ruby, the "Lenders" and the Lenders, together with the Borrowers, collectively referred to as the "Parties").

## RECITALS

WHEREAS, on December 5, 2010 ("Whitton Petition Date"), Whitton filed a voluntary petition with the Bankruptcy Court (as defined in Section 1.1) and, on December 8, 2010 ("Simmons Petition Date", and together with the Whitton Petition Date, collectively, the "Petition Dates"), Simmons filed a voluntary petition with the Bankruptcy Court, initiating the Chapter 11 Cases and have continued in the possession of their assets and in the management of their businesses pursuant to Bankruptcy Code Sections 1107 and 1108;

WHEREAS, an immediate and on-going need exists for the Borrowers to obtain additional funds in order to continue the operation of their businesses as debtors-in-possession under Chapter 11 of the Bankruptcy Code and, accordingly, the Borrowers have requested that the Lenders extend post-petition financing to the Borrowers;

WHEREAS, the Lenders are willing to make the Revolving Loans (as defined in Section 1.1) to the Borrowers upon the terms and conditions set forth herein;

LV1 1352456v2 04/19/11

WHEREAS, all exhibits hereto, or expressly identified in this Agreement, are incorporated herein by reference, and taken together, shall constitute a single agreement.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

**1.1    Defined Terms.**

Capitalized terms used in the Loan Documents (as defined herein) shall have (unless otherwise provided elsewhere in the Loan Documents) the following respective meanings and all section references in the following definitions shall refer to Sections of the Agreement:

"506(a) Order" shall mean the Final Order (unless the Lenders waive the Final Order requirement), or any stipulation entered between the Debtors and the Secured Lender holding a Lien on such Property, in reasonably satisfactory in form and substance to Lenders, together with all extensions, modifications and amendments thereto, entered upon an application of the Borrowers reasonably satisfactory in form and substance to the Lenders, which fixes and determines (i) the Property Value of some or all of the Properties as of the Plan's Effective Date in an amount acceptable to Debtors and within 10% variation (calculated as an aggregate across all Properties) of Debtors' opinion of value, and (ii) the amount of the secured portion of such Prepetition Lenders' Claims pursuant to Bankruptcy Code Section 506(a) as well as the amount of such Prepetition Lenders' unsecured Claims.  For purposes of this Agreement, the satisfaction of any condition or time frame which is tied to the date of the entry of the 506(a) Order shall mean the date when the last of all such orders and stipulations shall have been entered.

LV1 1352456v2 04/19/11

"Affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person shall mean the power, directly or indirectly, either (a) to vote a majority of the outstanding equity securities having ordinary voting power for the election of directors of such Person or (b) to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agreement" shall mean this Debtor-in-Possession Revolving Credit Agreement, as the same may from time to time be amended, modified or supplemented.

"Administrative Claim" shall mean a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to Bankruptcy Code sections 503(b), 507(a)(2) or 507(b), including: (a) the actual and necessary costs and expenses incurred after the Whitton Petition Date and through the Plan's Effective Date of preserving the Borrowers' bankruptcy estates and operating the businesses of Borrowers (such as wages, salaries, or commissions for services, and payments for goods and services); (b) compensation and reimbursement of expenses for legal, financial advisory, accounting, and other services, including but not limited to, Professional Fees allowed pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Whitton Petition Date and ending on the Plan's Effective Date; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code and 28 U.S.C. §1930; and (d) all Bankruptcy Court approved requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

"Advance" shall mean the Lenders' disbursement of proceeds of a Revolving Loan to Borrowers in accordance with this Agreement.

3

"Avoidance Actions" shall mean any actions commenced, or that may be commenced before or after the Effective Date, pursuant to section 542, 543 544, 545, 547, 548, 550, 551, 552 and/or 553 of the Bankruptcy Code.

"Bankruptcy Code" shall mean 11 U.S.C. §§ 101, et seq., as amended.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Nevada.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"BLV Dean Martin 7635 Property" shall mean that certain real estate as identified on Exhibit [A] attached hereto and as further described therein.

"BLV Mesquite Property" shall mean that certain real estate as identified on Exhibit [A] attached hereto and as further described therein.

"BLV Mountain Vista Property" shall mean that certain real estate as identified on Exhibit [A] attached hereto and as further described therein.

"Borrower" shall mean and refer to either of Whitton Corporation, a Nevada business corporation or South Tech Simmons 3040C, LLC, a Nevada limited liability company.  Whitton and Simmons are collectively referred to herein as the "Borrowers."

"Borrowing Availability" means, at any time, (a) the aggregate amount of the Maximum Cash Commitment Amount at such time *less* (b) the Total Utilization of Revolving Loan Commitments.

"Business Day" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in Nevada are authorized or required by law to close.

4

"Carve Out Properties" shall mean the BLV Dean Martin 7635 Property and the BLV Mountain Vista Property.

"Chapter 11 Cases" shall have the meaning ascribed thereto in the Preamble.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing Date" shall mean the date of entry of the Interim DIP Order by the Bankruptcy Court.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Commitment Termination Date" shall mean the earliest of (a) the Maturity Date, (b) the date that is forty five (45) days after entry of the Interim DIP Order by the Bankruptcy Court unless the Final DIP Order has been entered by the Bankruptcy Court prior to the expiration of such forty five (45) day period), (c) the date of substantial consummation of any Reorganization Plan (as defined in section 1101 of the Bankruptcy Code and which, for purposes of this Agreement, shall be no later than the Plan's Effective Date), and (d) the acceleration of the Revolving Loans and the termination of the Revolving Loan Commitments in accordance with the terms hereof, including Section 8.2.

"Default" shall mean any of the events specified in Section 8.1, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Effective Date" shall mean the date of approval of the Final DIP Order by the Bankruptcy Court and in any event is not later then forty-five (45) days from the date of entry of the Interim DIP Order.

5

"Estate" shall mean the estates of Debtors that were created by the commencement of the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code, and shall be deemed to include any and all privileges and incorporeal hereditaments of Debtors and any and all interests in property, whether real, personal or mixed, rights, causes of action, avoidance powers or extensions of time that Debtors or the estates shall have had effective as of the Petition Dates or thereafter, whether by virtue of sections 544, 545, 546, 547, 548, 549 or 550 of the Bankruptcy Code or otherwise.

"Event of Default" shall have the meaning ascribed thereto in Section 8.1.

"Final DIP Order" means the Final Order of the Bankruptcy Court entered after a final hearing, upon an application of the Borrowers reasonably satisfactory in form and substance to the Lenders, under Bankruptcy Rule 4001(c)(2), or such other procedures as approved by the Bankruptcy Court, and assuming satisfaction of the standards prescribed in section 364 of the Bankruptcy Code, together with all extensions, modifications and amendments thereto, which order shall be satisfactory in form and substance to Lenders, which, among other matters but not by way of limitation, (i) approves, on a final basis, the transactions contemplated in this Agreement, (ii) authorizes, on a final basis, the Borrowers to enter this Agreement and obtain credit, incur indebtedness, provide Lender with the Administrative Claim pursuant to Bankruptcy Code section 364(b) to secure payment of the Obligations in accordance herewith, and (iii) includes a finding that the Lenders are extending credit to Borrowers in good faith within the meaning of Bankruptcy Code section 364(e).

"Final Order" means an order or judgment entered by the Bankruptcy Court: (a) that has not been reversed, stayed, modified, amended, revoked, varied or set aside, and as to which (i) any right to appeal or seek certiorari, review, reargument, stay or rehearing has been waived or

6

(ii) the time to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending; or (b) as to which an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought and (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has been waived or expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending, provided, however, that no order or judgment shall fail to be a "Final Order" hereunder solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code, Rule 59 or 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be Filed with respect to such order or judgment.

"Fiscal Year" shall mean any of the annual accounting periods of the Borrowers ending on December 31 of each year.

"Interest Payment Date" means the last Business Day of each calendar quarter.

"Interim DIP Order" means  the Order entered by the Bankruptcy Court after an interim hearing (assuming satisfaction of the standards prescribed in section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law) upon an application of the Borrowers reasonably satisfactory in form and substance to Lenders, together with all extensions, modifications and amendments thereto, which order shall be satisfactory in form and substance to Lenders, which, among other matters but not by way of limitation, (i) approves, on an interim basis, the transactions contemplated in this Agreement, (ii) authorizes, on an interim basis, the Borrowers to enter this Agreement and obtain credit, incur indebtedness, provide Lender with the

7

Administrative Claim pursuant to Bankruptcy Code section 364(b) to secure payment of the Obligations in accordance herewith, (iii) includes a finding that the Lenders are extending credit to Borrowers in good faith within the meaning of Bankruptcy Code section 364(e).

"Lender" shall mean and refer to either of Ruby Capital Investments, LLC, a Nevada limited liability company or Silver Phoenix, LLC a Nevada limited liability.  Ruby and Silver are collectively referred to herein as the "Lenders."

"Lender Approved Reorganization Plan" shall mean a Reorganization Plan that is consistent with that certain "Restructuring and Debtor-in-Possession Term Sheet" entered into between and among Borrowers and Lenders dated as of February 14, 2011, as the same may from time to time be amended, restated,  modified of supplemented by mutual agreement of the Parties, or confirming a Reorganization Plan that is otherwise acceptable to Lenders in form and substance.

"Lender Approved Reorganization Plan Confirmation Order" shall mean the Final Order entered by the Bankruptcy Court (unless Lenders waive the requirement of a Final Order), satisfactory in form and substance to Lenders, together with all extensions, modifications and amendments thereto confirming a Lender Approved Reorganization Plan.

"Lender Approved Reorganization Plan's Effective Date" shall mean the date a Lender Approved Reorganization Plan, which has been confirmed pursuant to the Lender Approved Reorganization Plan Confirmation Order, becomes effective in accordance with its terms, or the occurrence of the "Effective Date" as defined in a Lender Approved Reorganization Plan which has been confirmed by the Lender Approved Reorganization Plan Confirmation Order.

"Lien" shall mean (a) any mortgage, pledge, statutory deemed trust, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security

8

interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC (other than the filing of any such financing statement which states therein that such filing is a precautionary filing only and is filed in connection with "true leases" only) or comparable law of any jurisdiction), (b) any arrangement or agreement which prohibits Borrowers from creating any mortgage, pledge, hypothecation, deposit arrangement, encumbrance, lien, charge or other security interest, or from entering into any agreement or arrangement described in clause (a) of this definition or (c) the sale, assignment, pledge or transfer for security of any accounts, general intangibles or chattel paper of Borrowers with or without recourse.

"Litigation" shall have the meaning ascribed thereto in Section 3.4.

"Loans" shall mean the Revolving Loans.

"Loan Documents" shall mean this Agreement, the Revolving Notes, and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, Lenders and including all other contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of Borrowers in connection with the Agreement or the transactions contemplated hereby. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all exhibits thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement as the same may be in effect at any and all times such reference becomes operative.

"Material Adverse Effect" shall mean a material adverse effect on (a) the business, operations, property or condition (financial or otherwise) of the Borrowers, (b) the ability of the

9

Borrowers to fully and timely perform their Obligations, (c) the validity, priority or enforceability of this Agreement, any of the Revolving Notes or any of the other Loan Documents, or the rights or remedies of the Lenders hereunder or thereunder, or (d) the feasibility of any Lender Approved Reorganization Plan.

"Maturity Date" shall mean the earlier of (a) December 31, 2011, or (b) the Plan's Effective Date.

"Maximum Cash Commitment Amount" shall mean (a) on and after the Closing Date and prior to the date of entry of the 506(a) Order, the sum of up to $350,000, and (b) on and after the date of entry of the 506(a) Order and prior to the date of entry of the Plan Confirmation Order, the sum of up to $825,000.  Such Maximum Cash Commitment Amount (which shall be advanced to Borrowers in cash) does not include the Interest and Origination Fee that will accrue in excess of the $825,000 Maximum Cash Commitment Amount.  Interest and Origination Fee will not reduce the Maximum Cash Commitment Amount.

"New Parent Company" shall mean a Nevada limited liability company that shall be formed and funded by the Lenders to own 100% of the equity interests of the Reorganized Debtors pursuant to a Lender Approved Reorganization Plan.

"Notes" shall mean the Revolving Notes.

"Notice of Revolving Loan" shall have the meaning ascribed thereto in Section 2.3.

"Obligations" shall mean the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Revolving Loans) the Revolving Notes and under this Agreement, or any other document made, delivered or given in connection therewith or herewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, or expenses.

"Plan Confirmation Order" shall mean the Final Order entered by the Bankruptcy Court (unless Lenders waive the requirement of a Final Order), satisfactory in form and substance to Lenders, together with all extensions, modifications and amendments thereto confirming a Reorganization Plan.

"Person" shall mean an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Petition Dates" shall have the meaning ascribed thereto in the Recitals.

"Plan's Effective Date" shall mean the date a Reorganization Plan, which has been confirmed pursuant to the Plan Confirmation Order, becomes effective in accordance with its terms, or the occurrence of the "Effective Date" as defined in a Reorganization Plan which has been confirmed by the Plan Confirmation Order.

"Postpetition Financing Orders" shall mean the Interim DIP Order, any other interim orders approving the lending pursuant to this Agreement and the Final DIP Order.

"Prepetition" means anytime or date prior to December 5, 2010.

"Prepetition Lenders" shall mean the Prepetition Lenders set forth on **Exhibit A** who hold Liens to secure their claims on the Property indicated with respect to such lenders as set forth on **Exhibit A** .

"Priority Claim" shall mean a Claim entitled to priority under sections 507(a)(2) through (8) of the Bankruptcy Code.

"Professional" shall mean a Person or Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327,

11

328, 329, 330, or 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"Professional Fees" shall mean all reasonable fees and expenses incurred by Professionals and allowed by the Bankruptcy Court.

"Professional Fee Claims" shall mean any Claim for compensation or reimbursement of fees and expenses as may be requested by a Professional to the extent such Professional is required to apply to the Bankruptcy Court for payment of such Claim pursuant to sections 326, 328, 330 or 331 of the Bankruptcy Code or as otherwise provided in a Reorganization Plan.

"Properties" shall mean collectively, all real estate and Rents thereof owned by the Debtors and listed on the Debtors Schedules, as amended or modified, including, the BLV Cheyenne Property, BLV Mountain Vista Property, BLV Dean Martin Property, BLV Mesquite Property, BofA Property, German American Brooks Property, German American Glendale Property, German American Greg Property, GSMS Property, Hudson Cheyenne Property, Hudson Dean Martin Property, Hudson Diablo Property, Hudson Russell Property, Hudson Seven Hills Property, Hudson Stephanie Property, JPMCC Property, and Umbra Property (each as described and defined on Exhibit A attached hereto) and each individually referred to as a "Property".

"Property Value" shall mean for any Property, its going concern value as determined by the Bankruptcy Court or through stipulation between the Debtors and the Prepetition Lender holding a Lien on such Property, for which the 506 Application seeks to fix a specific value for each such Property as set forth therein.

LV1 1352456v2 04/19/11

"Reorganized Debtors" shall mean on or after the Plan's Effective Date, the Borrowers, or the survivor of the Borrowers if the Borrowers have merged together, as reorganized debtor(s).

"Reorganization Plan" shall mean a plan of reorganization or plan of liquidation filed by Borrowers, or any creditors or other parties in interest in the Borrowers in the Chapter 11 Cases.

"Requirement of Law" as to any Person shall mean the certificate of incorporation and bylaws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other governmental authority, in each case, applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Revolving Loan" and "Revolving Loans" shall have the meaning ascribed to such terms in Section 2.1, as such Revolving Loans may be increased by interest and fees capitalized and added to the principal balance thereto pursuant to the terms of this Agreement.

"Revolving Loan Commitment" means Lenders' commitment to make Revolving Loans to the Borrowers in the aggregate amount of $825,000 in cash as follows: (a) on and after the Closing Date and prior to the date of entry of the 506(a) Order, the sum of $350,000, and (b) on and after the date of entry of the 506(a) Order and prior to the date of entry of the Plan Confirmation Order, the sum of $825,000 (including the prior Advance totaling $350,000. Such Revolving Loan Commitment (which shall be advanced to Borrowers in cash) does not include the Interest and Origination Fee that will accrue in excess of the $825,000 Revolving Loan Commitment. Interest and Origination Fee will not reduce the Revolving Loan Commitment.

"Revolving Loan Tranche 1" shall mean the initial Revolving Loan and Advances thereunder totaling $350,000 made on and after the Closing Date and prior to the date of entry of the 506(a) Order.

"Revolving Loan Tranche 2" shall mean the second Revolving Loan and Advances thereunder totaling $475,000 (to bring the total outstanding amount of the Revolving Loans and Advances thereunder to $825,000) made on and after the date of entry of the 506(a) Order and prior to the date of entry of the Plan Confirmation Order.

"Revolving Note" shall have the meaning ascribed thereto in Section 2.2.

"Subsidiary" or "Subsidiaries" of a Person shall mean a corporation, partnership or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the occurrence of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise indicated, all references to Subsidiaries are to the Subsidiaries of Borrowers.

"Total Utilization of Revolving Loan Commitments" means, as of any date of determination, the sum of the aggregate amount of all Advances of cash to Borrowers pursuant to Revolving Loans (and does not include interest and Origination Fee that are capitalized and added to principal balance of the Revolving Loans pursuant to the terms of this Agreement).

"US Trustee Fees" shall mean fees payable to the pursuant to 28 U.S.C. § 1930.

14

**1.2    Other Definitional Provisions.**

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have their respective defined meanings when used in the Notes or other document made or delivered pursuant hereto.

(b)    As used herein, in the Notes or any other Loan Document made or delivered pursuant to this Agreement, accounting terms relating to Borrowers and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under normal and customary use.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole, including all Exhibits, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection or clause contained in this Agreement or any such Exhibit.  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(d)    Unless the context otherwise requires, each reference herein to any agreement, document or instrument (including the Loan Documents) shall be deemed a reference to such agreement, document or instrument as amended, restated, supplemented or otherwise modified from time to time.

(e)    The term "includes" and "including" shall not be construed to imply any limitation.

(f)    In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."  Periods of days referred to in this Agreement shall be counted in

15

calendar days unless Business Days are expressly prescribed.  Any period determined hereunder by reference to a month or months or year or years shall end on the day in the relevant calendar month in the relevant year, if applicable, immediately preceding the date numerically corresponding to the first day of such period, provided that if such period commences on the last day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month during which such period is to end), such period shall, unless otherwise expressly required by the other provisions of this Agreement, end on the last day of the calendar month.

**1.3     Payment Terms; References to Money.**

Except as expressly set forth herein to the contrary, (a) all payments made by the Borrowers shall be made in dollars in respect of principal and interest on the Revolving Loans, and (b) to the extent not otherwise indicated, all amounts of money referenced herein shall mean and be references to amounts of money denominated in dollars.

**ARTICLE II**

**AMOUNT AND TERMS OF REVOLVING LOANS**

**2.1     Revolving Loan Commitments.**

Subject to the terms and conditions in this Agreement (including without limitation the conditions precedent set forth in ARTICLE IV) from and after the Closing Date, Lenders agree to make Revolving Loans (each, a "<u>Revolving Loan</u>") to Borrowers from time to time until the Commitment Termination Date in an aggregate principal amount at any one time outstanding not to exceed the Borrowing Availability; provided that Lenders shall not be permitted or required to make any Revolving Loan if, after giving effect thereto, the aggregate outstanding principal amount of all Revolving Loans outstanding would exceed the Borrowing Availability.

16

Until the Commitment Termination Date, the Borrowers may from time to time borrow, prepay and re-borrow the Revolving Loans in whole or in part under this Section 2.1, all in accordance with the terms and conditions in this Agreement (subject in particular to any reductions in Revolving Loan Commitments pursuant to Sections 2.4). Each Revolving Loan shall be denominated in dollars.

**2.2    Revolving Notes.**

Each Revolving Loan made by Lenders shall be evidenced by a promissory note issued by the Borrowers made payable to the order of Lenders substantially in the form of Exhibit B (a "Revolving Note"), with appropriate insertions as to date and principal amount and in a principal amount equal to the lesser of (a) the amount of the Revolving Loan Commitment and (b) the aggregate unpaid principal amount of all Revolving Loans made by Lenders. Each Revolving Note shall (i) be dated as of its date of issuance, (ii) be stated to mature on the Maturity Date or such earlier date the Revolving Loans shall be due and payable in full, whether by acceleration or otherwise, pursuant to the terms of this Agreement and (iii) provide for the payment of all principal and accrued interest.

**2.3    Procedure for Revolving Loans and Payments.**

(a)    Until the Commitment Termination Date, the Borrowers may borrow under the Revolving Loan Commitments on any Business Day; provided that (i) the Borrowers may not make more than one borrowing per calendar week. Each borrowing under the Revolving Loan Commitment shall be in an amount equal to and not less than the amount necessary to make an Approved Disbursement (as defined in Section 2.8 hereof). Prior to 2:00 p.m. Nevada time on the Borrowing Date requested by the Borrowers, Lenders will make the amount of the Revolving Loan available to the account of the Borrowers.

17

(b)     The Revolving Loans (including all interest and fees capitalized and added to the principal balance of the Revolving Loans) shall be paid in full on or prior to the Commitment Termination Date, pursuant to the terms herein.  Lenders' obligation to make Revolving Loans shall terminate at the close of business on the Business Day immediately preceding the Maturity Date, unless sooner terminated in accordance with the terms hereof.

**2.4     Permanent Reduction of Revolving Loan Commitment**.

The Borrowers shall have the right, upon not less than five Business Days' notice, to terminate the Revolving Loan Commitment or, from time to time, to reduce permanently the amount of the Maximum Cash Commitment Amount in whole or in part.  Such reduction of the Maximum Cash Commitment Amount shall be accompanied by payment in full of all outstanding principal and accrued interest thereon, to and including the date of such prepayment, together with any additional amounts owing and any outstanding fees and expenses due and owing such that after such payment, the total amount outstanding on all Revolving Loans shall not exceed the Maximum Cash Commitment Amount as reduced hereby.

**2.5     Interest Rates, Origination Fee and Payment Dates.**

(a)     Each Revolving Loan (and all amounts capitalized and added to the principal balance of the Revolving Loans) shall bear interest at a rate *per annum* of eighteen per cent (18.0%).

(b)     A non refundable origination fee ("Origination Fee") equal to three percent (3%) of the Maximum Cash Commitment Amount shall accrue upon the entry of the Interim DIP Order.

(c)     Notwithstanding the foregoing, in the event an Event of Default has occurred and is continuing, the Revolving Loan shall bear interest at a rate *per annum* equal to the rate set

18

forth above plus 5.0% ("Default Interest") from the date of occurrence of such Event of Default until the date such Event of Default is cured or waived (after as well as before judgment).  In addition, should any interest on any Revolving Loan or any other obligations payable hereunder not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest (to the extent permitted by law in the case of interest on interest) at a rate *per annum* equal to rate set forth above plus 5.0%, in each case, from the date of such non-payment until such amount is paid in full (after as well as before judgment).

(d)     Accrued interest on the Revolving Loans will be capitalized and added to the outstanding principal balance of the Revolving Loans as of each Interest Payment Date.

(e)     The Origination Fee shall be capitalized and added to the outstanding principal balance of the Revolving Loans.

Amounts representing interest and Origination Fee which are capitalized and added to the outstanding principal balance of Revolving Loan, shall thereafter bear interest in accordance with this Section and otherwise be treated as a Revolving Loan for all purposes of this Agreement (except for purposes of determining the Total Utilization of Revolving Loan Commitments). Interest accruing pursuant to Section 2.5(b) shall be payable in arrears on the Commitment Termination Date.

**2.6     Computation of Interest.**

(a)     Interest shall be calculated for the actual number of days elapsed on the basis of a hypothetical year of 365 days.

(b)     Each determination of an interest rate pursuant to any provision of this Agreement shall be conclusive and binding on the Borrowers and the Lenders in the absence of manifest error.  Any payment of interest on any Revolving Loan shall be subject to any applicable

withholding taxes and any amount withheld shall be treated as having been paid by the Borrowers to the Lenders.

**2.7    Prepayments.**

(a)    Optional Prepayments.  Borrowers may, at any time and from time to time prepay the Revolving Loans, in whole or in part, without premium or penalty, upon irrevocable written notice to the Lenders by 11:00 a.m. (Nevada time) on such date of prepayment, in each case specifying the date and amount of prepayment.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with any amounts payable, accrued interest to such date on the amount prepaid and any outstanding fees and expenses then due and owing.   Any prepayment shall be applied in the following order of priority (a) first, to the payment of all costs and expenses that are due and payable to the Lenders on such date under and in respect of the Loans; and (b) second, to the payment of the outstanding principal amount of all of the Revolving Notes that are due and payable to the Lenders on such date, together with all accrued and unpaid interest thereon.

**2.8    Use of Proceeds.**

The Borrowers shall utilize the proceeds of the Revolving Loans solely to pay the following expenses (collectively, the "Approved Disbursements" and individually, an "Approved Disbursement"): (a) for ordinary course of business expenses incurred in operating the Borrowers' business, (b) to pay allowed Administration Claims, including payment of compensation to employees, payment of Professional Fees, and payment of any contractual obligations, all consistent with the Final DIP Order, (c) for payment of US Trustee Fees or any other post petition payments required to be made by Borrowers which may not be made from Prepetition Lenders' cash collateral.

**2.9     Separate Loans Not To Exceed Commitment.**

All Loans to the Borrowers and all of the other Obligations of Borrowers arising under this Agreement and the other Loan Documents shall constitute separate loans to the Borrowers, evidenced by a separate promissory note executed by the Borrowers; provided, however, that the total outstanding balance of all loans by Borrowers, exclusive of accrued interest and Origination Fee which were capitalized and added to the principal, shall not exceed the Maximum Cash Commitment Amount as in effect from time to time under this Agreement.

**2.10     Each Borrower's Liability Limitation.**    Each Revolving Loan shall be made to the Borrower for payment of that Borrower's Approved Disbursements.  Notwithstanding anything to the contrary contained herein, the each of the Borrowers shall only be liable for payment of the Revolving Loans made to it.  Neither Borrower shall be liable or responsible for payment of Revolving Loans made to the other Borrower.

**2.11     Payment of Obligations.**

Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Lenders shall be entitled to payment of such Obligations as an Administrative Claim pursuant to Bankruptcy Code Section 364(b) without further application to or order of the Bankruptcy Court.

**2.12     [Intentionally Left Blank].**

LV1 1352456v2 04/19/11

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce Lenders to make the Loans, the Borrowers, make the following representations and warranties to Lenders with respect to Borrowers, as of the date of the entry of each of the Post Petition Financing Orders, each and all of which shall survive the execution and delivery of this Agreement.

**3.1     Corporate Existence; Compliance with Law.**

Borrowers (a) are duly organized, validly existing and in good standing under the laws of Nevada; (b) are duly qualified as a foreign corporation or limited liability company, as the case maybe, and are in good standing under the laws of each jurisdiction where their ownership or lease of property or the conduct of their business requires such qualification, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect; (c) subject to the entry of the Postpetition Financing Orders by the Bankruptcy Court, have the requisite corporate power and authority and the legal right to effect the transactions contemplated hereby and by the other Loan Documents to which they are a party; (d) have the requisite corporate power and authority and the legal right to including, without limitation, to conduct their business as now, heretofore and proposed to be conducted; and (e) are in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**3.2     Corporate Power, Authorization, Enforceable Obligations.**

Upon, and subject to, entry by the Bankruptcy Court of the Postpetition Financing Orders, (a) Borrowers have the corporate power and authority, and the legal right, to make, deliver and perform the Loan Documents to which they are a party and to authorize the

22

execution, delivery and performance of the Loan Documents to which they are a party, (b) Borrowers have the appropriate power and authority to borrow hereunder and have taken all necessary corporate action to authorize the borrowings on the terms and conditions set forth in this Agreement and in the Notes, (c)  the Agreement, and each other Loan Document to which they are a party will be, duly executed and delivered on behalf of Borrowers, and (d) this Agreement, and each other Loan Document to which Borrowers are a party when executed and delivered, will constitute, a legal, valid and binding obligation of the Borrowers, enforceable against each Borrowers in accordance with its terms, (whether enforcement is sought by proceedings in equity or at law).

**3.3     No Legal Bar.**

Except for the effect of the filing of the Chapter 11 Cases, and subject to the entry of the Postpetition Financing Orders, the execution, delivery and performance of the Loan Documents to which Borrowers are a party, the borrowings by the Borrowers hereunder and the use of the proceeds of the Loans (a) will not violate any Requirement of Law or material contractual obligation of Borrowers, (b) will not accelerate or result in the acceleration of any payment obligations of Borrowers, and (c) will not result in, or require, the creation or imposition of any Lien on any of the respective properties or revenues of any Borrowers pursuant to any such Requirement of Law or material contractual obligation.

**3.4     No Material Litigation.**

Other than for any litigation, investigation or proceeding before the Bankruptcy Court in the Chapter 11 Cases, no litigation, investigation or proceeding of or before any arbitrator or governmental authority (collectively, "Litigation") is pending or, to the knowledge of Borrowers, threatened by or against Borrowers (a) with respect to any of the Loan Documents or any of the

transactions contemplated hereby or thereby, or (b) which could reasonably be expected to have a Material Adverse Effect, except for litigation commenced prior to the Petition Dates by various Prepetition Lenders against the Debtors, or their predecessors in interest).

**3.5    No Default.**

Other then as set forth on Schedule 3.5 attached hereto, Borrowers are not in default under, or with respect to, any of their material contractual obligations arising after the Petition Dates in any respect which could reasonably be expected to have a Material Adverse Effect. Immediately after giving effect to this Agreement, no post petition Default or Event of Default has occurred and is continuing.

**3.6    Taxes.**

Borrowers have filed or caused to be filed all tax returns which, to the knowledge of the Borrowers are required to be filed. Borrowers have paid all taxes shown to be due and payable on said returns or on any assessments made against them or any of their property and all other taxes, fees or other charges imposed on them or any of their property by any governmental authority (other than any tax, fee or other charge the amount or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with customary usage has been provided on the books of such Loan Party or which accrued or became payable prior to the Petition Dates); and, no tax Lien has been filed, and, to the knowledge of Borrowers, no claim is being asserted, with respect to any such tax, fee or other charge.

**3.7    Purpose of Loans.**

The Borrowers shall not use the proceeds of any Revolving Loan hereunder other than in accordance with this Agreement.

24

**3.8    Accuracy and Completeness of Information.**

All information, reports and other papers and data with respect to the Borrowers (other than projections) furnished to the Lenders by or on behalf of Borrowers, were, at the time furnished, complete and correct in all material respects, or have been subsequently supplemented by other information, reports or other papers or data, to the extent necessary to give the Lenders a true and accurate knowledge of the subject matter in all material respects other then as set forth in this Agreement [or on Schedule 3.8 hereto], there is no fact known to Borrowers which has, or could reasonably be expected to have, a Material Adverse Effect.

**3.9    The Required Orders.**

On or prior to the date of the making of Revolving Loan Tranche 1 hereunder and Advances with respect thereto, the Interim DIP Order shall have been entered and shall not have been stayed, amended (without the Lenders' prior written consent, which consent shall be in their sole discretion), vacated, reversed, rescinded or otherwise modified in any respect.  On or prior to the date of the making Revolving Loan Tranche 2 hereunder and Advances with respect thereto, the Interim DIP Order, the Final DIP Order and the 506(a) Order, shall have been entered and shall not have been amended, stayed, vacated or rescinded without the Lenders' consent which shall not be unreasonably withheld, conditioned or delayed.

**3.10    [Intentionally Left Blank]**

**3.11    Reorganization Matters.**

(a)    The Chapter 11 Cases were commenced on their respective Petition Dates in accordance with applicable law and proper notice thereof and the proper notice for the hearing

for the approval of the Interim DIP Order has been given and proper notice for the hearing for the approval of the Final DIP Order will be given.

(b)    The Interim DIP Order (with respect to the period prior to entry of the Final DIP Order) or the Final DIP Order (with respect to the period on and after entry of the Final DIP Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended.

## ARTICLE IV

## CONDITIONS PRECEDENT

**4.1    Initial Loan Conditioned Upon Entry of the Interim DIP Order.**

The obligations of the Lenders to make the Revolving Loan Tranche 1 on the Closing Date, or to take, fulfill, or perform any other action hereunder is subject to the satisfaction of the following conditions precedent:

(a)    Loan Documents.    The Lenders shall have received this Agreement, the Revolving Note and all other Loan Documents, each other agreement, documents and instruments relating to the loan and other credit transactions contemplated by this Agreement, each duly executed where appropriate and in form and substance satisfactory to the Lenders.

(b)    No Material Adverse Effect.    No Material Adverse Effect shall have occurred with respect to Borrowers between February 14, 2011 and the date of making the initial Revolving Loan, other than those which customarily occur as a result of the pendency of the Chapter 11 Cases.

(c)    Interim DIP Order.    On or before March 15, 2011, the Interim DIP Order shall have been entered by the Bankruptcy Court.  Such Interim DIP Order (i) shall be in full force and

effect and (ii) shall not have been stayed, reversed, vacated or rescinded or, without the consent of the Lenders, modified or amended in any respect and, if the Interim DIP Order is the subject of a pending appeal in any respect, neither the making of such Loan nor the performance by the Borrowers of any of their Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(d)      Litigation.  No litigation shall have been commenced or be pending which has not been stayed by the commencement of the Chapter 11 Case and which, if successful, would have a Material Adverse Effect on Borrowers taken as a whole, their business or ability to repay the Revolving Loans or which would challenge this Agreement, Postpetition Financing Orders or the transactions contemplated thereby.

**4.2     Conditions to Additional Loans upon Entry of the 506(a) Order and Plan Confirmation Order.**

The obligations of the Lenders to make Revolving Loan Tranche 2 on or as of the date of Bankruptcy Court entry of the 506(a) Order, or to take, fulfill, or perform any other action hereunder is subject to the satisfaction of the following conditions precedent:

(a)      Conditions Set Forth In Section 4.1.  Each of the conditions precedent set forth in Section 4.1 shall be in full force and continuing effect.

(b)      Final DIP Order.  Not later than forty-five (45) days after the date of entry of the Interim DIP Order, the Final DIP Order shall have been entered by the Bankruptcy Court.  Such Final DIP Order (i) shall be in full force and effect and (ii) shall not have been stayed, reversed, vacated or rescinded or, without the consent of the Lenders which shall not be unreasonably withheld, conditional or delayed, modified or amended in any respect and, if the Final DIP Order

is the subject of a pending appeal in any respect, neither the making of such Loans nor the performance by the Borrowers of any of their Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(c)     No Material Adverse Effect.  As a condition precedent to Lenders' obligations to make Revolving Loan Tranche 2, no Material Adverse Effect shall have occurred with respect to Borrowers between the date of entry of the Interim DIP Order and the date of entry of the 506(a) Order, other than those which customarily occur as a result of the pendency of the Chapter 11 Cases

(d)     506(a) Order.  As a condition precedent to Lenders' obligations to make Revolving Loan Tranche 2, the 506(a) Order shall have been entered by the Bankruptcy Court. Such 506(a) Order (i) shall be in full force and effect and (ii) unless waived by Lenders, shall be a Final Order, or, without the consent of the Lenders which shall not be unreasonably withheld, conditional or delayed, modified or amended in any respect and, if the 506(a) Order is the subject of a pending appeal in any respect, neither the making of such Loans nor the performance by the Borrowers of any of their Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.


### ARTICLE V

### NEGATIVE COVENANTS

From the date hereof and for so long as the Revolving Loan Commitments remain in effect, any Revolving Note remains outstanding and unpaid or any Obligation is owing to the

28

Lenders hereunder, Borrowers hereby agree that they will not, (and will not seek, unless in connection with an amendment to the Agreement that is reasonably likely to be approved by the Lenders to the Bankruptcy Court authority to):

**5.1    Limitation on Indebtedness.**

Create, incur, assume or permit to exist any indebtedness, or enter into any agreement or binding commitment to create, incur, assume or suffer to exist any indebtedness, except the Revolving Loans and the other Obligations created under this Agreement;

**5.2    [Intentionally Left Blank]**

**5.3    [Intentionally Left Blank]**

**5.4    Plan of Reorganization.**

Propose, file, solicit votes for, support or prosecute a plan or disclosure statement for the Borrowers that is not acceptable to Lenders in form and substance;

**ARTICLE VI**

**AFFIRMATIVE COVENANTS**

From the date hereof and for so long as the Revolving Loan Commitments remain in effect, any Revolving Note remains outstanding and unpaid or any Obligation is owing to the Lenders hereunder, Borrowers shall perform or be subject to the following:

**6.1    Monthly Operating Reports.**

Each month Borrowers shall provide Lenders with a copy of the Monthly Operating Reports prepared by Borrowers and filed with the Bankruptcy Court in accordance with U.S. Trustee guidelines, contemporaneously with such reports filing with the Bankruptcy Court.

**6.2    Other US Trustee Reports.**

29

Borrowers shall provide Lenders with a copy of the any other reports or information mandated or requested by the U.S. Trustee in accordance with U.S. Trustee guidelines, contemporaneously with the Borrowers providing such reports to the U.S. Trustee.

**6.3     Deadlines re Lender Approved Reorganization Plan.**

(a)     No later than forty-five (45) days from the Effective Date, Borrowers shall present Lenders with their proposed draft of Lender Approved Reorganization Plan and related disclosure statement ("Daft Plan and Disclosure Statement") for Lenders' review and approval.

(b)     No later than twenty (20) days from the date the Lenders notify Borrowers' counsel that they have approved the Draft Plan and Disclosure Statement ("Lender Approval Date"), the Borrowers will finalize and file same with the Bankruptcy Court and seek a hearing to approve the disclosure statement and solicitation procedures.

(c)     No later than ninety (90) days from the Lender Approval Date, the Lender Approved Plan shall be confirmed by the Bankruptcy Court.

**6.4     Other Requirements.**

Borrowers will:

(a) deliver to the Lenders all financial statements and other reporting reasonably requested by the Lenders;

(b) promptly provide written notice to the Lenders of the receipt of any notice of

(i) the commencement of any material litigation against or involving any of the Borrowers (including any insolvency, administration, liquidation, or similar proceeding relating to any of the Borrowers) other than with respect to proceedings brought in the Chapter 11 Cases or in any adversary proceeding related to the Chapter 11 Cases,

30

(ii) termination of or default under any material contract, and (c) noncompliance with any rule, statute, law, permit or license that could reasonably be expected to have a material adverse impact on the business, property or financial condition of any of the Borrowers;

(iii) maintain adequate insurance; and

(iv) provide the Lenders, and their advisors, with reasonable access to all of the Borrowers' facilities and offices for the purposes of reviewing the business operations and assets of the Borrowers.

## ARTICLE VII

## TERMINATION AND PAYMENT

7.1     **Termination.**  The financing arrangements contemplated hereby shall be in effect until the Commitment Termination Date, and the Loans and all other Obligations shall be automatically due and payable in full on such date.

7.2     **Payment Upon Termination**

(a)     <u>Payment Pursuant to Lender Approved Reorganization Plan</u>.

Borrowers shall pay the entire obligation owing to the Lenders under this Agreement and all Obligations hereunder shall be deemed fully paid and satisfied on the Lender Approved Reorganization Plan's Effective Date by issuing to the New Parent Company, one-hundred percent (100%) of the equity interest in the Reorganized Debtors pursuant to the Lender Approved Reorganization Plan.  For purposes of disclosure only, Lenders advise that, among other things, it is a condition to Lenders support of the Lender Approved Reorganization Plan and their agreement to the satisfaction of the Obligations by the issuance of the equity interests in the New Parent Company as set forth herein, that Tom Hallett continue his employment with and management of the Reorganized Debtors and the Properties and, as part of the consideration for

31

his employment and property management on behalf, or for the benefit, of the New Parent Company, Tom Hallett will receive the following:  (i) an employment agreement providing Tom Hallett with an annual salary of $200,000 and thirty percent (30%) of the equity interests in the New Parent Company, and (ii) a property management agreement with Tom Hallett pursuant to which he will receive compensation in the form of ownership of 100% of the equity interest in, and title to, the Carve Out Properties, subject to the restructured secured loans encumbering same as provided under the Lender Approved Reorganization Plan.

(b)    <u>Payment Other than Pursuant to a Lender Approved Reorganization Plan</u>.  In  the event that no Lender Approved Reorganization Plan is confirmed by the Court or the Lender Approved Reorganization Plan's Effective Date does not occur, then all Obligations shall be paid to Lender as an allowed Administrative Claim in accordance with applicable provisions of the Bankruptcy Code and/or as ordered by the Court

**7.3    Approval of this Agreement Is Not Approval of Lender Approved Reorganization Plan**.  Court approval of this Agreement and the financing provided hereby shall not constitute approval of, or a finding or determination with respect to, a Lender Approved Reorganization Plan or any proposed terms thereof or conditions to Lenders' support thereof, including, without limitation, those set forth in section 7.2(a) above.  Confirmation of any Lender Approved Reorganization Plan may only be accomplished by Court determination and approval upon full compliance with all applicable provisions of the Bankruptcy Code for the confirmation of a plan, notwithstanding the Court's approval of this Agreement and financing provided hereby.

**7.4    Survival of Obligations Upon Termination of Financing Arrangements.**

Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this

Agreement shall in any way affect or impair the obligations, duties and liabilities of the Borrowers or the rights of Lenders relating to any unpaid portion of the Loans or any other Obligations, due or not due, liquidated, contingent or unliquidated or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Commitment Termination Date.  Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon the Borrowers, and all rights of Lenders, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Commitment Termination Date.

## ARTICLE VIII

## EVENTS OF DEFAULT; RIGHTS AND REMEDIES

**8.1    Events of Default.**

Notwithstanding the provisions of section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court or any notice to Borrowers, and subject to Section 8.2, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)    (i)  Borrowers shall fail to pay any principal of any Revolving Note when due in accordance with the terms thereof or hereof or

(ii) Borrowers shall fail to pay any interest on any Revolving Note, any other Obligation or any other amount payable hereunder, within three days after any such interest or other amount becomes due in accordance with the terms thereof or hereof; or

33

(b)    One or more judgments or decrees shall be entered after the Petition Dates against the Borrowers involving in the aggregate a liability (to the extent not covered by third party insurance as to which the insurer has acknowledged coverage) of $10,000 or more, net of insurance proceeds, and all such judgments or decrees shall not has been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

(c)    Proceeds of any Revolving Loan made hereunder are used to make a payment that is not in strict compliance with Section 2.8, unless agreed to by the Lenders or

(d)    The occurrence of any additional "Event of Default" identified in the Interim DIP Order or the Final DIP Order not identified herein; or

(e)    The occurrence of any of the following in the Chapter 11 Cases:

(i)   the dismissal of the Chapter 11 Cases, or the conversion of the Chapter 11 Cases from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or Borrowers shall file a motion or other pleading seeking the dismissal of the any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

(ii)  the appointment of a trustee in the Chapter 11 Cases or the appointment of an examiner with expanded powers (powers beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of any of the Borrowers under Bankruptcy Code section 1106(b);

(iii) the entry of an order of competent jurisdiction (1) reversing, staying, vacating or rescinding any Postpetition Financing Order or any of them otherwise ceases to be in full force and effect (except in the case of the replacement of the Interim DIP Order with the entry of the Final DIP Order) or (2) amending, supplementing or otherwise modifying

34

the Interim DIP Order or the Final DIP Order without the written consent of the Lenders or the filing of a motion for reconsideration (x) in respect of the total Revolving Loan Commitments, without Lenders' consent;

(iv)  Borrowers materially violate or breach the Postpetition Financing Orders or file any pleadings seeking, joining in, or otherwise consenting to any material violation or breach of the Postpetition Financing Orders;

(v)  this Agreement is not negotiated and finalized (along with all other Loan Documents) by the date that is fifteen (15) days after the date on which the Final DIP Order is entered;

(vi)  the bringing of a motion, taking of any action by Borrowers: (1) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (2) to file or seek confirmation of a Reorganization Plan or disclosure statement attendant thereto which is not a Lender Approved Reorganization Plan; or (3) any other action or actions adverse to Lenders' rights and remedies hereunder;

(vii) the Final DIP Order is not entered within forty-five (45) days following the entry of the Interim DIP Order;

(viii)  the entry of an order in the Chapter 11 Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement;

(ix)  the entry of an order in the Chapter 11 Cases confirming a plan or plans of reorganization that is not a Lender Approved Reorganization Plan;

35

(x)  the Bankruptcy Court shall enter an order or orders granting relief from or modifying the automatic stay applicable under Section 362 of the Bankruptcy Code to permit one or more creditors to execute upon, enforce or perfect a lien on any material asset of the Borrowers or that otherwise could reasonably be expected to have an adverse impact on the Borrowers' businesses;

(xi) commencement of any suit against the Lenders that would in any way reduce, set off, or subordinate the Obligations under this Agreement; or any such suit that is commenced by any party other than the Borrowers, and in the reasonable judgment of the Lenders, such suit has a reasonable possibility of success, and if successful, would be reasonably likely to have a Material Adverse Effect;

(xii) the payment of, or application for authority to pay, any prepetition Claim other than pursuant to a Lender Approved Reorganization Plan, without the Lenders' prior written consent, or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under this Agreement.

**8.2    Remedies.**

Upon the occurrence and during the continuance of an Event of Default, and without further order of or application to the Bankruptcy Court, the Lenders shall, by 3 business days prior written notice to the Borrowers (with a copy to the United States Trustee for the District of Nevada), take one or more of the following actions, at the same or different times:

(i)        terminate forthwith the Revolving Loan Commitments;

(ii)       declare the Loans or any portion thereof then outstanding to be due and payable, whereupon the principal of such Loans together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Borrowers accrued hereunder and under any other

36

Loan Document, shall become due and payable as an Administrative Claim, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrowers, anything contained herein or in any other Loan Document to the contrary notwithstanding; and

(iii)    take any action to receive payment of its aforesaid Administrative Claim for the Obligations in accordance with applicable provisions of the Bankruptcy Code or as ordered by the Court.

## ARTICLE IX

## MISCELLANEOUS

**9.1    Amendments and Waivers.**

Neither this Agreement, nor any Revolving Note or any other Loan Document, nor any terms hereof or thereof may be amended, restated, supplemented or modified except in writing signed by each of the parties hereto

**9.2    No Waiver; Cumulative Remedies.**

No failure to exercise and no delay in exercising, on the part of Lenders, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

**9.3    Survival of Representations and Warranties.**

All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall

37

survive the execution and delivery of this Agreement and the Revolving Notes and the making of the Loans hereunder.

**9.4    Successors and Assigns; Participations and Assignments.**

(a)    This Agreement shall be binding upon and inure to the benefit of the Borrowers and the Lenders and their respective successors and assigns, including any trustee appointed in this case.

(b)    Lenders may not sell any participation interest in or otherwise assign their rights under this Agreement or any Obligations of Borrowers hereunder without prior written consent of Borrowers.

(c) The Borrowers authorize Lenders to disclose to any permitted Assignee (each, a "Transferee") any and all financial information in Lenders' possession concerning the Borrowers which has been delivered to Lenders.

**9.5    Counterparts.**

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by telecopy), and all said counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrowers and the Lenders.

**9.6    Severability.**

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**9.7      Governing Law.**

THIS AGREEMENT AND THE REVOLVING NOTES AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND THE REVOLVING NOTES SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEVADA WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEVADA.

Submission To Jurisdiction; Waivers. Borrowers and Lenders hereby irrevocably and unconditionally: (a) submit for themselves and their property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the jurisdiction of the Bankruptcy Court; (b) consent that any such action or proceeding may be brought in the Bankruptcy Court and waive any objection that they may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agree not to plead or claim the same; (c) agree that nothing contained herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and (d) waive, to the maximum extent not prohibited by law, any right they may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

**9.8      No Waiver.**

No failure on the part of Lenders to exercise, and no delay in exercising, any right, power or remedy hereunder or any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or

39

further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

**9.9    Waiver of Claims.**

Upon the effectiveness of this Agreement, the Borrowers shall be deemed to have (a) released and forever discharged Lenders and their respective Subsidiaries, agents, employees, officers, directors, managers, attorneys, Affiliates, successors and assigns (collectively, the "Released Parties") of and from any and all liabilities, claims, obligations, indebtedness, liens, causes of action and rights of any kind, character or nature whatsoever, whether known or unknown, whether fixed or contingent, and whether liquidated or unliquidated, that the Borrowers may have or claim to have against any such Released Party and which arises out of or is connected in any way with any action of commission or omission of the Borrowers existing or occurring on or prior to the date of this Agreement, including without limitation any claims, liabilities or obligations relating to or arising out of or in connection with any of the transactions contemplated by any of the Loan Documents, from the beginning of time until the execution and delivery of this Agreement (collectively, the "Released Claims") and (b) agreed forever to refrain from commencing, instituting or prosecuting any law suit, action or other proceeding against any of the Released Parties with respect to any of such Released Claims.

IN WITNESS WHEREOF, the parties hereto has caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

WHITTON CORPORATION
SOUTH TECH SIMMONS 3040C LLC

By: _____
Name:  Tom E. Hallett
Title:

RUBY CAPITAL INVESTMENTS, LLC

By: _____
Name:
Title:

SILVER PHOENIX, LLC

By: _____
Name:
Title:

41

# EXHIBIT A

## THE PROPERTIES

| DEFINED TERM FOR PROPERTY | PROPERTY DESCRIPTION | PREPETITION LENDER |
|---|---|---|
| BLV Cheyenne 2475 Property | 27,363 square feet of flexible use and light industrial space located at  West Cheyenne Avenue in North Las Vegas, Nevada 89032 | Bank of Las Vegas |
| BLV Mountain Vista Property | 27,436 square feet of light industrial space located at 6100 Mountain Vista in Henderson, Nevada | Bank of Las Vegas |
| BLV Dean Martin 7635 Property | 14,251 square feet of office space located at 7635 Dean Martin in Las Vegas, Nevada | Bank of Las Vegas |
| BLV Mesquite Property | 15.45 Acres located at:  1300 W. Pioneer Blvd, Mesquite, NV 89027,  APN: 002-13-701-012 | Bank of Las Vegas |
| BofA Property | 26,941 square feet of office and flexible use space located at Sunset Road and Annie Oakley Drive in Las Vegas, Nevada (3950 E. Sunset Road, Las Vegas, Nevada) | Bank of America |
| German American Brooks Property | 28,710 square feet of light industrial space located at N. Simmons Street and W. Cheyenne Avenue in Las Vegas, Nevada | German American Capital Corporation |
| German American Glendale Property | 57,679 square feet of flexible use, light industrial, and warehouse space located at E. Glendale Avenue and S. Stanford Way in Sparks, Nevada | German American Capital Corporation |
| German American Greg Property | 69,236 square feet of flexible use, light industrial, and warehouse space located at 1220 and 1250 Greg Street in Sparks, Nevada | German American Capital Corporation |
| GSMS Property | 1215 and 1275 Kleppe Lane and 1455 Deming Way, Sparks, Nevada, consisting of approximately 80,518 square feet of office, light industrial and warehouse space | GSMS 2004, GG2 Sparks Industrial, LLC |
| Hudson Cheyenne Property | 2455 Cheyenne Avenue, Las Vegas, Nevada 89032, APN 139-17-510-039 | Hudson Americas, LLC as attorney in fact for Wells Fargo Bank, NA |

| | | |
|---|---|---|
| Hudson Dean Martin Property | 7625 Dean Martin Drive, Las Vegas, Nevada 89139, APN 177-08-211-001 | Hudson Americas, LLC as attorney in fact for Wells Fargo Bank, NA |
| Hudson Russell Property | 5720 and 5770 South Valley View Boulevard, Las Vegas, Nevada 89119, APN 162-32-101-001 | Hudson Americas, LLC as attorney in fact for Wells Fargo Bank, NA |
| Hudson Seven Hills Property | 835 and 855 Seven Hills Road, Henderson, Nevada 89053, APN 177-35-512-002 and 4 | Hudson Americas, LLC as attorney in fact for Wells Fargo Bank, NA |
| Hudson Stephanie Property | 1000 and 1030 Stephanie Place, Henderson, Nevada 89104, APN 161-34-201-001 | Hudson Americas, LLC as attorney in fact for Wells Fargo Bank, NA |
| JPMCC Property | approximately 51,690 square feet of light industrial and warehouse space located at 3040 Simmons Street, North Las Vegas, Nevada 89032 | JPMCC 2006-CIB 14 Simmons Street, LLC |
| Umbra Property | certain real property known as Clark County, Nevada Assessor Parcel Numbers 139-17-510-042 and 137-17-510-043 | Umbra Partners, LLC |

43

**EXHIBIT B**

[FORM OF]

REVOLVING CREDIT NOTE

$\underline{\hspace{2cm}}$                                                                    $\underline{\hspace{1.5cm}}$ __, 2011

      FOR VALUE RECEIVED, the undersigned, **WHITTON CORPORATION**, a Nevada business corporation and **SOUTH TECH SIMMONS 3040C, LLC**, a Nevada limited liability company, (collectively, the "Borrowers"), jointly and severally, promise to pay to the order of **Ruby Capital Investments, LLC**, a Nevada limited liability company and **Silver Phoenix, LLC**, a Nevada limited liability company (collectively, the "Lenders"), on the Maturity Date, if not sooner paid, the principal sum of [$\underline{\hspace{5cm}}$]pursuant to that certain Debtor-in-Possession Revolving Credit Agreement between the Borrowers and the Lenders dated as of $\underline{\hspace{2cm}}$, 2011, as such agreement may be amended, modified or supplemented from time to time (the "**Loan Agreement**").  The Borrowers further promise to pay to the order of the Lenders interest on the unpaid principal amount of this Revolving Note from time to time outstanding at the rate or rates per annum determined pursuant to Section 2.5 of, or as otherwise provided in, the Loan Agreement, and with such amounts being payable on the dates set forth in Section 2.5 of, or as otherwise provided in, the Loan Agreement.

      All payments and prepayments to be made in respect of principal, interest or other amounts due from the Borrowers under this Revolving Note shall be payable at 12:00 noon Las Vegas time, on the day when due.  The Borrowers expressly waive presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Revolving Note, and an action for any amounts due and unpaid shall therefore accrue immediately.

      This Revolving Note is the "Revolving Note" referred to in, and is entitled to the benefits of, the Loan Agreement.  This Revolving Note is entitled to the benefits of, certain other Loan Documents, as each of them may be amended, modified or supplemented from time to time.  Capitalized terms used in this Revolving Note that are defined in the Loan Agreement have the meanings assigned to them in the Loan Agreement unless otherwise expressly defined in this Revolving Note.

      This Revolving Note is governed by, and will be construed and enforced in accordance with, the laws of the State of Nevada.  The Borrowers consent to the exclusive jurisdiction and venue of the United States Bankruptcy Court for the District of Nevada located in [Clark County], Nevada with respect to any suit arising out of, relating to, or mentioning this Revolving Note.

      IN WITNESS WHEREOF, and intending to be legally bound, the Borrowers have executed, issued and delivered this Revolving Note as of March __, 2011.

LV1 1352456v2 04/19/11

ATTEST:                                    **WHITTON CORPORATION**

_____                   By_____
Secretary                                      Name:
                                               Title:


ATTEST:                                    **SOUTH TECH SIMMONS 3040C, LLC**

_____                   By_____
Secretary                                      Name:
                                               Title:

45

**SCHEDULE 3.5**

LV1 1352456v2 04/19/11

**SCHEDULE 3.8**

LV1 1352456v2 04/19/11